**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ANGELA SABATINO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 4:26-cv-00959-SRW** |
| | ) | |
| **W.C.&D. ENTERPRISES, INC. D/B/A WALTER KNOLL FLORIST** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

COMES NOW Defendant W.C. & D. Enterprises, Inc. d/b/a Walter Knoll Florist ("Walter Knoll"), by and through its undersigned counsel, and submits this Memorandum of Law in Support of its Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 and Local Rule 4.01(E) of the United States District Court for the Eastern District of Missouri. Walter Knoll relies on its concurrently filed Statement of Uncontroverted Material Facts ("SUMF").

## I. STATEMENT OF THE CASE AND SUMMARY OF THE ARGUMENT

Plaintiff Angela Sabatino ("Plaintiff") filed this action against Walter Knoll asserting claims under Title VII for sexual harassment and retaliation and alleging that she was constructively discharged. (SUMF ¶ 7).

This case turns on chronology and causation. Plaintiff worked for Walter Knoll beginning in November 2022 and alleges that David Knoll subjected her to several instances of sexual comments or conduct during her employment. (SUMF ¶¶ 3, 20-37). Plaintiff did not make a formal

complaint to management until January 30, 2024. By that time, Plaintiff had already worked approximately five hours on Sunday, January 28, and management had begun addressing the resulting communication and accountability concerns before Plaintiff raised her harassment complaint during the January 30 meeting. (SUMF ¶¶ 41–50).

The undisputed record defeats Plaintiff's theory that Walter Knoll failed to address her harassment complaint. When Plaintiff raised her concerns on January 30, Walter Knoll discussed removing David from her reporting relationship, placing Tammy Knoll in an oversight role, and having Plaintiff work through Tammy and Tadd Stone. (SUMF ¶¶ 49-63). Walter Knoll confirmed that arrangement in writing on February 2. (SUMF ¶¶ 82-84). Plaintiff thereafter had no substantive interaction with David and testified that David made no further comments or engaged in any conduct she considered offensive, inappropriate, or sexually harassing. (SUMF ¶¶ 63, 99-101, 107).

Plaintiff cannot establish a hostile work environment claim under Title VII. Her testimony identifies a limited number of discrete incidents, she testified that David also engaged in similar physical conduct toward a male employee, and she expressly testified that David's conduct was "not because of [her] sex" and that he "could do it to a guy or girl." (SUMF ¶¶ 20-32). The undisputed record also defeats employer liability because Walter Knoll responded to Plaintiff's complaint and the complained-of conduct stopped. (SUMF ¶¶ 49-63, 82-84, 99-107).

Plaintiff's retaliation claim fails for the same central reason: causation. Plaintiff relies on the timing between her January 30 complaint and the January 31 work-log requirement. But the undisputed record shows that the underlying concern arose from Plaintiff's January 28 Sunday work, Walter Knoll's preexisting scheduling and approval policies, and management's communication and accountability concerns discussed before and during the January 30 meeting.

(SUMF ¶¶ 38-48). Tammy and Tadd contemporaneously told Plaintiff that the log arose from the Sunday-work issue and was not a repercussion for her harassment complaint. (SUMF ¶¶ 64-75).

Even if Plaintiff could establish a prima facie case of retaliation, Walter Knoll had a legitimate, non-retaliatory reason for the log requirement, and Plaintiff cannot show that reason was pretextual. Plaintiff acknowledged that management used the log to know where she was and what work she was performing, no one told her the log was required because she complained of harassment, and she ultimately identified no retaliation other than the log itself. (SUMF ¶¶ 73-75, 103-105).

Plaintiff's constructive-discharge theory likewise fails. After January 30, the alleged harassment stopped, Walter Knoll communicated with Plaintiff about returning to work, Tammy told Plaintiff that she wanted to make sure Plaintiff felt safe, and Chuck Knoll asked when Plaintiff could "rejoin us." (SUMF ¶¶ 80-90, 96-107). Plaintiff nevertheless resigned on February 26, 2024, despite admitting that the log did not impede her ability to perform her job and that David's harassment had stopped. (SUMF ¶¶ 93-107).

For these reasons, and those set forth below, Walter Knoll is entitled to judgment as a matter of law on Plaintiff's claims.

## II. STATEMENT OF UNDISPUTED FACTS

### A. Plaintiff's Claims

Walter Knoll employed Plaintiff Angela Sabatino from November 22, 2022 until Plaintiff submitted her written resignation on February 26, 2024. (SUMF ¶¶ 1-4). Plaintiff filed a Charge of Discrimination on February 3, 2024 alleging sex discrimination, sexual harassment, and retaliation, and later amended the Charge following her resignation to allege constructive discharge. (SUMF ¶¶ 5-6, 85). Plaintiff thereafter filed this action asserting claims under Title VII

for sexual harassment and retaliation and alleging that she was constructively discharged. (SUMF ¶ 7).

### B. Plaintiff's Employment, Policies, and Supervisory Structure

Plaintiff began working for Walter Knoll as a Display Design Assistant under the direct supervision of Tadd Stone. Her duties included setting up storefronts, handling merchandise and inventory, creating window displays, closing stores, and assisting the floral department during holidays. (SUMF ¶¶ 8-9). On her first day of employment, Plaintiff received and electronically signed Walter Knoll's Worksite Employee Acknowledgment, Policy Against Unlawful Harassment, Discrimination, and Retaliation, and handbook acknowledgment. Plaintiff testified that she read and understood the harassment policy. (SUMF ¶¶ 10-11).

Walter Knoll's Employee Handbook prohibited sexual harassment, directed employees to report harassment to a supervisor, Human Resources, or another member of management, prohibited reprisal for reporting harassment, and stated that allegations would be investigated. (SUMF ¶¶ 12-14). Walter Knoll's separately issued harassment policy further instructed employees that, if Walter Knoll did not completely and timely address a harassment complaint, the employee should contact G&A Partners directly. Plaintiff electronically acknowledged that policy on November 22, 2022. (SUMF ¶ 15).

In June 2023, Chuck Knoll informed Plaintiff that Tadd was happy with her performance and that Walter Knoll was increasing her hourly pay. (SUMF ¶ 16). By summer 2023, David Knoll had become Tadd's supervisor, while Tadd remained Plaintiff's direct supervisor. Plaintiff, Tadd, and David thereafter worked in the same Christmas-showroom area during portions of Plaintiff's employment. (SUMF ¶¶ 17-19).

### C. Plaintiff's Allegations Concerning David Knoll

Plaintiff testified that David was the only person at Walter Knoll whom she contends sexually harassed her. (SUMF ¶ 20). She identified five categories of conduct: an alleged screw-gun contact, comments concerning a plush rose, comments about a "rack," a comment after Plaintiff offered David dates to eat, and a comment while Plaintiff was on her knees plugging in Christmas lights. (SUMF ¶ 21).

Plaintiff testified that the screw-gun incident occurred once, while employees were installing holiday decorations at Metropolitan Square in November 2023. According to Plaintiff, she was bent over working with garland when she felt the screw gun touch or brush her rear end for approximately two seconds. Plaintiff testified that David responded that she had "put that out there" or words to that effect. (SUMF ¶¶ 22-25). Plaintiff later discussed the incident with Tadd, who told her that he would support her if she wanted to report it to David or Chuck Knoll. (SUMF ¶ 26).

Plaintiff also testified that David made "nice rack" or "nice big rack" comments approximately five times, made one comment after she offered him dates to eat, and once made a "while you're down there" comment while she was on her knees plugging in Christmas lights. (SUMF ¶¶ 27-29). When asked to identify additional specific conduct beyond the categories she described, Plaintiff could not provide additional specific examples. (SUMF ¶ 30).

Plaintiff further testified that David had smacked male employee Michael Mercer on the rear end on multiple occasions. When asked whether David engaged in the conduct Plaintiff identified because of her sex, Plaintiff responded, "No, not because of my sex," and testified that David "could do it to a guy or girl." (SUMF ¶¶ 31-32).

### D. The January 25, 2024 Rose Incident and Plaintiff's Communication with Robin Knoll

On January 25, 2024, Plaintiff and Tadd were finishing a Valentine's Day display when David examined a plush rose used in the display. Plaintiff testified that David commented that the rose looked like a vagina, rubbed or tapped the flower, and said words to the effect of "you've got to get it right in that spot." Plaintiff testified that the incident occurred once. (SUMF ¶¶ 33-35).

Afterward, Plaintiff spoke with Robin Knoll. Plaintiff testified that she told Robin she was "sick of David being David," but could not recall whether she provided Robin specific details about what David had done. (SUMF ¶ 36). Plaintiff identified the January 25 incident as the last incident of alleged sexual harassment before her January 30 complaint and identified no harassment on January 26, January 28, or January 29. (SUMF ¶ 37).

### E. Plaintiff's January 28 Sunday Work and Management's Accountability Concerns

Plaintiff's regular schedule was generally Monday through Friday, although she sometimes worked weekends when work needed to be completed. Walter Knoll's Employee Handbook required supervisor approval for overtime and advance supervisor approval before nonexempt employees began work before their scheduled start time or continued working after their scheduled end time. (SUMF ¶¶ 38-39). Plaintiff testified that she sometimes took it upon herself to work weekends and, when Tadd was absent, sometimes worked without reporting to another manager. (SUMF ¶ 40).

On Sunday, January 28, Plaintiff clocked in at approximately 8:10 a.m. and worked approximately five hours completing Christmas-inventory work. Plaintiff testified that she made the decision to perform the work herself and could not testify that she informed Tadd in advance that she would work that Sunday. (SUMF ¶¶ 41-44). Plaintiff testified that January 28 was the first weekend-work instance that management questioned. (SUMF ¶ 45).

During the January 30 meeting, Plaintiff acknowledged that she had worked Sunday and stated that she had not understood she needed approval to make up hours. Tammy told Plaintiff that the concern was not that Plaintiff had performed work, but that management had not known she would be there and needed improved communication concerning the department's work. David and Tammy also discussed management's use of daily agendas, schedules, and calendars to improve communication and accountability. (SUMF ¶¶ 46-48).

### F. Plaintiff's January 30 Harassment Complaint and Walter Knoll's Response

On January 30, 2024, Plaintiff met with David and Tammy. Plaintiff told them that David had made sexual remarks that made her uncomfortable and described the screw-gun and rose incidents. David denied remembering the screw-gun incident and stated that the allegation should be escalated and investigated by others because he was the person accused. (SUMF ¶¶ 49-53).

Tammy told Plaintiff that sexual harassment would not be allowed, that Plaintiff was right to raise the issue, and that Tammy and Tadd could work with Plaintiff if David could not. David then left the meeting and Chuck Knoll joined so that Plaintiff could continue discussing her concerns without David present. (SUMF ¶¶ 54-56). Chuck asked whether Plaintiff wanted to involve law enforcement concerning the alleged physical contact. Plaintiff declined, and Chuck explained that he did not want to be a barrier if she wished to make a police report. (SUMF ¶ 57).

Plaintiff told Chuck and Tammy that she wanted the conduct to stop and did not want it to happen to other people. Chuck and Tammy discussed changing the reporting structure so Plaintiff would work through Tadd and Tammy rather than have David direct her day-to-day work. Chuck specifically stated that David did not need to direct Plaintiff's work and that Walter Knoll could change the reporting arrangement. (SUMF ¶¶ 58-60). Plaintiff expressly stated that she was not asking Walter Knoll to terminate David and would not want him terminated. (SUMF ¶ 61).

Plaintiff later testified that she was told that Tammy would supervise Tadd and that David would no longer remain in that reporting relationship. After the January 30 meeting, Plaintiff had no substantive communication with David and identified no further comment or conduct by David that she considered sexually harassing. (SUMF ¶¶ 62-63).

### G. The January 31 Work-Log Requirement

When Plaintiff reported to work on January 31, she found a notebook on her desk and was told by Tadd that she was expected to keep a log of her work activities. Plaintiff asked to meet with Tammy, and Plaintiff, Tammy, and Tadd met that day. (SUMF ¶¶ 64-65).

Plaintiff told Tammy she believed the log was punishment for the harassment complaint she had made the previous day. Tammy immediately denied that it was. Tadd identified Chuck as the person who requested the log. Tammy explained that Walter Knoll had required employees to track their activities at other times and that the purpose was to understand what work was being performed. (SUMF ¶¶ 66-68).

When Plaintiff questioned the timing, Tammy explained that the requirement arose from the Sunday-work issue, "not from the other issue." Tadd likewise explained that Chuck wanted greater accountability concerning what Plaintiff was doing and when she was doing it and acknowledged that the communication issue also fell on him because he had not known Plaintiff was working. Tammy and Tadd again told Plaintiff that the log was not a repercussion for her harassment complaint and was connected to the Sunday work. Plaintiff acknowledged that she should have asked someone before coming in that Sunday. (SUMF ¶¶ 69-72).

At deposition, Plaintiff testified that no one told her she was required to keep the log because she complained of sexual harassment. She also testified that the purpose of the log was to allow management to know where she was and what she was doing because of communication

problems within management. Plaintiff nevertheless believed the log was retaliatory because of its timing and because she had not previously been required to keep one. (SUMF ¶¶ 73-75).

Plaintiff did not complete a log on January 31. She returned to work on February 1 but again did not complete one because she decided she would not do so. (SUMF ¶¶ 76-78).

**H. Plaintiff's Medical Leave and Communications Regarding Her Return**

February 1, 2024 was Plaintiff's last day physically worked at Walter Knoll. Plaintiff testified that she had no interaction with David on January 31 or February 1 beyond seeing him in passing. (SUMF ¶¶ 79-80).

On February 2, Plaintiff emailed Tammy that she would not be at work and was attempting to obtain medical help because she was "not okay." That same day, Chuck sent Plaintiff a written recap of the January 30 meeting confirming that Walter Knoll would remove David from interactions with Plaintiff and Tadd as much as possible, place Tammy in an oversight role, and generally have Plaintiff work while Tammy or Tadd was present. Plaintiff testified that the written response was consistent with what had been discussed during the January 30 meeting and was not a surprise to her. (SUMF ¶¶ 81-83).

Plaintiff signed and filed her original Charge of Discrimination on February 3. On February 5, Plaintiff's counsel sent Chuck a courtesy copy of the Charge, thereby notifying Walter Knoll of the administrative filing. (SUMF ¶¶ 85-86).

On February 7, Plaintiff obtained a medical note excusing her from work through February 19. Tammy emailed Plaintiff that day to ask whether she would be at work the following day and stated that she wanted to make sure Plaintiff felt safe and should check in with Tammy or Tadd. Plaintiff responded that she was not feeling well and would not return that day. (SUMF ¶¶ 87-88).

On February 12, Plaintiff asked Chuck to use accrued PTO and asked about a copy of the harassment complaint she believed would be submitted to G&A Partners. Chuck responded that he did not understand Plaintiff's request for a copy of a harassment complaint and added that Tadd was ready for Plaintiff's help after Valentine's Day, asking when Plaintiff could "rejoin us." Plaintiff testified that she understood Chuck's email as asking when she could return to work. (SUMF ¶¶ 89-90).

Before her resignation, Plaintiff called G&A Partners and was told that G&A had nothing from Chuck concerning her complaint. Plaintiff thereafter did not submit her own complaint to G&A despite having received Walter Knoll's harassment policy and knowing that G&A could receive complaints. Plaintiff testified that she did not know why she did not make the complaint herself after learning that G&A did not have one. (SUMF ¶¶ 91-92).

**I. Plaintiff's February 26, 2024 Resignation**

On February 26, 2024, Plaintiff emailed Walter Knoll a resignation letter. In the letter, Plaintiff cited anxiety about returning to work, her belief that Walter Knoll had not adequately investigated her complaint, and her concern that the work-log requirement constituted retaliation. Walter Knoll acknowledged Plaintiff's resignation and processed her separation as a quit. (SUMF ¶¶ 93-95).

After January 30, Tadd communicated with Plaintiff regarding how she was doing and whether she was returning to work. Plaintiff testified that she found nothing offensive or inappropriate about those communications. (SUMF ¶ 96).

After resigning, Plaintiff amended her Charge to allege that she had been constructively discharged because she could not return to what she characterized as a hostile work environment.

(SUMF ¶ 97). Plaintiff testified that she did not know the definition of constructive discharge. (SUMF ¶ 98).

Plaintiff agreed that eliminating interaction between her and David was a response to her January 30 complaint. She further admitted that David made no comments and engaged in no conduct she considered offensive, inappropriate, or sexually harassing after January 30 and that she was not harassed by David at any time between January 30 and February 26. (SUMF ¶¶ 99-101).

When asked what occurred after January 30 that made her working conditions so intolerable that she felt compelled to quit, Plaintiff identified retaliation and her belief that Walter Knoll had not taken her complaint seriously. When asked to identify the retaliation, Plaintiff identified the work log. Plaintiff could identify no retaliation other than that requirement. (SUMF ¶¶ 102-104). Plaintiff never completed the log and admitted that it did not impede her ability to perform her job. (SUMF ¶ 105).

Plaintiff also testified that the purpose of having her complaint documented with G&A was to protect her from further harassment by David. Plaintiff ultimately agreed that David's harassment stopped after January 30, testifying, "Yes, it stopped." (SUMF ¶¶ 106-107).

**J. Plaintiff's Post-Employment Work**

Plaintiff began working for Sugar Fire Events, now Culinary Canvas, in approximately spring 2023 while she was still employed by Walter Knoll. During her Walter Knoll employment, she accepted event work on nights and weekends as her schedule allowed. (SUMF ¶¶ 108-109).

After leaving Walter Knoll, Plaintiff began accepting as many event assignments as she could and, as of her deposition, attempted to work full time during busy periods. Plaintiff testified that the work paid approximately $20 to $30 per hour depending on the assignment. Aside from

Culinary Canvas and a one-day flower-installation job, Plaintiff had not worked for another employer after leaving Walter Knoll. (SUMF ¶¶ 110-112).

## III. ARGUMENT

### A. Legal Standard

Summary judgment is appropriate when the pleadings, discovery materials, documents, affidavits, declarations, and other materials in the record demonstrate that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).

The moving party bears the initial burden of informing the Court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may satisfy this burden by showing that the non-moving party lacks evidence sufficient to establish an essential element of a claim on which the non-moving party bears the burden of proof at trial. *Id.* at 322-23.

Once the moving party satisfies its initial burden, the non-moving party must identify specific facts in the record showing that there is a genuine issue for trial. *Torgerson*, 643 F.3d at 1042. The non-moving party may not rest on allegations, denials, speculation, conjecture, or conclusory assertions. *Id.*; see also *Joseph v. Thomas-Grace Constr. Inc.*, 183 F.4th 960, 965 (8th Cir. 2026). A fact is material only if it might affect the outcome of the case under the governing law, and a dispute is genuine only if a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In reviewing a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Torgerson*, 643 F.3d at 1042. The Court, however, is not required to accept unreasonable inferences

or sheer speculation as fact. *Klum v. City of Davenport*, 145 F.4th 907, 911 (8th Cir. 2025). The Eighth Circuit has further made clear that there is no "discrimination case exception" to Rule 56. *Torgerson*, 643 F.3d at 1043.

Accordingly, where the record demonstrates that Plaintiff cannot establish an essential element of her claim, or where the record taken as a whole could not lead a rational trier of fact to find for Plaintiff, summary judgment must be entered. *Celotex*, 477 U.S. at 322-23; *Torgerson*, 643 F.3d at 1042.

### B. Plaintiff Cannot Establish Sex Discrimination Based on a Hostile Work Environment Under Title VII

To establish a hostile work environment claim under Title VII, Plaintiff must prove that she belongs to a protected group, was subjected to unwelcome harassment, the harassment occurred because of her sex, and the harassment was sufficiently severe or pervasive to affect a term, condition, or privilege of her employment. *LeGrand v. Area Res. for Cmty. & Hum. Servs.*, 394 F.3d 1098, 1101–02 (8th Cir. 2005); *Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 933 (8th Cir. 2002). Where liability is premised on an employer's response to harassment after receiving notice, the plaintiff must establish that the employer knew or should have known of the harassment and failed to take prompt and effective remedial action. *Tatum v. Ark. Dep't of Health*, 411 F.3d 955, 959 (8th Cir. 2005). Once an employer becomes aware of harassment, its obligation is to take remedial action reasonably calculated to end it. *Id.*

The fourth element contains both an objective and subjective component. The conduct must be sufficiently severe or pervasive that a reasonable person would find the environment hostile or abusive, and the plaintiff must actually perceive it as such. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–23 (1993). Courts consider the totality of the circumstances, including the frequency and severity of the conduct, whether it was physically threatening or humiliating rather than merely

offensive, and whether it unreasonably interfered with the employee's work performance. *Id.* at 23. The Eighth Circuit has repeatedly emphasized that this is a demanding standard and that even conduct well beyond the bounds of appropriate workplace behavior does not necessarily create an actionable hostile environment. *Paskert v. Kemna-ASA Auto Plaza, Inc.*, 950 F.3d 535, 538–39 (8th Cir. 2020); *Blomker v. Jewell*, 831 F.3d 1051, 1056–57 (8th Cir. 2016).

Plaintiff cannot satisfy these standards. Even assuming that the conduct she attributes to David Knoll was unwelcome, the undisputed record does not permit a reasonable jury to find either that the conduct occurred because Plaintiff is female or that it was sufficiently severe or pervasive to alter the conditions of her employment.

Title VII prohibits harassment because of sex; it does not prohibit all workplace conduct that is vulgar, crude, offensive, or sexual in character. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80–81 (1998). Conduct does not become sex discrimination merely because it carries sexual connotations. Rather, the critical inquiry is whether the plaintiff was subjected to the challenged conduct because of her sex. *Id.* Comparative evidence concerning the alleged harasser's treatment of men and women is therefore relevant to that inquiry.

Here, Plaintiff's own testimony forecloses a reasonable inference that David's conduct was directed at her because she is female. Plaintiff testified that David was the only person whom she contends sexually harassed her. (SUMF ¶ 20). Yet she also testified that David smacked male employee Michael Mercer on the rear on multiple occasions. (SUMF ¶ 31). More significantly, when specifically asked whether David engaged in the complained-of conduct because of her sex, Plaintiff answered: "No, not because of my sex." She further testified that David "could do it to a guy or girl." (SUMF ¶ 32). The Eighth Circuit has affirmed summary judgment where a plaintiff's own testimony established that the challenged workplace conduct was not directed at her because

she was a woman and where similar conduct was directed toward both sexes. *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 965–66 (8th Cir. 1999). And even crude, gender-specific vulgarity does not, standing alone, establish discrimination because of sex. *McCown v. St. John's Health Sys.*, 349 F.3d 540, 543–44 (8th Cir. 2003). Plaintiff's testimony here goes further than merely failing to supply evidence of sex-based motivation; she expressly disclaims it.

Plaintiff independently cannot establish that David's alleged conduct was sufficiently severe or pervasive. Plaintiff identified a finite series of incidents over several months: one occasion on which a screw gun allegedly brushed or touched her rear end for approximately two seconds accompanied by a remark; approximately five "nice rack" or "nice big rack" comments concerning merchandise racks; one comment involving food called "dates"; one "while you're down there" comment while Plaintiff was plugging in Christmas lights; and one incident involving sexualized comments about a plush rose. (SUMF ¶¶ 21–29, 33–35). When asked to identify additional specific conduct, Plaintiff could not do so. (SUMF ¶ 30). She identified January 25, 2024 as the last alleged incident before raising her complaint on January 30. (SUMF ¶ 37).

Eighth Circuit precedent places materially more serious conduct outside Title VII's hostile-environment threshold. In *LeGrand*, the alleged harasser asked the plaintiff to watch pornography and masturbate with him; later suggested the plaintiff could advance professionally if he engaged in sexual activity; kissed him on the mouth; grabbed his buttocks; reached for his genitals; and, on another occasion, gripped his thigh. 394 F.3d at 1100–03. The Eighth Circuit nevertheless affirmed summary judgment, holding that the three incidents over nine months, though "manifestly inappropriate," were not sufficiently severe or pervasive to create an actionable hostile environment. *Id.* at 1102–03.

The same conclusion followed in *Duncan*, where the alleged harasser propositioned the plaintiff for a relationship, repeatedly touched her hand, displayed sexualized objects, required her to draw a sexually suggestive planter to demonstrate qualification for another position, posted a "Man Hater's Club" poster, and asked her to type a misogynistic "He-Men Women Hater's Club" document. 300 F.3d at 931–35. The court held those circumstances insufficient as a matter of law to alter the conditions of employment. *Id.* at 934–35. More recently, *Paskert* affirmed summary judgment where the plaintiff alleged unwanted physical contact, statements that her supervisor could "have" her, and repeated remarks that he should not have hired a woman and wanted to make her cry. 950 F.3d at 538–39. The court expressly relied on *Duncan* and *LeGrand* in concluding that even reprehensible and improper conduct may fall short of Title VII's demanding standard.

Measured against those cases, Plaintiff's allegations do not create a jury question. The record contains one brief alleged physical contact and a limited number of discrete sexualized remarks spread over several months. It contains nothing approaching the physical conduct in *LeGrand*, the extended course of conduct in *Duncan*, or even the expressly sex-based remarks found insufficient in *Paskert*.

The undisputed record further demonstrates that, once Plaintiff raised her complaint with management on January 30, Walter Knoll acted to end the complained-of conduct. Management addressed Plaintiff's concerns during the meeting, David left while Plaintiff continued discussing them with Tammy and Chuck, and Walter Knoll changed Plaintiff's reporting arrangement so that she would work through Tadd Stone and Tammy Knoll rather than David. (SUMF ¶¶ 49–63). Walter Knoll subsequently confirmed that arrangement in writing. (SUMF ¶¶ 82–84). Plaintiff herself stated that she was not asking Walter Knoll to terminate David and did not want him terminated. (SUMF ¶ 61).

Most importantly, the corrective measures worked. Plaintiff testified that after January 30 she had no substantive interaction with David and that David made no further comments or engaged in any conduct she considered offensive, inappropriate, or sexually harassing. (SUMF ¶¶ 63, 99–101, 107). When ultimately asked whether the harassment stopped, Plaintiff answered, "Yes, it stopped." (SUMF ¶ 107). That undisputed fact is significant. In *Tatum*, the Eighth Circuit held that an employer's response satisfied Title VII even though the investigation did not begin for two weeks, took approximately eight weeks, and required the plaintiff to continue working in the same office as the alleged harasser. 411 F.3d at 959–60. The court declined to endorse every aspect of the employer's response but held that the absence of any further harassment demonstrated that the employer had taken prompt and effective corrective action. *Id.* Likewise, *Weger* held that an employer acted reasonably despite flaws in its investigation where the complained-of harassment ceased once reported and corrective measures were implemented. 500 F.3d 710, 723–24 (8th Cir. 2007).

Thus, even apart from Plaintiff's inability to establish that the alleged conduct occurred because of her sex or was sufficiently severe or pervasive, the record does not support a theory that Walter Knoll ignored known harassment or failed to respond once Plaintiff complained. To the extent Plaintiff proceeds under a notice-and-remedial-action theory, the undisputed evidence defeats it. And because Plaintiff cannot establish the underlying hostile-work-environment elements in any event, the Court need not resolve any unnecessary dispute concerning David's precise status within Walter Knoll's management structure. See *LeGrand*, 394 F.3d at 1101 (declining to decide the alleged harasser's supervisory status where the plaintiff independently failed to establish an actionable hostile environment).

Plaintiff therefore cannot establish that she was subjected to actionable harassment because of sex, cannot establish harassment sufficiently severe or pervasive to alter the terms or conditions of her employment, and cannot show that Walter Knoll failed to take corrective action once it learned of her complaint. Walter Knoll is entitled to summary judgment on Plaintiff's Title VII hostile-work-environment theory.

**C. Plaintiff Cannot Establish Retaliation Under Title VII**

In the absence of direct evidence of retaliation, a Title VII retaliation claim is analyzed under the *McDonnell Douglas* framework. *Joseph v. Thomas-Grace Constr. Inc.*, 183 F.4th 960, 967–68 (8th Cir. 2026). Plaintiff must first establish facts permitting a reasonable jury to find that she engaged in protected conduct, suffered a materially adverse action, and that the challenged action was causally linked to the protected conduct. *Id.* Title VII's antiretaliation provision does not reach every workplace inconvenience following protected activity. Rather, the challenged action must be materially adverse and one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). The action must produce some cognizable injury or harm; petty slights, minor annoyances, and ordinary workplace burdens are insufficient. *AuBuchon v. Geithner*, 743 F.3d 638, 642–44 (8th Cir. 2014). Ultimately, Title VII retaliation requires but-for causation: the challenged action must be one that would not have occurred absent the protected activity. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

Even assuming Plaintiff's January 30 complaint constituted protected activity, her retaliation claim fails at both the material-adversity and causation requirements. Plaintiff identified the work-log requirement as the retaliatory act at issue and, when asked to identify any other retaliation, testified, "Not that I can think of right now." (SUMF ¶¶ 103–104). The log required

Plaintiff to document her work activities, and management explained that its purpose was to understand what work was being performed and improve accountability. (SUMF ¶¶ 64, 68–74). Plaintiff never completed it, either on January 31 or when she returned on February 1. (SUMF ¶¶ 77–78). Most significantly, Plaintiff admitted that the requirement did not impede her ability to perform her job. (SUMF ¶ 105).

That is not material adversity under *Burlington Northern*. The inquiry is objective, and nothing in this record would permit a reasonable jury to conclude that the work-log requirement would dissuade a reasonable employee from reporting discrimination, particularly where Plaintiff never completed the log and admitted that it did not impede her ability to perform her job. See 548 U.S. at 68. In *AuBuchon*, the Eighth Circuit held that accelerated deadlines, additional work assignments, and similar workplace burdens were insufficient where they amounted to minor annoyances rather than material injury or harm. 743 F.3d at 642–44. Plaintiff's log requirement is less consequential still. Title VII does not convert ordinary managerial oversight into actionable retaliation merely because it follows protected activity.

Plaintiff independently cannot establish causation. To be sure, the log was imposed the day after Plaintiff raised her harassment complaint. But temporal proximity does not exist in a vacuum, and the undisputed chronology begins before the protected activity. On January 28, Plaintiff independently reported to work on a Sunday and worked approximately five hours. (SUMF ¶¶ 41–44). Plaintiff could not testify that she had informed Tadd in advance that she would be working, and she later acknowledged that she should have asked someone before coming in. (SUMF ¶¶ 44, 72). During the January 30 meeting, management addressed the resulting communication problem, specifically, that management had not known Plaintiff would be working, and discussed the need

for greater visibility into what work was being performed and when. (SUMF ¶¶ 46–48). The work-log requirement followed the next day. (SUMF ¶ 64).

That chronology defeats an inference that Plaintiff's harassment complaint caused the log. In *Hervey v. County of Koochiching*, the Eighth Circuit rejected a retaliation theory where the challenged employment consequence followed protected activity but arose from a workplace problem that already existed before the protected conduct. 527 F.3d 711, 723–24 (8th Cir. 2008). Evidence that the employer was already addressing the underlying problem undercuts the significance of close temporal proximity. *Id.* The Eighth Circuit recently reiterated that, as a general matter, "something more than temporal proximity is required" to establish retaliatory causation. *Meinen v. Bi-State Dev. Agency*, 101 F.4th 947, 950–51 (8th Cir. 2024). Plaintiff has no such additional evidence here.

Indeed, Plaintiff admitted that no one told her the log was required because she complained of harassment. (SUMF ¶ 73). She further testified that the stated purpose of the log was to permit management to know where she was and what she was doing because of communication problems within management. (SUMF ¶ 74). Her contrary belief rested on two facts alone: the log was new to her and it was imposed immediately after her complaint. (SUMF ¶ 75). Timing, however, cannot erase what preceded it. The management concern arose on January 28, was addressed on January 30, and concerned accountability and communication wholly independent of Plaintiff's harassment complaint.

On this record, Plaintiff cannot show either a materially adverse action or a causal connection between her protected activity and the work-log requirement. Much less could a reasonable jury conclude that, but for her harassment complaint, the challenged action would not

have occurred. *Nassar*, 570 U.S. at 360. Walter Knoll is therefore entitled to summary judgment on Plaintiff's Title VII retaliation claim.

### D. Even If Plaintiff Could Establish A Prima Facie Case of Retaliation, Walter Knoll Had a Legitimate, Non-Retaliatory Reason for the Work-Log Requirement

Even if Plaintiff could establish a prima facie case of retaliation, her claim proceeds no further unless Walter Knoll fails to articulate a legitimate, non-retaliatory reason for the challenged action. *Joseph v. Thomas-Grace Constr. Inc.*, 183 F.4th 960, 967–68 (8th Cir. 2026). Walter Knoll's burden at this stage is one of production, not persuasion. It need not prove that its articulated reason actually motivated the challenged action; rather, it need only identify a lawful reason supported by evidence in the record. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254–55 (1981). The ultimate burden of proving unlawful retaliation remains with Plaintiff. *Id.*

Walter Knoll readily satisfies that burden. On January 28, Plaintiff reported to work on a Sunday and worked approximately five hours. (SUMF ¶¶ 41–44). Plaintiff could not testify that she had informed Tadd in advance that she would be working and later acknowledged that she should have asked someone before coming in. (SUMF ¶¶ 44, 72). Management addressed the resulting communication and accountability concerns during the January 30 meeting, including its need to know when Plaintiff was working and what work was being performed. (SUMF ¶¶ 46–48). The following day, Plaintiff was instructed to maintain a log identifying where she was working and what she was doing. (SUMF ¶¶ 64, 68–74). Walter Knoll therefore articulated a straightforward operational reason for the requirement: improving communication and allowing management to account for Plaintiff's work activity following the January 28 incident.

Courts recognize such workplace-management concerns as legitimate employment reasons. In *Crothers v. Sodexo, Inc.*, the court held that the employer satisfied its burden by

producing record support for reasons that included unapproved weekend work and unauthorized overtime. No. 4:25-CV-00647-AGF, 2026 WL 2727900, at *18 (E.D. Mo. Sept. 16, 2026). Likewise, in *Marti v. Grey Eagle Distributors, Inc.*, the court rejected a retaliation theory based on increased supervision and work-tracking procedures where management implemented those measures to monitor work being performed and address productivity concerns. 937 F. Supp. 845, 855–56 (E.D. Mo. 1996). The court recognized the employer's legitimate "desire and need to monitor its own work environment."

The work-log requirement served the same ordinary managerial purpose here. Whether Plaintiff believes the requirement was necessary, appropriate, or fair does not alter Walter Knoll's burden at this stage. Walter Knoll has articulated a legitimate, non-retaliatory reason for the log supported by the contemporaneous record. Accordingly, even assuming Plaintiff could establish a prima facie case, Walter Knoll has satisfied its burden under *McDonnell Douglas*, and the burden returns to Plaintiff to demonstrate pretext.

### E. Plaintiff Cannot Demonstrate That Walter Knoll's Reason Was Pretextual

Once Walter Knoll articulates a legitimate, non-retaliatory reason for the work-log requirement, the burden returns to Plaintiff to produce evidence that both creates a genuine issue as to whether that reason was pretextual and permits a reasonable inference that Walter Knoll acted in retaliation. *Joseph v. Thomas-Grace Constr. Inc.*, 183 F.4th 960, 967–68 (8th Cir. 2026). That showing requires "more substantial evidence" than the prima facie case because the evidence of pretext and retaliation is considered in light of the employer's stated justification. *Id.* at 968. Plaintiff cannot make that showing here.

The chronology affirmatively undermines any inference that Walter Knoll's stated reason was pretextual. Plaintiff worked approximately five hours on Sunday, January 28, 2024, and could

not testify that she notified Tadd in advance. (SUMF ¶¶ 41–44). During the January 30 meeting, management addressed the resulting communication problem and discussed the need for greater accountability concerning Plaintiff's schedule and work activity. (SUMF ¶¶ 46–48). Only then, on January 31, was Plaintiff instructed to maintain the work log. (SUMF ¶ 64). Thus, the very concern Walter Knoll identified as the reason for the log arose before Plaintiff engaged in the protected activity on January 30. That chronology is significant. The Eighth Circuit has held that evidence an employer was concerned about a problem before the protected activity "undercuts the significance of the temporal proximity" and supplies a non-retaliatory explanation for otherwise close timing. *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002). Likewise, an employee cannot create a triable retaliation claim merely by engaging in protected activity while an employment concern is already being addressed. *Hervey v. County of Koochiching*, 527 F.3d 711, 724–25 (8th Cir. 2008).

Nor is there evidence that Walter Knoll's explanation was invented after the fact. On January 31, Tammy expressly connected the log to Plaintiff's Sunday work and told Plaintiff it was "not from the other issue." (SUMF ¶ 69). Tadd likewise explained that Chuck wanted accountability regarding what Plaintiff was doing and when she was doing it, and that the January 28 incident reflected a communication problem because management did not know Plaintiff was working. (SUMF ¶ 70). Plaintiff acknowledged that no one told her the log was imposed because she complained and testified that management's stated purpose was to know where she was and what she was doing because of the communication problems. (SUMF ¶¶ 73–74). Her contrary belief rested on the fact that the requirement followed her complaint and that she had never previously been asked to maintain such a log. (SUMF ¶ 75). But timing and Plaintiff's disagreement with management's decision do not establish that the stated reason was false. See

*Hervey*, 527 F.3d at 725–26 (a plaintiff must do more than question the "wisdom and fairness" of management's actions and must instead create a genuine issue concerning the employer's actual perceptions and beliefs).

The record also lacks the ordinary indicators of pretext. A plaintiff may attempt to establish pretext by showing that the employer failed to follow its own policies, treated similarly situated employees differently, or materially shifted its explanation for the challenged decision. *Nelson v. Lake Elmo Bank*, 75 F.4th 932, 938 (8th Cir. 2023). Plaintiff cannot establish pretext merely by arguing that the log was unnecessary or an unwise management response; federal courts do not sit as "super-personnel department[s]" to review the wisdom or fairness of employers' business judgments. *Knight v. Cambria Co., LLC,* 183 F.4th 657, 667 (8th Cir. 2026).

At bottom, Plaintiff offers temporal proximity and her own belief that the new requirement was retaliatory. The undisputed chronology, however, shows that Walter Knoll's stated concern arose before her complaint and was repeated contemporaneously when the log was imposed. Plaintiff therefore cannot produce evidence from which a reasonable jury could conclude that Walter Knoll's accountability and communication rationale was pretext and that retaliation was the real reason for the work-log requirement. Summary judgment is warranted on Plaintiff's retaliation claim for this independent reason as well.

**F. Plaintiff Cannot Establish Constructive Discharge**

Plaintiff's constructive-discharge theory fails as a matter of law. To establish constructive discharge under Title VII, Plaintiff must show that she "was discriminated against by [her] employer to the point where a reasonable person in [her] position would have felt compelled to resign" and that she actually resigned. *Brokken v. Hennepin Cnty.*, 140 F.4th 445, 451 (8th Cir. 2025) (quoting *Green v. Brennan*, 578 U.S. 547, 555, 560 (2016)). The inquiry is objective and

considers the totality of the circumstances, including the frequency and severity of the challenged conduct, whether it was physically threatening or humiliating, and whether it unreasonably interfered with the employee's work performance. *Id.* And where a constructive-discharge theory rests on an allegedly hostile work environment, the plaintiff must establish "something more" than the showing necessary for the underlying hostile-environment claim. *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004). Plaintiff plainly resigned; the dispositive question is whether the conditions she faced were so intolerable that a reasonable person would have felt compelled to do so.

Plaintiff cannot make that showing. As explained above, the conduct on which she bases her hostile-work-environment claim does not itself rise to the level required by Title VII. Her constructive-discharge theory, which demands an even greater showing, necessarily fails to the extent it rests on those same allegations. See *Suders*, 542 U.S. at 147. The undisputed post-complaint record independently confirms that conclusion. After the January 30 meeting, Walter Knoll implemented the response discussed with Plaintiff: David would be removed from interactions with Plaintiff and Tadd as much as possible, Tammy would assume an oversight role, and Plaintiff generally would work while Tammy or Tadd was present. (SUMF ¶¶ 82–83). Plaintiff agreed that eliminating interaction with David was a response to her complaint. (SUMF ¶ 99). She further admitted that David made no comments and engaged in no conduct she considered offensive, inappropriate, or sexually harassing after January 30 and that she was not harassed by David at any time between January 30 and her February 26 resignation. (SUMF ¶¶ 100–101, 107). When ultimately asked whether the harassment stopped, Plaintiff answered, "Yes, it stopped." (SUMF ¶ 107).

Nor does the record identify any other post-complaint condition sufficiently intolerable to compel a reasonable employee to resign. Plaintiff testified that Tadd's communications with her after January 30 were not offensive or inappropriate. (SUMF ¶ 96). When asked what made her working conditions intolerable, Plaintiff identified retaliation and her belief that Walter Knoll had not taken her complaint seriously. (SUMF ¶ 102). When asked to identify the retaliation, she identified the work-log requirement. (SUMF ¶ 103). Plaintiff could identify no other retaliatory act. (SUMF ¶ 104). She never completed the log and admitted that the requirement did not impede her ability to perform her job. (SUMF ¶ 105). Thus, the only post-complaint employment measure Plaintiff identified as retaliation neither prevented her from performing her job nor resulted in any continuation of the alleged harassment.

The communications preceding Plaintiff's resignation further undermine any contention that remaining employed had become objectively untenable. On February 7, Tammy contacted Plaintiff regarding her return to work, stated that Walter Knoll wanted to ensure that Plaintiff felt safe, and directed her to check in with Tammy or Tadd. (SUMF ¶ 88). On February 12, Chuck told Plaintiff that Tadd was ready for her help after Valentine's Day and expressly asked when she could "rejoin us." Plaintiff understood that communication as asking when she could return to work. (SUMF ¶ 90). The Eighth Circuit has recognized that an employer's efforts to retain an employee and provide alternatives to resignation weigh against a finding of constructive discharge. See *Bell v. Baptist Health*, 60 F.4th 1198, 1203 (8th Cir. 2023); *Ames v. Nationwide Mut. Ins. Co.*, 760 F.3d 763, 769 (8th Cir. 2014). Here, Walter Knoll was not closing off Plaintiff's ability to return; management was affirmatively attempting to facilitate it.

Finally, Plaintiff resigned without identifying any new discriminatory or intolerable condition that remained unaddressed. During the weeks preceding her resignation, the alleged

harassment had ceased, Walter Knoll had altered the reporting arrangement, and management was attempting to bring Plaintiff back to work. Even after Plaintiff contacted G&A Partners and learned that G&A did not have the complaint she believed Walter Knoll would submit, Plaintiff did not submit a complaint herself despite knowing that G&A could receive complaints. (SUMF ¶¶ 91–92). She instead resigned on February 26. (SUMF ¶ 93). Whatever anxiety Plaintiff subjectively experienced about returning to work, constructive discharge turns on whether a reasonable employee would have been objectively compelled to resign. *Brokken*, 140 F.4th at 451. On this record, where the alleged harassment stopped, Plaintiff's interaction with David was eliminated, the only asserted retaliation did not impede her work, and Walter Knoll was actively seeking her return, a reasonable jury could not find working conditions so intolerable that Plaintiff was compelled to resign. Summary judgment is therefore warranted on Plaintiff's constructive-discharge theory.

**G. Plaintiff Cannot Recover Punitive Damages**

Plaintiff's request for punitive damages fails as a matter of law. Under Title VII, punitive damages are available only where an employer engages in intentional discrimination "with malice or with reckless indifference to the federally protected rights" of the employee. 42 U.S.C. § 1981a(b)(1). That standard focuses on the employer's knowledge that it may be violating federal law, and requires proof that the employer acted "in the face of a perceived risk that its actions will violate federal law." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535–37 (1999). The Eighth Circuit therefore recognizes that a plaintiff seeking punitive damages bears a "formidable burden," and that even conduct sufficient to establish an underlying Title VII violation does not necessarily establish the heightened state of mind required for punitive liability. *Sturgill v. United Parcel Serv., Inc.*, 512 F.3d 1024, 1035–36 (8th Cir. 2008). Indeed, *Sturgill* reversed a punitive-damages award

despite an underlying Title VII violation because the record established, at most, a violation of Title VII's negligence standard rather than malice or reckless indifference. *Id.* at 1036.

For the reasons set forth above, Plaintiff cannot establish an underlying violation of Title VII in the first instance. Her punitive-damages request therefore necessarily fails with those claims. But even assuming Plaintiff could establish an underlying violation, the record contains no evidence from which a reasonable jury could conclude that Walter Knoll acted with the state of mind required by § 1981a(b)(1). To the contrary, Walter Knoll maintained written policies prohibiting unlawful harassment, discrimination, and retaliation; Plaintiff received and electronically acknowledged those policies when she began her employment and testified that she read and understood them. (SUMF ¶¶ 10–14). Those policies provided avenues for reporting harassment and expressly prohibited retaliation against employees who raised such concerns. (SUMF ¶¶ 12–14). Although the existence of a written policy alone does not resolve the punitive-damages inquiry, *Kolstad* recognizes that an employer's good-faith efforts to comply with Title VII preclude vicarious punitive liability for managerial conduct contrary to those efforts. 527 U.S. at 545–46.

Walter Knoll's conduct after Plaintiff complained confirms that its policy was not merely theoretical. Following the January 30 meeting, Walter Knoll implemented the response discussed with Plaintiff and confirmed it to her in writing: David would be removed from interactions with Plaintiff and Tadd as much as possible, Tammy would assume an oversight role, and Plaintiff generally would work while Tammy or Tadd was present. (SUMF ¶¶ 82–83). Plaintiff agreed that eliminating her interaction with David was a response to her complaint. (SUMF ¶ 99). More significantly, the response worked. Plaintiff admitted that David made no further offensive, inappropriate, or sexually harassing comments and engaged in no such conduct after January 30,

and ultimately testified, "Yes, it stopped." (SUMF ¶¶ 100–101, 107). The Eighth Circuit has held that when an employer promptly and conscientiously responds to complaints of harassment or discrimination with good-faith efforts, punitive damages are not warranted. *Dominic v. DeVilbiss Air Power Co.*, 493 F.3d 968, 974–76 (8th Cir. 2007). As *Dominic* explained, it is "illogical to ascribe malice or reckless indifference" to an employer that responds appropriately to allegations of discrimination. *Id.* at 975 (quoting *Carter v. Kan. City S. Ry. Co.*, 456 F.3d 841, 847 (8th Cir. 2006)).

Nor does Plaintiff's retaliation theory supply the missing evidence of malice or reckless indifference. As discussed above, Plaintiff identified the work-log requirement as the alleged retaliation and could identify no other retaliatory act. (SUMF ¶¶ 103–104). She never completed the log and admitted that it did not impede her ability to perform her job. (SUMF ¶ 105). And the contemporaneous record reflects that management repeatedly attributed the log to communication and accountability concerns arising from Plaintiff's January 28 Sunday work, not to her harassment complaint. (SUMF ¶¶ 66–72). Nothing in that record would permit a reasonable inference that Walter Knoll imposed the log while consciously disregarding a perceived risk that it was violating Title VII. See *Sturgill*, 512 F.3d at 1035–36.

This record therefore bears no resemblance to one in which an employer ignores complaints, permits known misconduct to continue, or consciously disregards its obligations under federal law. Walter Knoll maintained anti-harassment and anti-retaliation policies, responded to Plaintiff's complaint with concrete workplace changes, and the complained-of harassment ceased. Even if Plaintiff could establish an underlying Title VII violation, she cannot satisfy the separate and heightened standard necessary for punitive damages. Summary judgment should therefore be entered in Walter Knoll's favor on Plaintiff's request for punitive damages.

## IV. CONCLUSION

For all of the foregoing reasons, the undisputed material facts establish that Plaintiff cannot meet her burden under Title VII on any of her claims. Plaintiff has failed to produce evidence sufficient to establish the required elements of her claims, and the absence of proof as to any one element is fatal as a matter of law.

With respect to Plaintiff's sex-discrimination claim based on an alleged hostile work environment, Plaintiff cannot establish that the complained-of conduct occurred because of her sex or that it was sufficiently severe or pervasive to alter the terms and conditions of her employment. The undisputed record further establishes that Walter Knoll responded to Plaintiff's complaint by altering her reporting and working arrangement, minimizing her interaction with David, and implementing additional oversight, after which Plaintiff admits that the alleged harassment stopped.

With respect to Plaintiff's retaliation claim, Plaintiff cannot establish a materially adverse action or the requisite causal connection between her protected activity and the work-log requirement. Even assuming arguendo that Plaintiff could establish a prima facie case, Walter Knoll has articulated a legitimate, non-retaliatory reason for the work-log requirement, management's communication and accountability concerns arising from Plaintiff's January 28 Sunday work, and Plaintiff has failed to produce evidence from which a reasonable jury could conclude that this explanation was false and that retaliation was the real reason for the work-log requirement.

Plaintiff likewise cannot establish constructive discharge. The alleged harassment had ceased before her resignation, Walter Knoll had implemented measures intended to address her concerns, and management continued communicating with Plaintiff regarding her return to work.

On this record, Plaintiff cannot establish that her working conditions were so intolerable that a reasonable person in her position would have felt compelled to resign.

Finally, Plaintiff cannot recover punitive damages. The record contains no evidence that Walter Knoll acted with malice or reckless indifference to Plaintiff's federally protected rights. To the contrary, Walter Knoll maintained policies prohibiting harassment and retaliation, responded to Plaintiff's complaint with affirmative workplace measures, and the complained-of harassment ceased. Plaintiff therefore cannot satisfy the separate and heightened standard required for punitive damages under Title VII.

Accordingly, there is no genuine issue of material fact, and Defendant W.C. & D. Enterprises, Inc. d/b/a Walter Knoll Florist is entitled to summary judgment as a matter of law on all claims asserted in Plaintiff's Petition.

In the alternative, should the Court determine that summary judgment is not warranted on all claims, Defendant respectfully requests that the Court, pursuant to Rule 56(g), enter an order stating those material facts that are not genuinely in dispute and treating those facts as established in the case. The undisputed evidence set forth in Defendant's Statement of Uncontroverted Material Facts, including Plaintiff's allegations concerning David Knoll, Walter Knoll's response to Plaintiff's January 30 complaint, the January 28 Sunday work and resulting communication and accountability concerns, the January 31 work-log requirement, the cessation of the alleged harassment, and the communications concerning Plaintiff's return to work, are supported by the record and appropriate for an order under Rule 56(g). An order identifying such facts as established will narrow the issues for trial and promote the efficient administration of justice as contemplated by Rule 56(g).

Respectfully submitted,

McMAHON BERGER, P.C.

/s/ Robert D. Younger___________
Robert D. Younger, 42909MO
Nick P. Sikes, 76961MO
2730 North Ballas Road, Suite 200
P.O. Box 31901
St. Louis, Missouri 63131-3039
(314) 567-7350 – Telephone
(314) 567-5968 – Facsimile
younger@mcmahonberger.com
sikes@mcmahonberger.com

*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 6th day of October, 2026, the foregoing was filed electronically with the Clerk of the Court through the Court's CM/ECF system, which will provide electronic notice to all counsel of record.

/s/ Robert D. Younger_____________