**Deposition of:**

Angela Sabatino

**Case:**

ANGELA SANATINO

vs

W.A.&D., ENTERPRISES, INC.

**Date:**

8-21-2026

360 LITIGATION SERVICES
FULL-CIRCLE LEGAL TECHNOLOGY FROM DEPO THROUGH VERDICT
1332 Strassner Drive | 360LitigationServices.com
St. Louis, Missouri 63144 | 314.394.2206

**ANGELA SANATINO**

**PLAINTIFF**

**VS.**

**W.A.&D., ENTERPRISES, INC. D/B/A WALTER KNOLL FLORIST**

**DEFENDANT**

**DEPOSITION OF**

**ANGELA SABATINO**

**AUGUST 21, 2026**

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF MISSOURI**

**EASTERN DIVISION**

**ANGELA SANATINO,**

**PLAINTIFF,**

**vs. No. 4:26-CV-00959**

**W.A.&D., ENTERPRISES, INC. D/B/A WALTER KNOLL FLORIST,**

**DEFENDANT.**

**Deposition of Angela Sabatino, taken on behalf of the Defendant, at the offices of McMahon Berger, 2730 North Ballas Road, Suite 200, in the City of St. Louis, State of Missouri, on the 21st day of August, 2026, before Randy R. Dunn, RPR, CRR, CCR MO #193.**

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:

Mr. Matthew J. Ghio
The Ghio Law Firm, LLC
3115 S. Grand Boulevard, Suite 100
St. Louis, MO 63118
(314) 707-5853

FOR THE DEFENDANT:

Mr. Robert Younger
McMahon Berger
2730 North Ballas Road, Suite 200
St. Louis, MO 63131
(314) 567-7350

# INDEX

| | PAGE |
|---|---|
| **EXAMINATION** | |
| QUESTIONS BY MR. YOUNGER | 6 |
| QUESTIONS BY MR. GHIO | 173 |
| **EXHIBITS** | |
| Deposition Exhibit 1 (email) | 16 |
| Deposition Exhibit 2 (worksite employee acknowledgment) | 21 |
| Deposition Exhibit 3 (policy against unlawful harassment, discrimination, and retaliation) | 23 |
| Deposition Exhibit 4 (employee handbook acknowledgement) | 23 |
| Deposition Exhibit 5 (handbook) | 24 |
| Deposition Exhibit 6 (time entry) | 36 |
| Deposition Exhibit 7 (charge of discrimination) | 39 |
| Deposition Exhibit 8 (time entry) | 63 |
| Deposition Exhibit 9 (charge of discrimination) | 124 |
| Deposition Exhibit 10 (email) | 125 |
| Deposition Exhibit 11 (email) | 126 |
| Deposition Exhibit 12 (letter) | 130 |
| Deposition Exhibit 13 (email) | 131 |
| Deposition Exhibit 14 (email) | 133 |

**EXHIBITS CONTINUED**

| | PAGE |
|---|---|
| Deposition Exhibit 15 (email) | 135 |
| Deposition Exhibit 16 (charge of discrimination) | 137 |

ANGELA SABATINO,

of lawful age, having been first duly sworn to testify the truth, the whole truth, and nothing but the truth in the case aforesaid, deposes and says in reply to oral interrogatories, propounded as follows, to-wit:

EXAMINATION

BY MR. YOUNGER:

Q Good morning, ma'am?

A Good morning.

Q Could you please state your name for the record?

A Yes. Angela Sabatino.

Q Miss Sabatino, have you ever had your deposition taken before?

A Um, I was in a car accident a couple years ago and I did a deposition then.

Q Okay. So you're familiar with kind of how this is going to go today?

A Yeah.

Q Okay. Just to make sure we're on the same page, I just kind of want to go over a couple of ground rules so that we know where we're going, okay?

A Okay.

Q As I ask you questions and you answer them, this old dude over here, he's going to take everything down?
A Okay.
Q And when we're finished he's going to transcribe that into a booklet type form and it reads question/answer, question/answer.
And anything that you say will be taken down in this record, okay. Is that fair?
A Yes.
Q Therefore I would ask that you avoid answering by nodding your head, shrugging your shoulders, things like that, but answer audibly, yes, no, I don't know, maybe, whatever it may be, okay?
A Yes, sir.
Q You're kind of quiet. I'm going to ask you to keep your voice up so he can hear you accurately, okay?
A (Nods head.)
Q Is that fair?
A Yes.
Q Okay. Also, if you don't understand my question, if you don't hear me, if I'm using a word you don't know what it means, if it just doesn't

make sense, would you please tell me that before you answer?

A Yes, sir.

Q If you answer I'm going to assume that you heard and understood the question; is that fair?

A Yes, sir.

Q If at any point in time today I ask you a question and you don't know the answer, for instance, who was present when that happened. And you say I can't remember his name, okay. If you remember later on today, please tell me. I remember that guy's name is such and such?

A Yes, sir.

Q This is my only opportunity to talk to you. So I want to make sure that you have every opportunity to tell me all of the facts and everything that happened and everything that you want me to know, okay?

A Okay.

Q If at any point in time you want to take a break, if you want to just stretch your legs, get a glass of water, use the restroom, smoke a cigarette, I don't care what it is for, just tell me and can we take a break.

A Okay.

Q Unless I've asked a question and you haven't answered it yet, we are going to take that break, okay?
A Okay.
Q And if you haven't answered the question, we will take a break as soon as you do, all right?
A Okay.
Q Where do you currently reside?
A St. Louis County.
Q What's the address?
A 4620 Theiss.
Q How do you spell that street?
A T-H-E-I-S-S.
Q What's the zip code?
A 63128.
Q And what's the municipality?
A Concord, Missouri.
Q Okay.
A St. Louis County.
Q How long have you lived there?
A Uh, since 2019.
Q And who do you live with?
A My son.
Q How old is your son?
A Sixteen.

Q Has anyone else ever lived there with you?
A No.
Q Are you currently working?
A Yes.
Q Where at?
A I work for Culinary Canvas.
Q What is Culinary Canvas?
A They're an events company.
Q What do you do?
A I work events for them. I manage events for them, I bartend events for them, I do set ups at corporate events, weddings, all around St. Louis.
Q Okay. So I heard you say you bartend?
A Uh-huh.
Q Set up?
A Uh-huh.
Q And manage events?
A Uh-huh.
Q Anything else that you do?
A No.
Q Okay. Are you paid hourly?
A Yes.
Q What is your rate of pay?
A It depends which job I'm doing. If I'm bartending I make $25 an hour.

Q If you're managing?
A I make $30s an hour.
Q Did you say set up was one thing you did?
A Yes.
Q What if you're setting up, what do you make?
A Between 20 and 25 depending on what the set up is.
Q Do you do anything else, I think I just asked you this, I'm a little unclear. Managing, set up and bartending?
A Yes.
Q Do you do anything else?
A No.
Q You act as a server or anything like that?
A No.
Q How about tear down?
A I mean it is all in one.
Q Set up includes tear down?
A Sometimes.
Q Okay.
A Depending on the events, what the client wants, what they pay for.
Q So you're making somewhere between 20 and $30s an hour depending on your activity?

A Yes, sir.
Q One more thing.
A Yes.
Q If we talk over each other, he can't sometimes make out what we're saying.
A Okay.
Q And then he gets all testy, you know. So please try to let me finish my question. I know sometimes you will know exactly where I'm going, it is kind of conversational. Let me finish my question and I will let you finish your answer before I start my next question, okay?
A Okay.
Q When did you start with Culinary Canvas?
A I was working at Walter Knoll actually when I started there. I believe, I'm not 100 percent sure, but I believe it was like spring of '23. Yes, I believe. Now I'm not 100 percent, but I believe that is about when. And they were not called Culinary Canvas. We just merged with Culinary Canvas.
Q What were they called?
A They were called Sugar Fire Events then.
Q Sugar Fire Events, is that in any manner related to the Sugar Fire barbecue chain here in St.

Louis?
A Yes, to a couple of them.
Q Okay. So you were working there and for Walter Knoll for approximately a year at the same time?
A I believe so.
Q Okay. Did you work anywhere else other than Sugar Fire Events/Culinary Canvas after you quit working at Walter Knoll?
A Just thinking back. I have filled out many job applications after Walter Knoll.
I got a job as a flower installer for a company over in Columbia, Illinois. I can't even think what they are called. I don't remember what they are called, but it didn't work out.
Q What were you doing as a flower installer?
A Installing garden beds, native plants.
Q Like at home?
A I'm sorry?
Q You either let me finish or I have to let you finish.
A Okay.
Q At people's homes flower beds?
A It was supposed to be, but when I got to my first day of work it was not what I signed up

for, so I did not go back.
Q What did you sign up for?
A To be a flower installer.
Q And what was it?
A It was essentially me and a bunch of guys and they wanted me to like do yard work in people's yards essentially, not what I signed up for.
Q How long did you work there?
A One day. I talked to my boss at the end of the day and said it was not for me.
Q Do you recall what the rate of pay was?
A I believe 25, I believe.
Q I know you left Walter Knoll in February of 2024, have you worked anywhere else other than Sugar Fire/Culinary Canvas or as a flower installer in Columbia, Illinois?
A No, sir.
Q Between the spring of '23 and February of '24, how many hours would you work a week on average for I'll just call it Culinary Canvas, understanding it may have been a different name at that time?
A There were, so we didn't have a set schedule. I go into an app and pick up events when I would have time. It could be one, it could be one a month, it could be five a month, ten a month. It

really just depends on how busy I was at Walter Knoll, but I did try to do that on nights if I could. That allowed me to, or weekends it allowed me to when I wasn't busy going to soccer.

Q Did that change after you quit at Walter Knoll?

A Yes.

Q How did it change?

A Um, after that, wintertime is fairly slower for events. They pick back up in the spring. So I started just picking up as many events as I could.

Q Between, I'm sorry, after you quit Walter Knoll, so over the past roughly year and a half, approximately how many hours do you work a week for Culinary Canvas?

A Like I said, it just depends. I could work ten. Right now I'm working a lot because it is busy season, it is wedding season. I try to work full time.

Q And who do you report to at Culinary Canvas?

A We have, we just merged with them recently. A gentleman named Will Smith. I have not met him yet. We just merged this month.

Q I asked you about your rate of pay. You gave me somewhere between 20 and $30 an hour depending on the position?
A Yes, sir.
Q Has that changed over time?
A No, that doesn't change. It is a set pay.
Q And that was the same rate back in February of '24?
A Yes.
Q Okay.
(Deposition Exhibit Number 1 marked for identification.)
Q (MR. YOUNGER) I've just handed you what's marked as Exhibit 1. I represent to you this is, it appears to be an email. It is to you and to Tadd Stone, correct?
A Yes.
Q And it is dated November 19th, 2022?
A Yes.
Q Is this the email that you got from Chuck Knoll regarding your starting working at Walter Knoll?
A I will have to read over it. If you give me a minute. Yes, sir.
Q And it indicates you started on

November 22nd, 2022. Does that sound correct to you?
A Yes, sir.
Q It also indicates that your manager will be Tadd Stone, T-A-D-D, correct?
A Yes, sir.
Q Was Tadd Stone your direct supervisor once you started?
A Yes.
Q How did you hear about a job opportunity at Walter Knoll?
A I was looking for jobs that had to do with what I have interest in, which is gardening and flowers, et cetera, flower shops.
Q Where were you looking?
A Online.
Q Okay. So you came across an online advertisement for Walter Knoll?
A Yes, sir.
Q Were you interviewed when you applied?
A I had a phone conversation with Chuck. They essentially, what he told me was that he doesn't really do in person interviews. They have a super high turnover rate, go through a lot of employees, that's why he doesn't. So, no, I did not

have an in-person interview. I talked to him over the phone. He liked what I had to say and I went to work on that day.

Q And just to make sure it is clear, Chuck is Chuck Knoll?

A Yes, sir.

Q There's going to be a lot of Knolls here. I understand using first names, but I just want to make sure the record is clear as to what we're talking about.

A Okay.

Q What do you recall, what was discussed on that phone interview or discussion with Chuck?

A I do not. I would assume it was the same as any other over the phone interview. I mean he asked me what my experience was and when my availability was. If I would be willing to work any overtime. They do have blackout days there that you have to work.

Q Do you recall anything else?

A No.

Q In relation to the time that you started and in this email that's Exhibit 1, do you recall how long before this email that that phone interview took place?

A I do not. I would say roughly maybe a week.
Q Okay. I didn't mark it and I'm just curious, but I have an email that goes back to November of 2021?
A Okay.
Q Regarding potential employment?
A Okay.
Q Was there a long gap between the time you applied and the time you were hired?
A No.
Q Okay.
A That could have essentially been from me just searching, I guess.
Q Okay.
A Can I ask what was it again?
Q You can ask, but I'm not going to answer.
A Okay. I mean.
Q It is okay. That's fine. Was there anything about that phone call, that phone interview with Chuck that you found to be offensive or inappropriate?
A During our phone interview?
Q Yes.
A No. I take it it was a little strange,

but he wasn't going to do an in-person interview to get to know me before he hired me, but that's apparently what they do.

Q You didn't find that offensive or inappropriate, did you?

A I found it a little strange, but I was kind of excited.

Q Let's try an answer the question. I didn't ask you if it was strange. Did you find it offensive or inappropriate?

A No.

Q Do you recall, when you started at Walter Knoll, what were your job duties?

A My job duties, I was the display design assistant. I worked under Tadd Stone. He reported to Chuck Knoll. My job would essentially be setting up their stone fronts, going through their merchandise, doing inventory, doing their window displays in all of their stores that were open when I first started there. Shutting down stores that closed. We would have to during holidays help over in the flower department, in the floral department. That's about it.

Q Did that change over time, over the 15 months that you worked there?

A It became more work, more demand. They place a lot of work on us, but I would say it got busier, the work got busier, but it didn't really change except when we started working under Dave.
Q Okay. The work didn't change, but the amount of work changed?
A Yes.
Q And then you said except when you started working under Dave?
A Yes.
(Deposition Exhibit Number 2 marked for identification.)
Q (MR. YOUNGER) I just handed you what's marked as Exhibit Number 2. Do you recognize that document?
A I suppose so. I believe that this was part of the, when I got there on the first day, actually, all the stuff I filled out online.
Q I'm sorry, do you recognize it or not?
A Yes.
Q The last page appears to be something that was signed online. I'm guessing that's not your regular signature?
A No, because they didn't give us a stylus.
Q I have that same problem, but did you sign

that?
A Yes, sir.
Q And looks like it is on November 22nd of 2022?
A Yes.
Q And that was your first day of employment?
A Yes.
Q Was this part of an orientation?
A There was no orientation.
Q Okay. You did though receive this Worksite Employee Acknowledgment, which is Exhibit 2 and you signed it?
A Yes.
Q Did you read it?
A Quickly.
Q Did you understand it?
A I mean there could have been some stuff I didn't understand.
Q Did you ask any questions?
A No one was in the room with me. They're so busy there. They don't have time for their employees.
Q Okay. I appreciate the side comment. Did you ask any questions?
A I don't remember.

Q Okay.
(Deposition Exhibit Number 3 marked for identification.)
Q (MR. YOUNGER) Handing you what's marked as Exhibit 3. Do you recognize that document?
A Yes, sir.
Q Is that another document that was provided to you on your first day of employment at Walter Knoll?
A Yes, sir.
Q And is the last page, is that where you signed it on November 22nd of 2022?
A Yes, sir.
Q Did you read this Policy Against Unlawful Harassment, Discrimination, and Retaliation when it was provided to you on November 22nd?
A Yes, I read everything quickly.
Q Did you understand it?
A Yes.
Q Did you ask any questions about it?
A No.
(Deposition Exhibit Number 4 marked for identification.)
Q (MR. YOUNGER) I'm going to hand you what's marked as Exhibit 4. Do you recognize that

document?
A Yes.
Q What is it?
A Handbook acknowledgment.
Q Is that your signature on the last page?
A Yes, sir.
Q And was that also provided to you on November 22nd of 2022?
A Yes, sir.
Q Did you receive a copy of the employee handbook that is referencing?
A I don't remember if I got an actual physical copy. Everything was online that we signed. I don't believe they did give us a copy.
Q Did you have access to the actual handbook online?
A Yes, while filling it out, yes.
(Deposition Exhibit Number 5 marked for identification.)
Q (MR. YOUNGER) Is this the handbook you were provided at least online on November 22nd of 2022?
A Yes, sir.
Q Did you review it?
A Quickly.

Q Did you ask any questions about the handbook?
A No, sir. There was no one to ask questions. I was in a room by myself on computer.
Q You understand that you can ask questions at any point in time during the day, right?
A Yes.
Q Not of me, I'm talking about back when you started work, correct?
A Oh, you mean in the work place, not here?
Q Correct.
A Yes, I understand that.
Q And you understand that there were people in the building, correct?
A Yes.
Q While you were reviewing these forms, correct?
A Yes.
Q And you knew where to find someone if you had a question, right?
A Yes.
Q Okay. But you didn't ask any questions?
A No.
Q You didn't look for anybody to ask questions of?

A I believe I actually may have asked Tadd questions.
Q Do you know what you may have asked Tadd?
A I do not.
Q So you are just speculating, you have no real idea if you did or didn't ask Tadd questions?
A I believe I did ask him a few questions.
Q Do you remember any of those questions?
A Not exactly, no.
Q What makes you think you asked him questions?
A I think I had a question about if we were working Monday through Friday or on the weekend. I believe that was it, but sometimes they're in the office. Have you been there before? To their building?
Q This is your answer. No, it is not an exchange of questions.
A Okay. I was going to say sometimes they're not there.
Q Who is there?
A Their managers. You couldn't just walk into an office there.
Q Really. Were the doors locked?
A Sometimes.

Q And people were inside?

A Or not.

Q Okay. If you knocked on the door and someone was inside, was there instances where they just didn't open the door for you?

A At times, yes.

Q Who would that be?

A Chuck.

Q Chuck. Anyone else?

A Sorry, Chuck Knoll. No, that's the only person I would ever have questions for.

Q So you think you might have asked Tadd Stone questions about working Monday through Friday?

A I know that I asked Tadd.

Q You are certain of that now?

A Yes, now that I'm thinking about it. It has been a very long time.

Q Did you ask Tadd any other questions on the day that you were given on November 22nd, when you were given all of these policies and handbook?

A I don't believe so. I think that was about it. Concerning the Monday through Friday or if we were working weekends.

Q Did you ask anyone else questions about the information you were given on that first day of

employment?

A No.

Q Did you try to ask anyone else questions and were ignored?

A No.

Q Someone pushed away, whatever it may be?

A No.

Q Was there anything about that first day wherein you were given the policies and you were given things to read and sign and complete before you actually started working with the flowers, was there anything about that process that you found to be offensive or inappropriate?

A Can you ask that again?

Q Sure. Was there anything about that process on your first day before you started actually working with flowers while you were being provided policies and handbook and other documents to fill out. Was there anything about that process that you found to be offensive or inappropriate?

A No, sir.

MR. YOUNGER: Let's take a 5 minute break for the restroom.

MR. GHIO: Okay.

(Recess)

Q (MR. YOUNGER) Now, a little bit earlier this morning I asked you about whether or not your job duties changed. During the 15 months you worked at Walter Knoll and you said the duties didn't change, but the work increased. Is that a fair statement?
A Yes.
Q Okay. But then you said something about until you started working under or with Dave, Dave Knoll, right?
A Yes, sir.
Q Is that correct, that's what you said?
A Yes, sir.
Q When did you start working with or being supervised by Dave Knoll?
A I have to think about this for a moment. I believe it was the summer of '24, 2024.
Q It couldn't have been the summer of '24 because you quit in February of '24?
A Of '23.
Q So summer of 2023?
A Yes, sir.
Q Prior to that, you were being supervised by Tadd Stone, correct?
A Yes.

Q And he was being supervised by Chuck Knoll?
A Yes.
Q Okay. In the summer of '23, did Dave Knoll become your direct supervisor or did he become Tadd Stone's supervisor?
A He became Tadd's supervisor.
Q And let's start there. In the summer of 2023, how did your job duties change when Dave became Tadd's supervisor?
A So we, I believe it was the summer, spring or summer of '23, in the building there's a huge, huge room that Walter Knoll, Senior used as his workshop. It was just jam pack with stuff. The guys came and cleaned it out. We actually ended up setting it up as the new Christmas showroom that Dave wanted to do and that is when he decided that he wanted us, he wanted us in his department because we were going to be showing clients the showroom and going to clients and do all of their Christmas set up. And that's where our office was also.
Dave's office became my office, Dave Knoll's office and Tadd's office, was all essentially in that room once it got cleaned out.
Q So was this, the Christmas showroom set up

for clients, was that added on to your job duties?
A Yes.
Q Was anything else added on to your job duties?
A Yes.
Q Let me ask you, was it just Christmas or was it Christmas, Valentines?
A Everything.
Q It was holidays?
A Yes.
Q It would change as the year went on?
A Yes.
Q What else was added to your job duties when Dave started supervising Tadd Stone?
A The greenhouse that he ran. That's essentially what he was in charge of was the greenhouse part of Walter Knoll.
Q And what were you supposed to do with the greenhouse?
A Everything. Clean, stuff that I was not hired to do, clean, lift very heavy things, inventory on his plants. Work in his warehouse, their warehouse, the Knoll's warehouse. And Tadd and I worked in that warehouse a lot.
Q Any other job duties that were added to

you when Dave became Tadd's supervisor?
A No, that's about it.
Q You have filed a charge of discrimination and a lawsuit against Walter Knoll Florist, correct?
A Yes, sir.
Q And your allegations are that you were sexually harassed, correct?
A Yes.
Q And that you were retaliated against for reporting that sexual harassment, correct?
A Yes, sir.
Q As I understand it, your allegations are that David Knoll sexually harassed you?
A Yes.
Q Did anyone other than David Knoll sexually harass you at Walter Knoll Florist?
A No.
Q So all of the sexual harassment, all of the bad actions were committed by David Knoll?
A Yes, sir.
Q Prior to David Knoll taking over as Tadd Stone's supervisor, which you think was around the summer of 2023, did David Knoll do or say anything that you thought was offensive or inappropriate?
A Always.

Q Okay. So that started from the first day of your employment?
A With David Knoll and his remarks.
Q Started on the first day of your employment?
A I didn't meet him on my first day of work. I didn't meet him until probably a couple months in because I didn't work under him.
Q Okay. You started November 22nd. When you say a couple of months in, would you have met him around Valentine's Day?
A I don't remember when I met David Knoll.
Q Okay. Prior to meeting David Knoll, did anyone to your knowledge say or do anything that you found to be offensive or inappropriate while you worked at Walter Knoll Florist?
A What is inappropriate?
Q Do you not understand the word inappropriate?
A No, I do understand it.
Q Then you could answer the question?
A But can you ask that again?
MR. YOUNGER: Read that to her, please?
(The requested portion of the record read by the reporter.)

A Prior to meeting David, no.
Q What was your schedule at Walter Knoll?
A Monday, well supposed to be Monday through Friday from I believe 8:00 to 4:00. It would change though depending on what we had to do for work that day.
Q Your schedule would change?
A Sometimes.
Q Would you sometimes work weekends?
A Uh-huh, yes, sir.
Q How did that work? How would you know if you were going to work a weekend?
A Um, it would just depend on what we got done during the week. If we had, we didn't get all of our stuff done and it needed to be done by the following week or if Tadd didn't come to work to be my manager, and work would fall behind. We would go in on a weekend or we would go in on a weekend when the Knolls needed us to come in on the weekend.
Q How would you know if you're supposed to go in and work on a weekend?
A If my work didn't get done and I had a deadline to meet.
Q So you made that decision on your own?
A With Tadd.

Q Would Tadd tell you you need to come in this weekend to finish this up?
A Sometimes. Sometimes he wouldn't. Sometimes I would just take it upon myself to come in and get my work done.
Q Were there instances where you would come in on a weekend and no one would know other than you?
A Tadd would know.
Q Tadd would always know?
A When I was working, yes, Tadd would know.
Q He would know either because he told you you needed to do it or you told him you needed to do it?
A Yeah, if he wasn't at work. Tadd missed a lot of work. He took care of his elderly mom. Half the time I was in charge of myself reporting to no one and that happened very often.
Q Would you agree with me that if Tadd is not there often and you are not reporting to anyone, you were just doing your work, would anyone else know what you're doing?
A No, they didn't care what we were doing, no. They weren't involved with us.
Q When you say they, who are you talking

about?
A Tammy and Chuck.
Q And that's Tammy Knoll also, correct?
A Yes, sir. Tammy Knoll and Chuck Knoll. I don't believe they even knew who I was for a while there. They have a lot of employees.
(Deposition Exhibit Number 6 marked for identification.)
Q (MR. YOUNGER) I've handed you what's marked as Exhibit 6. Do you recognize this document?
A Yes.
Q Does this appear to be a timesheet for hours that you worked?
A Yes, sir.
Q And it would cover the period of Monday, January 22nd through Sunday January 28th of 2024, correct?
A Yes, sir.
Q And it looks like you worked five hours on Sunday, January 28th?
A Yes, sir.
Q Do you recall that day?
A I do not.
Q Not at all?

A Not at all. That was my first week of work there, correct? Oh, this was '24. I thought we were looking at '23, I'm so sorry. Yes.
Q You do --
A I recognize this week.
Q Okay. Why were you working on Sunday, January 28th?
A Because I had a deadline.
Q What were you working on?
A I'm sorry.
Q What were you working on?
A I was working on getting Christmas inventory merchandise done over on the store side.
Q Who told you to do that?
A I did.
Q And did you tell Tadd that's what you were going to do?
A Tadd was not there. He was taking care of his sick mom.
Q Was Tadd not there the entire week?
A I do not believe he was there on Thursday or Friday. That's why I went in on Sunday because I had a lot of work to do.
Q Do you have a phone number for Tadd? Not now, did you then?

A Yes. There are many times Tadd does not respond.
Q Were you able to text Tadd?
A If I needed to, yes.
Q Did you let him know you were going to work Sunday, the 28th of January?
A I would have to get my texts. I honestly do not know, but I could get my texts.
Q At some point in time was your working on Sunday brought to your attention by management?
A Ask again, I'm sorry?
Q At some point in time after January 28th, that Sunday, was your working on Sunday brought to your attention by some management at Walter Knoll?
A Yes.
Q Okay. First of all, who brought it to your attention first that you worked on Sunday?
A Tammy and Dave when I asked to have a meeting about what I asked to have a meeting about. Nothing was said to me prior to that.
Q Monday would have been January 29th of 2024, correct?
A Yes, sir.
Q Do you recall if Tadd Stone was present at work that Monday?

A Yes, I believe he came back on Monday. I can't be for sure. I don't know which day he came back honestly. I do not recall.

(Deposition Exhibit Number 7 marked for identification.)

Q (MR. YOUNGER) I'm handing you what's marked as Exhibit 7. Do you recognize this document?

A Yes.

Q Okay. What is it?

A It is a charge of discrimination.

Q It is your charge of discrimination against Walter Knoll, correct?

A Yes, sir.

Q These are not memory tests and I'm not trying to trick you. I'm giving you this, but I want to refer you to the second to last line on that first page in the particulars box.

And it is right in the middle of that line where it starts, I came in on Sunday. Do you see where I'm at?

A Yes, sir.

Q It says, I came in on Sunday to make up hours as I had done before. I work closely with Tadd. Tadd was not in on Monday. When Tadd came

back to work on Tuesday, January 30, David Knoll called him first thing in the morning and asked him if I had come in on Sunday to make up hours.
Do you see that?
A Yes, sir.
Q I'm going to ask you again, does that help refresh your recollection as to whether or not Tadd Stone was at work on Monday, January 29th, 2024?
A Yes, sir.
Q Was he?
A According to this, yes.
Q He was. The part that I read that says Tadd was not in on Monday. Do you see that?
A On here?
Q Yes.
A Okay.
Q Do you see that?
A I do not. Where is it at?
Q The very last line the, second word, Tadd was not in on Monday?
A Okay. In the morning. I do see it.
Q I'm sorry, it says in the morning on there for you?
A No, it does not. I'm just trying to think back to that time.

Q Okay. So this doesn't help you remember if Tadd was there Monday, the 24th or 29th of January?
A I'm reading it.
Q Okay.
A If I can read it for a minute.
Q Please, go ahead.
A I would love to read it. Thank you. Tadd did leave, that's why I, okay. Because he left that morning.
Q Are you finished reading Exhibit 7?
A Yes.
Q Okay. Does that help refresh your recollection whether or not Tadd Stone was present at work on Monday, January 29, 2024?
A Yes.
Q Was he present on January 29th?
A For part of the day. I think it was for an hour and then he left to take his mom to a doctor's appointment I believe.
Q Okay.
A Yeah, he did, he left.
Q I just want to make sure I understand this?
A Uh-huh.

Q I'm looking at Exhibit 7 and I'm at the second to last line right in the middle that starts, I came.
Do you see that?
A Yes.
Q Okay. I'm going to read along with you and I'm going to ask you what this means. I came in on Sunday to make up hours as I had done before.
Do I read that correctly?
A Yes.
Q That means you came in on Sunday, January 28th, 2024, and according to Exhibit 6, you were there at 8:10 a.m. and left at 1:15 p.m., correct?
A Yes.
Q Now, it says I work closely with Tadd.
Did I read that correctly?
A Yes.
Q It says Tadd was not in on Monday, correct?
A Yes.
Q Does that mean that he was not present on Monday, January 29th?
A That probably means that he was not, I mean he wasn't there for part of the day. I don't

recall if it was when I got to work or if it was later in the day, but no, he was not there for part of the day.

Q Part of the day?

A Okay. Part of the day, yes.

Q Okay. It says when Tadd came back to work on Tuesday, January 30, 2024.

Did I read that correctly?

A Yes.

Q Does that mean he wasn't there on Monday and he came back on Tuesday?

A No, when he came back to work on Tuesday. He was there for part of the day on Monday.

Q Okay.

A Okay.

Q Why do you think he was there for part of the day on Monday?

A Because that's how he works. He had to take his mom to doctor appointments because she was sick on Thursday and Friday.

Q Let me go a little further then. You say Monday he had to take his mother to a doctor's appointment?

A I believe so.

Q Okay. If I'm going to the second page,

the third line down it says, starts the third word Tadd.
Do you see that?
A Where it says Tadd present, without Tadd present?
Q No, it says Tadd had to leave. The third line down, third word in is Tadd?
A Yes, I see it.
Q Okay.
A Yes, he left.
Q Right.
A Yeah.
Q I'm just trying to understand this document. According to this document, at least my reading of it is, Tadd wasn't there Monday. He came in on Tuesday. There was a meeting set up with you and David and Tammy that Tadd couldn't go to on Tuesday because he was taking his mother to the doctor?
A Yes, he left work.
Q On Tuesday?
A On Monday.
Q On Monday?
A Yes. He was not there for part of the day on Monday.

Q Okay. And you're certain of that?
A Now that I'm thinking about it.
Q And why are you so certain?
A Because his mother was sick and that's why he wasn't at work on Thursday and Friday, which is why I got behind on work because I didn't have anyone helping me meet my deadline, which was due on Monday. He was not there because his mom was sick and he had to take her to the doctor for part of the day.
Q So you know he came in on Monday part of the day?
A Yes.
Q How do you know that?
A He was there for maybe a few minutes, I believe. How do I know that?
Q Yes.
A Because I saw him I guess.
Q Did anything else happen that day, that Monday that you recall Tadd being present for?
A Did anything else happen?
Q Yes.
A As far as, I don't understand the question.
Q Was there a meeting, did Tadd crash his

car into the warehouse, did something happen that causes you to remember Tadd Stone was at work on Monday, January 29th, 2024?

MR. GHIO: I object to the form of the question, it is compound.

Q (MR. YOUNGER) Do you understand my question?

A I really don't. I'm not quite understanding. It says he was not in on Monday. He was not there for part of the day. It is plain and simple he was not there.

Q Uh-huh.

A For part of the day.

Q Where does it say for part of the day?

A It doesn't.

Q Okay.

A I just don't understand though. He was not there for part of the day. That's my answer.

Q My question is, you specifically recall him being there for some part of Monday, January 29th?

A Yes.

Q Okay. What makes you recall that, did anything happen?

A On that Monday morning?

Q On any time that Monday?
A With Tadd or with anyone?
Q That would make you remember that he was there?
A Well, considering, I mean, yeah, Tadd and I have spoke. We spoke about what I was going to do as far as having a meeting with the Knolls.
Q And you didn't know anything about the meeting with the Knolls until Tuesday, January 30th, did you?
A I asked for a meeting.
Q When did you ask for that meeting?
A I believe the previous week. I think it was the previous week when Robin saw me in the hallway and asked me what was wrong, yeah.
Q When were you told that David Knoll said you couldn't come in on Sundays to make up your hours?
A It was either Monday or Tuesday, I think. It was during the meeting, whenever the meeting was.
Q So David Knoll is the first one who told you that?
A When we had the meeting.
Q Was David Knoll the first person that told you, you couldn't come in on Sunday to make up your

hours?
A David and Tammy in the meeting told me that they were unaware that I came into work on Sunday and I cannot do that.
Q Okay. And were you told that in order to come in on Saturday or Sundays to make up your hours or for overtime, whatever it may be, it it had to be cleared with Tadd before you could do it?
A No.
Q No?
A No, nothing ever had to be cleared with Tadd. If I had a deadline and it is my job to make sure something is done and my supervisor is not there to supervisor me, and help me with my job and to get things done, I will go in on a Saturday or Sunday to make sure that my deadline is met. Because if it is not met, you get the wrath of all the Knolls when you get back to work on Monday. Everyone.
So I had to make sure that was done because I was told it had to be done by Monday. It had to be and I also did a damn good job doing my job doing that like I always do.
Q At some point in time after Sunday, January 28th when David Knoll and Tammy Knoll told

you that you couldn't come in on the weekends, did they say you'll never be allowed to work weekends again, or did they say, get it cleared with somebody before you do it. We need to communicate?

A Yes, that's what they said. That's the first line of communication from the Knolls in what, a year and a half, yes. Never was told that.

Q You were told that on Tuesday, January 30th, correct?

A In the meeting.

Q Were you told not to work weekends unless it was cleared by management, some level of management on January 30th?

A Yes.

Q And that was the first time you were told that?

A It is the first time I was ever told that, yes.

Q At that same time, were you also instructed to keep some form of a log of what you were doing each day?

A Was I told again?

Q At that same time were you also told to keep some form of a log as to what you were doing each day?

A During our meeting, no, I was not.
Q At some point in time, on January 30th, or around January 30th, were you told to keep some form of a log as to what you were doing each day?
A Yes.
Q When was that?
A It was the day after our meeting, which would have been the following day.
Q Okay. The meeting that you're speaking of, is that the one that involved yourself, David and Tammy?
A Yes.
Q And then David left during the meeting and Chuck came in?
A Yes, and Tadd was also supposed to be there.
Q Was he there?
A No.
Q Okay. I'm only concerned about who was actually present. Was anybody else present other than you, David and Tammy and then Chuck joined later and David left?
A No.
Q And that was January the 30th on a Tuesday, correct?

A I believe so, yes.
Q And sometime after that meeting, you were told to keep a log of what you were doing each day?
A Yes.
Q By who?
A Tadd.
Q When?
A When I came into work the following morning after a meeting.
Q Wednesday morning?
A Yes.
Q That would be January 31st?
A I could tell you the exact time if I could get my phone.
Q That would be January 31st, correct?
A I believe so.
Q Now, first of all you recorded the meeting on January 30th, correct?
A Yes, sir.
Q And you recorded the meeting on January 31st, correct?
A Yes, sir.
Q Did Tadd give you these instructions verbally or in writing?
A Which instructions?

Q To keep a log of everything you do?
A I came into work that morning. Sat at my desk that I shared with Dave Knoll in Dave Knoll's office, sat down and there was a notebook in front of me and a pen. And Tadd told me, I asked him what it was. He said, it is from the Knolls. It is a notebook and they want you to start logging what you are doing every hour on the hour while you are at work every day.
Q Did you ask why?
A Yes.
Q And what did he say?
A He had no answer. He could not answer my question because he didn't know.
Q What did he actually say to you?
A He said I could talk to Chuck or Tammy because he didn't believe it was necessary either.
Q He said I don't believe it is necessary?
A Yes.
Q Tell me everything you remember him saying?
A Yes. I asked him what this was and he said it is a book for you to log your hours every hour on the hours.
I don't think it is necessary. I

don't have time to do all of my work, how am I going to make a log. I go, do you have one as well? And he said no. He said I don't think this is necessary. I said I want to speak with whoever gave this to you.

Q Anything else?

A No.

Q Were you asked prior to that time what you were doing on Sunday, the 28th, when you were at work?

A I asked prior to that time by who.

Q By anybody. Prior to Wednesday morning when this notebook was given to you by Tadd and you were asked to keep a log of everything you did. Had anybody questioned you about what you were actually doing on Sunday the 29th, the 28th for five hours while you were working?

A Nobody asked me about that at all unless I went into the meeting with them, with Tammy Knoll, and Chuck Knoll, and David Knoll prior to that time. That was the first time that was brought up.

Q On the 30th, who asked you what you were doing that Sunday, the 28th?

A Tammy and Dave, I believe, in our meeting.

Q Would it be fair to say then that Tammy

and Dave had no idea what you were doing when you were working on Sunday, the 28th?
A They should have known. If I'm at work and I have a deadline, which they gave me. They knew why I was at work, they knew. I also have my work. If there's inventory sheets from that day that are logged by Tammy that I turned in. There's a note that was put on the desk. There are cameras in there watching me work and I took pictures of all of my work to hold myself accountable for Tadd.
Q So in order to know what you did on that Sunday?
A Uh-huh.
Q They would have to go through all the paperwork, go back and look at the video film and basically investigate to figure out where you were working and what you were doing?
A They could plain and simply look at all the inventory that I boxed up and scanned into the system that day. That's all they would have to do.
Q They would have to do some form of investigation to see what it is that you did that Sunday?
A No, they would look at boxes that I marked and that I took over to the warehouse, which I

actually have videos of. They would have to simply look. They don't need to investigate anything. They can look and see that I did my job.

Q They would have to do something to figure out what you were doing, correct?

A Yeah, just look.

Q Did you have a lot of discussion about communication and the need for communication on during that meeting on the 30th of January?

A Yes.

Q And was that primarily around the issue of communicating when you were going to work on the weekend and what you were actually doing?

A I was never told that I have to ask to come in to work when I have a deadline.

Q I understand that you may not have been told this before January 28th.

A In the year and a half I believe I was there.

Q I'm talking about January 28th, 29th, 30th and 31st.

A Uh-huh.

Q You were told that during the meeting on the 30th, correct?

MR. GHIO: I object to the question. It

is vague.
Q (MR. YOUNGER) During the meeting on the 30th, you were told you can't come in on weekends without some form of management approval or authorization, correct?
A Yes, that is what Tammy and David told me in the meeting.
Q And at some point in time during this four day period of January 28th to January 31st, you were told to keep a log of what you did each day, correct?
A Yes.
Q And Tadd is the one who told you to do that?
A Yes, sir.
Q He told you to do that on the morning of the 31st of January, correct?
A Yes, sir.
Q Before you had a second meeting with Tammy, and we will get to it, whoever else was there, correct?
A Yes, it was right before that.
Q And then during that meeting and that meeting on the 31st happened with Tadd and Tammy, correct?

A Yes.
Q During that meeting on the 31st, you were told that you were asked to keep that log as a communication tool so that people would know what you were doing if you were working on the weekend and whether it was necessary?
A That wasn't just for the weekend, that was for every day that I worked.
Q And that's not my question. You were told that asking you to keep the log was a form of communication so that your supervisors would know what you were doing, and if it was necessary to work on weekend and things like that or if you had approval or whatever it may be?
MR. GHIO: Object to the form of the question, it is compound.
Q (MR. YOUNGER) You can answer.
A You are going to have to ask it again. Can you ask again, please?
Q Yes. Let me try it a different way.
A Okay.
Q Were you ever told why they wanted you to keep a log of what you were doing?
A To hold myself accountable.
Q To who?

A To my bosses, to the Knolls and to Tadd.
Q Who told you that this was to hold yourself accountable?
A Tammy.
Q And did she tell you to hold yourself accountable so your bosses would know what you were doing?
A Yes. I mean that was the whole point of it. Them giving me a book I guess.
Q That was the whole point of it?
A So they could, they wanted to know where I was, what I was doing on the hour, every hour while I was at work because there's no communication in that place between management, yes. That is my answer.
Q Did anyone ever tell you that you were asked to keep a log of everything you were doing because you complained of sexual harassment?
A No, that's not what -- no.
Q Okay. Did those two events, you complaining of sexual harassment and them asking you to keep a log of what you are doing to be accountable, did that have anything to do with each other or did they just happen to be at the same time?

A They 100 percent, yes, yes, my answer is yes.
Q How so?
A I have never ever in however long I worked there, whatever it was, year and a half, two years. I had never been asked to do that because they always complimented my work. They always knew I was a good employee until that day. Little strange.
Q And prior to January 28th, you had come in on weekends, correct?
A Sometimes.
Q And sometimes you came in when nobody knew, correct?
A Sometimes.
Q And no one ever asked you about it, correct?
A Correct.
Q So this is the first time that we have actual confirmation that someone at Walter Knoll had a question about why you were working on a Sunday and that would be January 28th, correct?
A Yes.
Q Okay. And then they told you as a result of that incident, we want you to keep a log?
A Ask me again?

Q Yes. They told you after that incident on January 28th, which is to the best we know, the first time they know you were at work without any authorization on a Sunday, that's when they asked you to keep a log?

A I didn't need authorization. If I had work to do, I went into work. That's plain and simple.

Q Let's try and answer my question, okay.

A Okay. You need to ask again. I don't understand. Can you ask again?

MR. GHIO: Let me object to the form of the question because the question assumes facts that aren't in evidence. She's trying to answer the question truthfully. If you answer questions that assumes facts that are not there, she has to answer in a way that's not a lie.

MR. YOUNGER: Just make your objection a legal obligation. I understand how the process works.

A This is what my take on this, if I can say. May I?

Q (MR. YOUNGER) Say anything you want?

A I had a deadline, okay. When you have a deadline and the work is not done at Walter Knoll,

you get screamed at by Chuck Knoll. He's scarry. They scream at their employees if stuff isn't done.

When my boss that works closely with me does not come to work on a Thursday and a Friday, I have a deadline. I have to get my work done because I am a good employee and I do my job. When he doesn't come to work and it makes my work double and I have the Knolls, Tammy, Chuck, telling me this has to be done. Valentine's Day stuff has to be on the shelves by Monday, no questions asked. I am going to come to work on a Sunday and do my job because I've never had to ask permission before ever, ever. I've never been told ever. This was never an issue.

I have many people that I worked with that would go in on the weekend, but it only became an issue with me that day for working on a Sunday. I mean that's ridiculous, it is ridiculous. I was doing my job and I was doing it good because I was told that I had a deadline by them. They told me I had a deadline to meet on a Monday.

I don't understand what the big deal is. They told me I had a deadline. I had no one helping me. If they were that worried about it, they could have came in to help me on Thursday or

Friday, but everyone watched me struggle and do it by myself. So I went in on Sunday. I didn't need to ask permission. I never had to ask permission to go to work on a Sunday to either make up my hours or meet my deadline, plain and simple.

Never, in a year and a half you can look at my time stamps. Look at how many times I went in on a weekend. I don't know what the number is, but I'm sure it's there. No one ever said anything to me before until this. I find it a little strange period. That's what I have to say about it. Doing my job, plain and simple and doing a good job because they loved me until this day. That's all I have to say about that.

Q Okay.

THE WITNESS: Can we take a break?

MR. YOUNGER: Sure.

(Recess)

Q (MR. YOUNGER) After you came to work on Sunday, January 28th, either Monday, Tuesday or Wednesday after that, was that the first time that you were called into question about working on a weekend?

A Yes.

Q Okay. And then on January 31st was the

first time that you were told to keep a log of what you did every day, correct?

A Yes.

Q Okay.

(Deposition Exhibit Number 8 marked for identification.)

Q (MR. YOUNGER) I just handed you what's marked as Exhibit 8. Do you recognize that document?

A Yes.

Q Is that your time record and timesheet for the week of January 29th through February 4 of 2024?

A Yes.

Q Does that accurately depict the time that you clocked in and worked those days?

A Yes.

Q I'm going to ask you a quick question. Down on Thursday, February 1st, do you see the little red E?

A Yes, sir.

Q What does that mean?

A I was actually going to say I don't know, not sure.

Q Okay. Fair enough. So I want to back up to the week before.

A Okay.
Q The week before on Thursday, January 25th, was there some incident involving David Knoll?
A On Thursday.
Q January 25th?
A I don't know.
Q Okay.
A I don't know.
Q Let me ask you to take a look at Exhibit 7 again.
A Okay.
Q If you are looking at the particulars, it is the fifth line down and it is a little past the middle of the page it starts with, the next significant act?
A First, second page?
Q First page, fifth line down in the particulars.
A Okay.
Q About the middle of the page where it starts with, the next significant act.
A Okay.
Q Do you see that?
A Oh, yes.
Q Am I with you?

A Yes.
Q I'm going to read that. It says, the next significant act of sexual harassment occurred on Thursday, January 25, 2024.
Did I read that correctly?
A Yes.
Q Okay. We're going to talk about that incident later. But as I understand it, after that incident you had a conversation with Robin Knoll?
A I don't know if it was immediately after that.
Q I never used the word immediately. Try and listen to my question and answer the questions, okay?
A Yes.
Q After that incident, did you have a conversation with Robin Knoll about the incident?
A Yes.
Q Tell me what you recall about that conversation?
A I was in the bathroom upset and I came out and she asked me what was wrong. She's a female and she can see when another female is upset. She put her arms around me and asked what was wrong. And I told her that I was sick of David doing -- being

David and they do not get along and her response to me was something along the lines of, I guess I can say something along the lines of, he's at it again. That mother F-er. I'm going to talk to him, and then she went away and I never spoke to her about it again I don't believe.

Q So you just said you're sick of David being David?

A Yes.

Q Did you tell her anything else?

A No.

Q Did you tell her what he said or did or anything?

A I don't remember if I went into detail because I was on like the floor with other employees. I don't know if I went into specifics.

Q I'm sorry, you were on the floor with other employees?

A Yes.

Q I thought you were in the bathroom crying?

A I came out of the bathroom and we passed each other. She was probably coming to use the restroom through the store.

Q So the conversation with Robin did not happen in the restroom?

A No, not in the restroom. It was when I was coming out of the restroom.

Q Okay. And you don't recall if you ever told her anything about what David had done that upset you?

A No, I do not. I just don't remember specifics. I just remember I was crying in the bathroom and I came out and told her, she asked what was wrong hand I told her David.

Q And you were crying because of what David had just done, right?

A Um, I believe so. I was in the bathroom sick of David.

Q And that's what made you cry?

A A combination of things.

Q What else?

A The work, the amount of work that was placed on us. How things were in the workplace. The screaming constantly. Just the combination of things, but mainly David, yes.

Q Did David scream at you that day?

A That day?

Q Uh-huh.

A No. Did he scream at me? No.

Q You also state in Exhibit 7, Robin called

Dave and asked him why is Angela uncomfortable around you. Did you hear that call?

A No, I did not hear it, but he told me she was going to call him.

Q She told you she was going to?

A Yeah.

Q Did she tell you what she was going to ask word for word in quotes?

A I mean, I assume that's exactly what she was going to ask him.

Q This is nothing more than your assumption?

A I mean I know that she called him to ask him.

Q How do you know that?

A Because I know she called him.

Q How do you know that?

A I just know. Because I wanted to have a meeting about it and then a meeting happened. So she had to have called him.

Q So you're assuming that she called?

A No, I know she did because he told me that he talked to Robin, I believe, yeah.

Q Okay.

A I think it is in the recording actually.

Q And after this, I'm sorry, did you talk to

Robin on that Thursday, January 25th?
A In passing?
Q Was there more than one conversation with Robin?
A No, that was I just don't remember exactly what day it was.
Q Okay.
A I don't remember if it was that day or the day after, I don't remember.
Q Would you still have been crying what David had done on the 25th, the day after?
A Possibly.
Q Is this the first time you were brought to tears by this?
A By David?
Q Yeah?
A No, no.
Q Any other instances where your crying spells lasted more than a day?
A Yeah, when I get screamed at in the workplace, yes.
Q On Tuesday, January 30th, you had a meeting with David and Tammy, and then Chuck came in and David left, right?
A Yes.

Q I want to take you to Monday, January 29th. Did you have any conversations with anyone on Monday, January 28th about working Sunday?
A On Monday?
Q Yes.
A About working Sunday.
Q I'm going to ask you one favor. Can you put the exhibit down. If I think the answer is in there, I will let you refer to it, okay?
A Okay.
Q I just would like you to concentrate on my question and try to answer my question, okay?
A Okay.
Q Fair?
A Fair.
Q Okay. Did you have any discussions with anyone on Monday, the 29th, about your working on Sunday the 28th?
A Whatever day our meeting was, it was that day.
Q Okay. Your meeting was on January 30th, which is Tuesday?
A Okay. That was the first time.
Q I'm going to give you that.
A Okay.

Q I want to talk about some other day.
A Okay.
Q Did you have any discussions with anyone on Monday, January 29th, about coming in on Sunday, the 28th?
A No.
Q I know you had a discussion with Robin Knoll either Thursday or Friday of the week before, correct?
A Correct.
Q Did you have any discussions with anyone regarding David Knoll's conduct on Monday, January 29th?
A No.
Q Do you know if, do you know if Chuck Knoll had any conversations with anyone on January 29th concerning your working on January 28th?
A No.
Q Do you know if Tadd Stone had any conversations with anyone on January 29th concerning your working on January 28th?
A No.
Q Do you know if David Knoll had any conversations with anyone on January 29th concerning your working on January 28th?

A No.
Q Do you know when the decision to tell you don't work on weekends any more without authorization, do you know when that decision was made?
MR. GHIO: Object to the form of the question.
A I think I know.
Q (MR. YOUNGER) What do you think?
A During our meeting.
Q During the meeting on January 30th?
A With Dave and Tammy.
Q And what makes you think that?
A Because that was the first time I was ever told that.
Q Okay. You understand there has to be a decision made before you're told, correct, that would be the order of events?
A Not at that place, but yes, usually, yes.
Q You don't know when the decision to have you keep a log was made, do you?
A After we had our meeting. I feel like I would have been told about that in our meeting.
Q You feel like it?
A If it was there and it was important, yes.

Q Okay. You had this meeting on Tuesday, January 30th and it started with yourself, David and Tammy, correct?
A Yes.
Q And during that meeting, you made complaints about David sexually harassing you, correct?
A Yes.
Q Now, one of the actions of David Knoll that you were complaining about during that meeting occurred at the Metropolitan Square, correct?
A Yes.
Q While you were setting up for Thanksgiving display, correct?
A Yes.
Q Can you tell me what happened, by the way that was November 6th of 2023, correct?
A I believe so.
Q So it was a little over two months prior to your making this complaint?
A Yes. Tadd knew about it that day he was there, but I had made that complaint to him because he is my supervisor, yes.
Q Can you tell me what happened on November 16th of 2023 at the Metropolitan Square?

A Yeah. Myself and about I'd say anywhere, I'd say around 30 employees were doing the massive Christmas tree in the entryways at every entrance at the Met building. Tadd and I were told to go over to one of the entrances and do the garland and you have to like fluff the garland before it goes up. So I was fluffing it as I would be bent over.

And then it was me, Tadd, Dave, Dave's daughter, and I think there might have been two other people there. We couldn't get it up. We asked Dave to go get a drill and when he came back, he was behind me. Him and his daughter might have been talking with the drill because we had to put some screws in the side to keep it up. I was bent over fluffing it, like the garland to put it up, bent over. And he was behind me and I came up and I felt something, I felt him behind me and I turned around and asked him what he was doing. And he laughed as he always did with everything because everything is a joke.

His daughter was there and said dad, and Tadd also said Dave, and I asked him what he was doing. He told me you just put that out there or put that thing out there, and that's what was said.

Q Did he touch you?

A With his hands?
Q Yes.
A Or with the drill?
Q Let's take it one at a time. Did he touch you with his hands?
A No, he didn't touch me with his hands I don't believe, I don't know. I don't have eyes behind my head. I felt something, I felt a brush on my butt on my behind when I came up like this because he had the drill. And that's what I felt. I don't know if it was the drill, his hand, I don't know. I couldn't see behind me, but yes, I felt something and that's why I turned around and asked him what he was doing. And Tadd told him, he just said Dave. You can't say anything to these people or they scream at you. So nothing was said that night.
Q Is the drill the same as a screw gun?
A I believe so.
Q You reference in your charge a screw gun?
A Yeah, a screw gun.
Q Are they the same thing?
A I don't know.
Q In your understanding?
A Yes.

Q Are you using the terms interchangeably?
A Yes.
Q You say you felt something brush up against your butt?
A Yes.
Q Okay. That's different than say a smack, right?
A A touch is a touch regardless what it is to me.
Q Technically it is not, okay?
A I felt something.
Q So I need to understand what it is you felt?
A I felt --
Q Do you understand the difference between a brush up against and a smack?
A Yes, I understand. It was a touch.
Q It wasn't a smack?
A No.
Q Was it a hard touch, a forceful touch?
A It was a touch.
Q Okay. I got that.
A Yeah.
Q I need more details?
A It was a touch. I mean, did it go in my

butt? No. Was it hard? No. It was a touch. Anything that touches my butt that I don't approve of, is a touch, regardless of what it is, it's a touch.

Q I think we understand it was a touch.

A Yes.

Q And I think I understand that you don't care about the details. It was a touch. I care about the details.

MR. GHIO: I'm going to object.

MR. YOUNGER: You want to object, wait until I finish.

A I told you --

MR. GHIO: Let him finish so I can make my objection.

Q (MR. YOUNGER) I don't care about the -- I care about the details of the touch.

A Okay.

Q Whether it was hard, soft, brushed up against you, how long were you touched, was it multiple seconds, was it just a quick, okay?

A Can I stand up and show?

Q You can do anything you want, but please wait until I'm finished because he can't take us both down, okay. So that being said, go ahead and

object.
MR. GHIO: That question I don't have an objection to. The first question was objectionable. What you just stated was not objectionable.
Q (MR. YOUNGER) Fair enough. That being said, you described this touch as a brushed up against you, correct?
A I mean it was a touch.
Q I understand it was a touch. I would like more details about the touch.
A Right.
Q How long was whatever was in contact with your butt, how long was it in contact?
A I mean as soon as I felt something touch my butt, you know, you move.
Q Uh-huh.
A I don't know, two seconds.
Q Okay.
A I have no idea. I felt it and turned around.
Q And you don't know specifically what touched your butt?
A I mean he had the drill in his hand or screw gun.
Q Okay.

A That he got for us to use.
Q Do you know what touched your butt?
A Yes.
Q What touched your butt?
A The screw gun.
Q How do you know that?
A Because I felt it.
Q Okay. You felt him brush the screw gun against your butt?
A Yes.
Q For about two seconds at the most?
A It was a touch, yes.
Q And he did this in front of a co-worker Tadd?
A Yes.
Q And his own daughter?
A Yes.
Q Did you in some manner interpret this brushing the screw gun against your butt as sexual in nature?
A Yes, very.
Q Why?
A Because that's the kind of person Dave Knoll is.
Q If anybody else had brushed the screw gun

against your butt, would you have considered it sexual in nature?

A Yes, but more so. I mean, yes, of course, anything that a touches me that I don't give permission, yes.

Q Okay.

A Especially my butt.

Q Why especially your butt?

A Because it is inappropriate. If he had the drill, he was sitting on the ground next to me and had the drill and it touched my shoe, I mean come on, it is a little bit different, but it is a butt.

Q Did he say anything else that you haven't already told me?

A I don't believe so.

Q Did Tadd say anything else other than David?

A I don't believe so.

Q Did Tadd, I'm sorry, did David's daughter say anything other than dad?

A I don't believe so. I honestly, I don't think so. I mean it was like 1:00 a.m. I don't know. I don't think so.

Q Do you contend that by touching your butt

with the screw gun that David was making sexual advances towards you?
A Yes.
Q You do.
A I believe it to be of a sexual nature.
Q Do you understand what an advance is?
A Yes. I mean, I don't know what he was doing.
Q Did you get punished?
A For what?
Q For stopping David from touching your butt with the screw gun?
A That night or?
Q Well, let's start with that night.
A No because we had a job to do that we had to get done, but it was talked about, yes.
Q It was talked about that night?
A Yes, with Tadd.
Q Okay. Who else was present?
A Just Tadd and I.
Q What was your conversation between yourself and Tadd that night?
A Tadd told me that he would back me up if I wanted to let Dave know or let Chuck know. He said think about it. If you want to say something, he

will be there by my side.

Q Did he say anything else?

A Uh-huh.

Q What?

A He told me, you know, we can make, we can say something about it, but nothing is going to get done because that's how it is there. The HR department is the owner.

Q Did he say anything else?

A No.

Q What did you say?

A I told him I'm going to think about it and it was 2:00 a.m. I wanted to go home and go to bed. Nothing much more was said about it at that time.

Q Were you crying?

A Was I crying?

Q Yes.

A Speaking to him?

Q Yes.

A I don't know, I don't remember.

Q Were you crying while you were still at the Met Life building after he touched you on the butt?

A No, I wasn't crying. I was working. You don't cry in front of the Knolls.

Q Now we're talking about your meeting on January 30th with David and Tammy. That was the first thing you told them about was the touching your butt with a screw gun, right?
A Yes.
Q And then the second thing you addressed with them was the Thursday, January 25th incident?
A Yes.
Q What happened on Thursday, January 25th?
A We finished up our Valentine's display over on the store side and Dave had to come and okay it, make sure it was good, what he wanted. He grabbed a rose off the table in Dave fashion, you know what this looks like? (indicating) That's Dave, that's what he did. And Tadd just looked at me and I looked at Tadd, and he kept going about it. Who ordered these things. I've got to show my brothers. Do you know what this looks like? (indicating)
We both knew. I walked away. He went and talked to his brothers about what he thought looked like a vagina, the rose and came back and he had it in his hand in front of him in the store. And he was looking at me and he's rubbing the top of the flower and he's tapping it. He's like, you got to get it right in that spot. Right

there, right there while he's staring at me.
And Tadd looked at me and said just walk away and that's what I did.
Q Have you told me everything David said?
A Excuse me?
Q Have you told me everything David said at that time?
A Yeah. You've got to get the spot. Looks like a vagina. I know what this looks like. I've got to get it right there. He's staring at me. I believe so, yes.
Q David actually used the word vagina?
A Yes.
Q He did?
A Yes.
Q Was that before or after he went and showed his brothers the flower?
A Before. Like when he picked it up. You know what this looks like. Right after he picked it up.
Q Tell me exactly what he said?
A A vagina.
Q Anything else you can recall him saying?
A No. He went, I guess, and showed his brothers a funny rose that looks like a vagina.

Q Tadd was there at the time?
A Yes.
Q Did you have any discussions with Tadd about what had just happened?
A After, yes.
Q When.
A After we got back to the office or lunch or something.
Q Later that day?
A Yeah, when we were in the office.
Q Tell me what you recall about that conversation with Tadd?
A Pretty much we both were like, can you believe that just happened? I'm so sorry that just happened. That's why I told you to walk away. What else did we talk about. I just told him, this is where I draw the line. I'm not having stuff like that happen any more, that was it. And I don't think he was at work the day after that.
Q Was that before or after your conversation with Robin Knoll?
A Was what?
Q Your conversation with Tadd?
A No, was what?
Q Was your conversation with Tadd before or

after your conversation with Robin Knoll?

A I don't know if it was before or after. I really honestly think it was before. I'm not 100% sure. I think it was before. It was something we talked about.

Q Let me back up. Why did you need to work on Sunday the 28th?

A Because I had a deadline.

Q And was Tadd absent to take care of his mother the week before the 28th?

A Yes. I believe so on Friday. I don't think he came to work. I have a text message somewhere.

Q Earlier you told me he wasn't there on Thursday or Friday?

A Yeah, he usually leaves like halfway through the day to take his mom to the doctor or to physical therapy. Sometimes he's there for part of the day, sometimes he's not. He left early a lot.

Q Other than those two incidents involving David Knoll, the touching your butt with a screw gun and the comments about the rose, did you report any other conduct or comments of David Knoll during your meeting on January 30th?

A Those, I believe I told them about the

rack one too, I believe. That was also brought up as well.

Q Do you recall anything else being brought up?

A I don't believe so. I think those were the three main ones.

Q Tell me what the rack incident is about?

A I mean, we would be pushing like a metal rack that we put our merchandise on. And I mean comments like, that's a nice big rack you got there, or that's a nice rack. I mean that happened many times. Nice rack while I'm pushing a rack.

Q Anything else?

A As far as the racks go.

Q That would be David saying rack, or nice big rack, right?

A Yeah.

Q How often would you say that happened?

A Those words coming out of his mouth probably about five times or so.

Q Were there any witnesses to that conduct?

A To the rack?

Q To the comments by David about a rack, were there any witnesses?

A No, I would be pushing it by myself like

in movement. Like pushing my inventory out the door.
Q Is the answer no, there were no witnesses?
A No, not that I know of. Tadd could have been around for one of those, I'm not sure. I would have to ask Tadd. So possibly, I don't know. That would be a question for Tadd. Because when something makes me upset, I just can't, yeah.
Q What was the first comment or action of David Knoll that you contend was sexual harassment?
A Rack, the rack.
Q That was the first?
A Yes.
Q Okay. What did David Knoll do or say that you contend was sexual harassment that we haven't talked about?
A Uh, this was every time we worked together. There is always comments. As far as sexual comments always. And that's why Robin did not like him. I'm put that out there. I could be up on a ladder. And he would be like, can you just get up there a little bit. I knew, I know what people are doing behind me, especially him or I could be --
Q I'm going to cut you off and I'm sorry.

A Yeah.
Q You are using the phrase I could be. As if it may or may not happen, you I don't know. I'm looking for actual facts. What did David do or say, other than what we've talked about, which is three incidents, what did he do or say that you found to be sexual harassment or you contend is sexual harassment?
A Those are the three major ones. There was always comments. I wouldn't say they were all as intense as those three. This was constant. This was something that happened every time that I was around him. And I have Tadd to back me up on that. It got out of control. It doesn't matter, it was every time. There's always comments, always comments. Eventually you get sick of it.
Q Tell me the first comment that David made that you believe is sexual harassment?
A There was the rack, nice rack, nice big rack. That's a nice rack you got there. That's a big rack, that's it.
Q Okay. Tell me any other comment that David made that you contend is sexual harassment?
A I don't know if this is, but I feel like we were at the Fox. I had my dates that I was

eating for lunch. I asked him if he wanted one. He looked at me and said, maybe we will do a date, but I'm married but that sounds nice, we'll see. It is just things like that. This was constant.

Q Did you take that as a serious comment or was he joking?

A Um, honestly, I didn't take it any way at the time. That's just how he talked to everyone.

Q Did it offend you when he said that?

A Yeah, he is offensive as a human.

Q When he said maybe a date, but I'm married, that offended you when you were offering him a date to eat?

A Yes.

Q Okay.

A It did.

Q Do you recall when that happened?

A I don't recall. I remember it was at the Fox. I could look at my clock in. Sometime around probably October before the Met building.

Q So October of '23?

A Yes, at the Fox.

Q Did you report that to anyone?

A No.

Q Was anyone else present?

A No, just him and I.
Q Did that offend you?
A He offended me every time he spoke.
Q Did that particular comment offend you about he didn't want a date to eat, but because he's married, however he phrased it?
A But we'll see, yes.
Q That offended you?
A Yes, that offended me.
Q Why didn't you report it to anybody?
A Because they do nothing at that place. You can report something, but HR is his brother. That's why. People don't report things there because nothing gets done, that's why.
Q Give me an example of somebody that reported something that nothing got done?
A Everything. Everything you take to HR, gets swept under the rug. They told us they were HR.
Q Give me an example of something that happened prior to October of 2023 that was reported and swept under the rug?
A Just in the workplace in general?
Q Anything.
A Do I need to tell, see, I don't know.

Q You need to answer the question.
A Okay. I mean there's people that have turned in complaints to Chuck, I mean, do I give names.
Q Who?
A Who?
Q Yes.
A I mean a couple females.
Q Who?
A Um, April has turned in a complaint, or not necessarily turned in, but went verbal complaints. You can speak to them, nothing is going to happen.
Q April, what is her last name?
A Becker.
Q Anyone other than April that you're familiar with that made complaints that were just swept under the rug prior to October of '23?
A Not that I know of right, but I can find out.
Q What would you do to find that out?
A I would, I mean, I know many people that suffered the wrath from these people, from Dave and Chuck. Maybe I would have to reach out to them, I don't know.

Q Who has suffered the wrath of Dave and Chuck?
A Everyone.
Q Who?
A Every employee there.
Q Every single employee?
A Yes.
Q So if I find one employee that says I love working here, and Dave or Chuck have never said or done anything to me?
A Some of the employees.
Q Okay. Which ones?
A I mean, I don't know all the people. We had like 100 employees.
Q Name one?
A Tadd and I worked together.
Q Name one?
A Name one what?
Q Name one employee that suffered the wrath of the Knolls?
A Me.
Q Other than you?
A Tadd.
Q Okay. Anyone else?
A April.

Q Okay. Anybody else?
A Michael.
Q Michael who?
A Mercer.
Q Okay. Anybody else?
A Um, Katie Danielle.
Q I'm sorry, what was that last name?
A Katie Danielle or Danielle. I don't know any other last names.
Q Do you know any other first names?
A Not off the top of my head, no. I would have to think about it. That was two years ago.
Q And first of all, did you witness any of these other employees suffering the wrath of the Knolls?
A Every day those people would scream at people. Every single day. If you pull up their cameras, you could see it.
Q What I'd really like is an answer to my question.
A Yes.
Q You did. What did you see with respect to the wrath of the Knolls in Michael Mercer, see or here?
A I mean being treated inappropriately.

Q Can you be more specific and tell me what you saw or heard?
A Dave would smack him on his butt, on his ass every time, not every time. I wasn't around him every time. Dave would make comments to him.
Q So Dave smacked Michael Mercer on the butt?
A Many times.
Q And Dave touched you on the butt with a screw gun?
A Yes.
Q Was it sexual, did you have an understanding that it was sexual when Dave would smack Michael Mercer on the butt?
A I do not know.
Q But you immediately assume it is sexual when he touched your butt with a screw gun?
A Yes.
Q The difference between you're a woman and Michael Mercer is a man?
A Not necessarily. I don't know if it was sexual to him or not. I don't know.
Q Given the fact that David smacked Michael Mercer on the butt multiple times and touched your butt once, would you agree with me that it appears

that David is treating men and women the same way by touching their butt?
A No.
Q No?
A I don't agree.
Q He treated you differently?
A He's not a gay man. Yes, 100 percent. He treated males and females differently at work every single day no matter what it was. I'm not talking about harassment. I'm talking about in general, screaming at people.
Q I want to talk about just touching people's butts. He touched men's butts and he touched women's butts, didn't he?
A I wouldn't say men's, Michael.
Q He touched a man's butt and he touched a woman's butt; is that correct?
A Sure, yes.
Q What was April Becker's complaint about?
A Everything. The work environment, the hostility, I mean, everything.
Q Were you present when she made the complaint?
A I mean she would complain to me.
Q Were you present when she made the

complaint to management?
A You can't. You make a complaint, you can't make a complaint. You can speak with them. Yes, I've been around when complaints have been made by many people at work.
Q That's all interesting. Please try to stick with my question.
A Okay.
Q This will go faster, I promise.
A Okay.
Q You told me April Becker made a complaint. Was that complaint to management?
A Yes. She would always complain to management, yes.
Q And then you told me the complaint was swept under the rug?
A Always.
Q Were you present whether April Becker made a complaint to management?
A I was at work. I wouldn't go in an office with her.
Q So is the answer, no, you were not present when she made the complaint to management?
A No.
Q No, you were not present?

A I was not present until after.
Q After she made the complaint, you were?
A This happened all the time. This is not a one time thing.
Q That's great you can go on and talk as much as you like. I don't care.
A Okay.
Q But I do want answers to my questions.
A No, I was not there in the office.
Q So anything that you know about her complaint would have been hearsay when you were told by April herself, correct?
MR. GHIO: I'm going to object to the extent it calls for a legal conclusion, but subject to that, you can go ahead and answer.
Q (MR. YOUNGER) Go ahead and answer.
A I would speak with her after.
Q Uh-huh.
A We all made complaints.
Q Let's talk about April's complaint, okay?
A Okay. No, I was not.
Q You were not there, correct?
A Correct.
Q You did not witness her complaint, correct?

A I was outside the room.
Q You did not witness the complaint. You weren't there and didn't hear it and didn't see it, could you hear it?
A You hear them talking, I couldn't tell.
Q So you couldn't tell me what she said when she went into Chuck's office, correct?
A No.
Q Anything you know about that complaint would have been told to you by April after the fact, correct?
A Yes.
Q And you say it was swept under the rug. What facts do you have to support that April's complaint was swept under the rug?
A I have nothing to support her, but.
Q Fair enough.
A Okay. But everything is swept under the rug because nothing ever happens.
Q I understand you have this global opinion what may or may not happen there. I want to talk about the specifics.
A Okay.
Q Was there more than one complaint by April that was swept under the rug?

A I do not know.
Q What was Katie Danielle's complaint?
A Um, her mom passed away, her mom died unexpectedly. She was a full-time employee of theirs. And when she came back to work for missing work, they punished her. They didn't give her any hours, but yet they left her on their payroll so she couldn't collect unemployment and she ended up quitting. That's her complaint.
Q She made a complaint to management about that?
A Yes.
Q Were you present when she made that complaint?
A I was outside and the door was cracked open, correct.
Q Do you spend a lot of your time outside of Chuck Knoll's office listening to what's going on?
A No, my merchandise area is right there and most of the time his door is open. So, yes, I do spend a lot of time right there.
Q So you heard Katy's complaint to Chuck?
A Uh-huh.
Q What did she say?
A I just told you. I just told you what she

said.
Q She went through the whole I am, I took off because my mom died?
A Yes. I am getting no hours, why am I getting no hours.
Q What was Chuck's response?
A You're on the schedule. You will get hours when you get hours. No hours. Can't have a job with no hours.
Q Do you know anything else about this situation?
A No, I do not. I know she -- no, I don't know. But yes, I did spend a lot of time outside his office because that was my merchandise area.
Q Now, let's get back to you.
A Yes.
Q Four things that David Knoll said or did that you found to be sexual harassment, offensive, inappropriate, because of your sex?
A No, not because of my sex.
Q I'm sorry, he didn't do anything because of your sex?
A He could do it to a guy or girl.
Q Did he do all of these things to guys and girls?

A I mean, that's a question for him.
Q You are the one that was there?
A Yeah.
Q You are the one I'm asking the questions of?
A We are talking about me though.
Q I'm talking about what you saw, heard, did, what David did or anything else in your presence or while you were working at Walter Knoll?
A Yes.
Q Did he do these things to men and women that you are now considering sexual harassment against you?
A If smacking a male on their butt and them being uncomfortable, then yes, I suppose so.
Q We are talking about four things. Touching your butt with the screw gun, making comments about the roses, making comments about the racks and some response to your offer to allow him to eat dates at the Fox?
A And Michael Mercer getting smacked on the ass because you asked me, right, or am I wrong.
Q I'm asking you about you. I just want to talk about you right now. All right. You brought a claim for sexual harassment, correct?

A Yes.
Q And you claim David Knoll is the one who sexually harassed you?
A Yes.
Q You identified four incidents that you think David Knoll was sexually harassing you, correct?
A Yes.
Q And those incidents he touched you on the butt with a screw gun, he made comments about the roses, comments about the rack and then a comment after you offered him dates to eat for lunch, correct?
A Yes.
Q Any other conduct or comments that you believe or that your contend were sexually harassing of you while you worked at Walter Knoll?
A Just by David?
Q Yes.
A I mean this was constant. There was comments every time we worked together.
Q So really shouldn't be very difficult for you to come up with a lot of explanations or a lot of details. You are going to have to let me finish.
MR. GHIO: Just answer the question.

Q (MR. YOUNGER) If it happened every day or constant, it shouldn't be very difficult for you to come up with examples of specifics. I want the specifics?
A I've given you the specifics that I consider to be sexual harassment.
Q Is there any other conduct or comments of David Knoll that you contend were offensive, inappropriate, sexual harassment?
A The way he spoke to me, yes, every day.
Q Okay. The way he spoke to you?
A All the time.
Q Explain, please give me some details?
A He's always inappropriate. Even Chuck says so and Tammy herself. I mean, I don't know what else to say.
Q Tell me the specifics of what he said that is inappropriate?
A It is just the way he speaks in general.
Q Okay. Tell me the specifics of the way he speaks in general that you find it to be sexual harassment, inappropriate and offensive?
A He turns everything that you say into something sexual almost every time. You have a conversation with the man. Not just to me, to other

people too and that is my answer.
Q Tell me specifics?
A I don't have any more specifics.
Q You have nothing to offer with respect to this daily regular sexual harassment that you experienced?
A This is constant though with everyone.
Q So examples shouldn't be very difficult to come up with because it was constant?
A Right.
Q Give me examples?
A I gave you my examples.
Q We have got four?
A Yeah. And that's enough.
Q Is there anything else?
A No, I have no more.
MR. GHIO: You listed four categories, not how many times he said rack.
MR. YOUNGER: She said about five, I did ask it.
A I just have nothing else to say about that. The way he spoke to me in general as a human bothered me. It does not matter what was said. I don't remember everything he said. I know he made me uncomfortable every time he came around me.

Q (MR. YOUNGER) Okay.
A That's it. That's all I remember.
Q You may think it doesn't matter what was said, I get that. Your statement of he made me uncomfortable every time he spoke to me and you can't give me any examples other than these four particular incidents?
A Okay. If, if I'm plugging in Christmas tree lights, while you're down there and he's standing by me. What does that mean. While you're down there.
Q I don't know, did it happen?
A Yes.
Q Or is that something you are making up as you sit here?
A Why would I make it up?
Q Because you don't have any other examples?
A It happened all the time, sir.
Q What does that mean, while you're down there?
A I don't know, you tell me or David can tell us.
Q Did you find it offensive?
A Yes.
Q Why?

A Because no respectful male says that to a woman that is on her knees plugging in Christmas lights, that's why.
Q How did you interpret that?
A How else would I interpret it?
Q How did you interpret it?
A While you are down there, because I know what kind of person Dave Knoll is very sexual, that's how I interpret it.
Q Very sexual?
A While you're down there and I'm on my knees, yes, very.
Q How is that sexual?
A It is.
Q Explain how it is sexual?
A Because he made it sexual by saying that, that's how it is sexual.
Q He said it, you took it as being sexual?
A Yes.
Q Explain to me why or how you took it to be sexual?
A Because when a man says while you're down there on your knees, it is sexual. What else would it mean?
Q How?

A He was referring, I know what he was referring to.
Q What was me referring to?
A He was being sexual, while you're down there, because he was.
Q What was he referring to?
A I don't know.
Q You don't know what he was referring to?
A While I'm down there.
Q You don't know what he was referring to?
A No, I don't know what he was thinking.
Q You took it as sexual?
A It was.
Q In what manner?
A Because I know what he was thinking.
Q What was he thinking?
A He was probably thinking in his head, you be nice giving me a blow job down there. That's probably what he was thinking.
Q That's certainly what you were thinking when he said it, right?
A Yes, because every word out of his mouth was sexual, yes.
Q How often did David say to you while you're down there?

A Once.
Q One time?
A One time.
Q Do you know when or where you were?
A In our office in the Christmas tree showroom.
Q Do you know when?
A Anywhere from, I don't know the date, no. Anywhere from that summer after the warehouse room got set up with the Christmas trees, I'd say that's anywhere from summer to fall.
Q Of 2023?
A Yes.
Q So that's a fifth action of David, comment of David, correct?
A Yes.
Q Are there any other actions or comments of David knowing that you found to be offensive or inappropriate and sexually harassing other than the five that we have discussed?
MR. GHIO: Again, I'm going to object to the form of the question. You keep saying five incidents, but each of the categories you are describing have multiple events. So there are more than five times this happened. My objection to the

question you keep mischaracterizing her testimony, but subject to that you can answer that.
Q (MR. YOUNGER) Let me clear that up. David Knoll touched your butt one time, correct?
A Yes.
Q David Knoll made the comments about the roses in reference to the vagina one time, correct?
A Yes.
Q David Knoll said while you are down there on your knees one time, correct?
A Yeah.
Q And David Knoll said the comments after you offered him dates to eat one time, correct?
A Yes.
Q So the only thing that has happened multiple times is saying nice rack, right?
A Yes.
Q That happened about five times you said?
A I'd say, yeah.
Q Okay. Now, is there anything else other than those five things that David Knoll did or said that you found to be offensive or inappropriate and sexually harassing?
A Not specifics that I can remember, but every time he spoke to me or people, it was always

sexual. There was always something sexual in it, always, but not specific to me that I can remember.
Q And you have no other examples of his sexual comments?
A No.
Q No, you don't?
A No, I do not, no.
Q Did you keep a journal at or near the time you were working at Walter Knoll?
A A journal?
Q Yes.
A Like at work or at home?
Q Either.
A No. I don't have time for that. I'm a mom, no, I wish.
Q Do you have any documents or information that you can review that would help you remember any other comments or conduct of David Knoll that we haven't already discussed?
A No. I may have text messages to my best friend.
Q Who is your best friend?
A Her name is Leann Higgins.
Q Did Leann Higgins ever work at --
A No.

Q -- Walter Knoll?
A No, sir.
Q Was the flower incident on Thursday, January 25th, was that the last incident where you contend David Knoll sexually harassed you?
A Yes.
Q So nothing happened on Friday, the 26th?
A I don't believe so.
Q Nothing happened on Sunday, the 28th?
A No.
Q Nothing happened on Monday, the 29th?
A No.
Q Okay. And what time of the day on January 30th did you meet with David and Tammy?
A I believe it was probably between ten and noon. I don't know the exact time.
Q And during that meeting with David and Tammy on January 30th, did Chuck Knoll come into the meeting at some point?
A Yes.
Q When Chuck Knoll came in, did David Knoll leave?
A Yes.
Q And then did you continue talking about your complaints regarding David Knoll's conduct with

Chuck?
A Yes. Tammy wanted to let him know what's going on and then it turned into him rambling about other stuff, yes.
Q At some point in time, either during or after that meeting, were you told that Tammy was going to begin supervising Tadd and you would not be in that reporting relationship with David any more?
A Ask that again, I'm sorry?
Q At some point, either during or after that meeting on the 30th, were you told that Tammy Knoll was going to begin supervising Tadd Stone, your supervisor, and that David would not be in that reporting relationship any longer?
A Essentially I was told that in an email, I believe, but that had been impossible. David had to be in charge of us, of our department. He had to be. There was no way around it.
Q Let's try the question --
A Okay, sorry.
Q -- of what you were told. Either during that meeting or after that meeting that Tammy Knoll was going to be supervising Tadd Stone and David would no longer be supervising him?
A Yes.

Q After that meeting, did you have any conversations with David Knoll?
A No.
Q After that meeting on January 30th, did David Knoll make any comments to you or engage in any conduct that you found offensive, inappropriate or sexually harassing?
A No, I had no contact with him, no. After the meeting?
Q After that meeting you didn't have any contact with David Knoll at all?
A He was still in passing.
Q In passing?
A My office was his office. They didn't move me that day.
Q Yet after that meeting, you had no communications with David, is that fair?
A Yes, that's fair.
Q You might have seen him, right?
A Yes.
Q Do you recall, did you see him?
A I believe so, just in passing. Oh, yes, actually, after our meeting, they were having a meeting and I have to walk past them to get to my office and saw him there and when they were doing

that, but no contact, no contacting.
Q Okay. You worked a full day that Tuesday the 30th, right?
A I believe so. If that's what my stuff says.
Q Yes?
A Yes.
Q And the next day, Wednesday the 31st, you came in and that's when you already told me there was a notebook on your desk and Tadd explained to you that you need to keep a log?
A Yes.
Q After you got that notebook and the instructions from Tadd, did you request another meeting with Tammy?
A Yes, or whoever give him the notebook.
Q Did you have a meeting then with Tammy and Tadd on the 31st?
A Yes.
Q Okay. And is that basically the only thing you did that day on the 31st?
A As far as work goes?
Q Yes.
A Yes, I left after that.
Q That's because they told you go ahead and

take the rest of the day off and regroup?
A Yes, essentially, yeah.
Q You weren't being punished, they were just saying, hey, you can take the rest of the day off to get your mind in order, however it was phrased?
A That's how they made it seem, yes.
Q So you didn't keep a log of what you did on January 31st, did you?
A No. I left work.
Q You didn't do anything?
A Yeah.
Q You came to work on February 1st?
A Yes.
Q Okay. Just to make it abundantly clear, you didn't have any contact or communication with David Knoll on February 1st, did you?
A I do not remember honestly. I don't know. I don't remember that day at all actually really.
Q Okay. Did you keep a log of everything that you did that day?
A No, I did not.
Q Why not?
A Uh, because I didn't.
Q I understand you didn't.
A I just didn't.

Q Why not?
A Because I wasn't going to do the log.
Q You were good at your job, right? I'm sorry, go ahead.
A That day, it was a bad day, that whole week was a bad week. Go ahead, I'm sorry.
Q You were good at your job, right?
A Yes.
Q And even if you didn't have enough time to complete your tasks, you would come in voluntarily on the weekends to make sure it got done, right?
A If I had to, yes.
Q Did David Knoll's conduct what we discussed, these five, I don't know what else to call them, did his conduct make it so that you could not do your job?
A Yes.
Q It did?
A Yeah, it was uncomfortable to be around period.
Q So every single day if David Knoll would make comments that made you uncomfortable, correct?
A I don't know what the question is.
Q Every single day David Knoll would make comments that made you uncomfortable?

A He would make me uncomfortable as a human period.
Q Okay.
A After his comments started, yes.
Q And you managed to work through those and be a very good employee and do your job effectively, correct?
A When he wasn't there. You know David Knoll didn't work down at that building all the time, correct?
Q Did you only do your job effectively when David Knoll wasn't there?
A I always did my job effectively.
Q So whether he was there or not, it didn't have any impact on your ability to do your job, did it?
A I don't even know how to answer that question honestly. It started to have a huge impact on me.
Q Name one aspect of your job that you failed to perform effectively or efficiently even because of David's conduct or comments?
A I mean, name one?
Q Anything?
A Anything. I mean for instance the day of

our meeting that affected me immediately. That affected my whole workday, that affected my future with the company.

Q And that was the meeting?

A Yeah.

Q I'm talking about the comments or conduct that you say David engaged in which led up to that meeting, okay?

A Uh-huh, yes.

Q Give me one example of how you were impacted in a negative manner that you could not perform your job effectively because of those conduct or comments?

A If I have someone screaming at me because his warehouse, his moldy warehouse that is leaking on me while I'm working and he's screaming at me to get things done when there's literally electrical being wet above my head. I cannot perform my job getting screamed at. That's my answer, period. I don't have another answer.

Q Let me delve into that answer a little bit. We have got five comments or conduct of David that you consider to be offensive, inappropriate and sexually harassing, right?

A Yes.

Q Which one did he scream at, which one of those five was he screaming at you?
A He didn't scream at me during those.
Q Right.
A He always screamed if a job needed to be done.
Q I wanted to know out of this alleged sexual harassment, not all the other things that happened. Maybe you didn't like the way you work things or whatever it is, these particular five types of sexual harassment that you are claiming happened?
A Alleged, he admitted it. It is not alleged.
Q Tell me how your work performance was negatively impacted as a result of any of those five alleged actions of sexual harassments?
A If I am made to feel uncomfortable as a female, as a human in general, made uncomfortable by the person whose in charge of me and they know that what's coming out of their mouth is making people uncomfortable, regardless if it was me or not. That's going to affect me overall in a negative way. It just is period. Period.
Q Uh-huh. What I need to know is how did it

negatively affect your ability to do your job? What is it that you couldn't do because of that conversation?

A There's nothing that I couldn't do, but when someone speaks down on me or sexually harasses me or makes sexual comments, it is going to get in my head and I'm going to think about it all day. It is going to interrupt my work because that is inappropriate and it should not be a thing. That's my answer.

Q When you say interrupt your work, what do you mean?

A If something is bothering me in my brain, in my mind, it will affect me period. I don't have another answer. I don't know how else to answer it.

Q Your general it will affect me, I need to know how it affects you?

A I have to concentrate at work. If I'm up on a 30-foot ladder and something is bothering me, it is going to get in the way of what I'm doing.

Q Could you give me one example of any portion of your work that you couldn't do or have difficulty doing because of David's conduct or comments?

A I just did.

Q Of your work that you couldn't do or had difficulty doing because of David's conduct or comments?

MR. GHIO: Other than what she's already testified to.

MR. YOUNGER: What she testified to was if I'm up on a ladder. I don't know if that's actually happened or didn't happen. I want actual examples, at least one how your work was in some manner interrupted or --

A Okay. The day he gave me the rose. When he's staring into my soul, tapping the top of the rose, like he's doing it like it's a vagina and staring into my soul while he's doing it looking at me, you got to get it in that spot. You got to get it in that spot. You have to tap it right here. That's going to affect me. I mean, it is going to affect me.

Q (MR. YOUNGER) Okay.

A Emotionally, mentally, it is going to affect the way I perform at work 100 percent.

Q How did it impact or affect the way you perform at work?

A I could not think at work to do my job.

Q I'm not asking why any more. You are

explaining to me that his conduct affected the way you did your work?

A Yes.

Q Specifically tell me how it impacted the way you did your work?

MR. GHIO: I'm going to object to that question. She just said it affects her ability to concentrate and think when you asked how it affected her at work. You are asking her the same question. It is bordering on badgering.

A I can't answer any more, that's my answer.

MR. GHIO: Okay. Stop, let me finish. You keep asking the same question again. She tells you and then you don't acknowledge that she's giving you information as if she hasn't given you the reason why. If it continues, I'm going to instruct her not to answer, end the deposition and get a protective order because it is becoming badgering. I just want to make that clear.

This is probably a good time to take a break for lunch because. It is noon. I'm sure we're not anywhere near finished. We have been going for an hour and 15 minutes. I think that's a good idea. There's no question pending. So this is a good time to break for lunch.

(Lunch recess taken)
Q (MR. YOUNGER) Do you have Exhibit 8 in front of you by any chance?
A Yes.
Q It indicates you worked on February the 1st, right?
A Yes, sir.
Q And we talked a little bit about that day already. Is that the last day that you actually attended work at Walter Knoll?
A Yes, I believe so.
Q And.
(Deposition Exhibit Number 9 marked for identification.)
Q (MR. YOUNGER) I'm going to hand you what's marked as Exhibit 9. Do you recognize that document?
A Yes, I do.
Q And is that a copy of your charge of discrimination?
A Yes.
Q At the bottom of the first page it says digitally signed by you, correct?
A Yes.
Q On February 3, 2024, correct?

A Yes.
Q Okay.
(Deposition Exhibit Number 10 marked for identification.)
Q (MR. YOUNGER) I'm handing you what's marked as Exhibit 10. Do you recognize that document?
A Yes.
Q Is that an email you sent to Tammy Knoll on February 2nd of 2024?
A Yes.
Q And basically you telling her that you weren't going to be at work on February the 2nd, correct?
A Yes.
Q And that would have been a Friday?
A Yes.
Q In this email you say, I'm trying to get into my therapist today because I am just not okay, yes?
A Yeah.
Q Who is your therapist?
A Um, I was making, trying to get into Mercy to speak with someone.
Q So no specific therapist?

A No specific therapist. I had spoke with Mercy earlier that day.
Q Had you visited with a therapist prior to February 2nd?
A No.
Q Were you able to meet with a therapist on February 2nd?
A I went to Mercy, I had an appointment at Mercy. I met with like a nurse practitioner.
Q On February 2nd?
A I don't know exactly what day it was. I don't know if it was in a day or not. I would have to look back at my records.
(Deposition Exhibit Number 11 marked for identification.)
Q (MR. YOUNGER) Hand you what's marked as Defendant's Exhibit 11. Do you recognize that document?
A Yes.
Q Is that an email that was sent to you by Chuck Knoll on February 2nd?
A Yes.
Q And have you had a chance to read that recently?
A Yes.

Q Okay. First of all, I'm going to ask you to read it now. I want to know if there's anything in here that you believe is not accurate?
A Okay. Fine.
Q So you agree it's accurate?
A Yes, for Chuck Knoll, yes.
Q I want to direct your attention towards paragraph number one at the bottom of the first page. Read along with me. Remove David Knoll from interactions with Tadd and Angel, it says Angel, as much as possible.
Did I read that correctly?
A Yes.
Q Is this the first time you were told that that was going to be the response to your complaint about David Knoll?
A I believe we talked about it a little bit during the meeting.
Q Okay. So this wasn't a surprise to you to get this?
A Um, no. Like I said, I believe we did talk about it, touched on it a little bit during the meeting.
Q You made your complaint, you weren't looking to get David Knoll fired, were you?

A No. I mean, he owns the business.
Q You were looking to get his conduct and comments to stop, correct?
A Yes.
Q You wanted an end to his harassment, correct?
A Yes.
Q And if you had no further interaction with him, then you wouldn't be subject to his harassing conduct; is that correct?
A One more time, I'm sorry.
Q Yes. If after your complaint you had no further interactions with David Knoll, then you would have accomplished your goal and ended the harassing conduct towards you, right?
A I don't agree with that.
Q Okay. If you had no interactions with him, how would he harass you?
A May I speak? It would be impossible to not have interactions with him.
Q So you just don't think it was going to be possible to not have interactions?
A I think I would have always had interactions.
Q Would you mind answering my question

though. If you had no interactions with David, he would not have been able to harass you, correct?
A Correct. If, correct.
Q And what they told you the result of your complaint is, we're going to stop the interactions between you and David and we are going to put Tammy in his place, isn't that basically what they told you?
A Yes.
Q Now, and that was basically relayed to you in some manner during your meeting, was it the meeting on January 30th or the second meeting on January 31st?
A The first meeting.
Q Okay. And then it was confirmed to you in this email, which is Exhibit 11, a couple days later on Friday, February 2nd?
A Yes.
Q Okay. Now, you would agree with me that on January 31st and February 1st, you didn't have any interactions with David, correct?
A January 31st and the 1st?
Q Yes.
A Which one was the day of the meeting?
Q Which meeting?

A The first meeting.
Q The first meeting was January 30th.
A Okay.
Q January 31st was the second meeting and February 1st was the last day you worked?
A Okay.
Q You didn't have any interactions with David on January 31st or February 1st, did you?
A No, just saw each other in passing.
Q Okay.
(Deposition Exhibit Number 12 marked for identification.)
Q (MR. YOUNGER) I've just handed you what's marked as Exhibit 12. Do you recognize that document?
A Yes.
Q What is it?
A It is from Mercy for my appointment.
Q And it indicates the date of your visit was February 7th of 2024, correct?
A Yes.
Q Was that your first appointment at Mercy Clinic Family Medicine?
A Yes.
Q Was this where you spoke a little earlier

you talked to a nurse practitioner and a doctor or something?
A Yes.
Q Lydia Greffet, is that the nurse practitioner or physician assistant that you saw?
A Yes.
Q Do you know who the doctor was?
A I only saw her.
Q That's it?
A Yes.
Q So when you say you saw a nurse practitioner and a doctor, you only saw one?
A Well, yeah, but I wasn't sure of her title exactly.
Q Fair enough. Is this the last time you saw her?
A Yes.
Q And she took you off work until February 19th, correct, or through February 19th?
A Yes.
(Deposition Exhibit Number g13 marked for identification.)
Q (MR. YOUNGER) I've just handed you what's been marked as Exhibit 13. Do you recognize this document?

A Yes.
Q And skipping down a little bit about a fourth of the way down the page. It appears to be an email from you to Tammy Knoll?
A Yes.
Q And right before that is an email from Tammy to you, correct?
A Yes.
Q And that was on February 7th?
A Yes.
Q And Tammy is just asking you if you are going to come in on February the 8th, right?
A Yes.
Q And you responded on February the 8th saying you're not feeling well, you're not going to come in. When you responded did you also provide her a copy of Exhibit 12, which you had gotten the day before?
A I believe so.
Q So at that point in time you were telling them, I'm not going to be back until at least the 20th of February, right?
A I mean until I felt.
Q But you were taken off work through the 19th?

A Yes. That's what they approved, yes.

(Deposition Exhibit Number 14 marked for identification.)

Q (MR. YOUNGER) I just handed you what's marked as Exhibit 14. Do you recognize that document?

A Yes.

Q And does that appear to be emails between yourselves and Chuck Knoll?

A Yes.

Q On February 12th of 2024?

A Yes.

Q I want to make sure because this is printed in such a manner that I don't understand how. So I want to make sure that I understand it.

Did you send Chuck Knoll an email on February 12th, which if you read in the very small type towards middle of the page saying Chuck, I'd appreciate it if I could use my 19.42 hours of PTO. I provided Tammy with my doctor's note. Also not sure if you have my correct email or not. It is Sabatino0082@gmail.com. I know you said that you were going to send me a copy of the harassment complaint that you submitted to G&H's HR department. I still have yet to receive that copy by email and

would like that ASAP. Thank you, Angela Sabatino.
Did I read that correctly?
A Yes.
Q Is that an email you sent on February 12th?
A Yes. I give him my new email.
Q It looks like then, your email is repeated by Chuck again, correct. It says from the time clock. Is this a time clock message or something, I'm not really sure?
A Sorry, it is really tiny. Are you referring to the small part up there?
Q Well, that's repeated it looks like right below it where it says from the time clock?
A Yeah.
Q It just repeated your email; is that correct?
A Yes.
Q Okay. And then down where it says number one. That's Chuck's response to your email, correct?
A Yes.
Q And he says, I close the payroll after the Super Bowl. Anyway, in general no vacation hours are available for use during the blackout peak

floral holidays. Two weeks before Valentine's Day, Mother's Day, the week before Thanksgiving until the end of the year, correct?

A Yes.

Q Did you understand that to be their policy?

A Um, at times it was their policy, but Tammy told me she would check and see if I can use my PTO.

Q Okay. And then number two Chuck says, I'm not sure what you are asking for with a copy of the harassment complaint, correct?

A Yes.

Q And then number three he says, I am sure Tadd is ready to have help cleaning up after Valentine's Day. When can rejoin us. I assume that's a mistype of, when can you rejoin us or when you can rejoin us or something of that nature. Is that how you understood it as well?

A Yes.

(Deposition Exhibit Number 15 marked for identification.)

Q (MR. YOUNGER) I just handed you what's marked as Exhibit 15.

Do you recognize that document?

A Yes.
Q Okay. I'm going to skip the email from Chuck to myself at the top. Down to, looks like your email on February 26th of 2024 that starts a little over halfway down the page. Do you see that?
A Yes.
Q Is that your letter of resignation?
A Yes.
Q And you submitted that it looks like at 7:47 a.m. on February 26th, 2024, correct?
A Yes.
Q Okay. Now, between January 30th, when you spoke to Chuck and Tammy and you were told that David was going to be removed from your chain of command until February 26th of 2024, when you resigned. Did you have any communications in any manner whatsoever with anyone at Walter Knoll Florist, other than the few emails that we just looked at?
A Maybe Tadd, I believe.
Q In what manner?
A I think he was asking me how I was doing, if I was coming back to work. I think that's about it. Tammy, Chuck, that's about it, yeah.
Q And in what form were those communications

with Tadd?
A I believe texts.
Q Okay.
A Or email, I'm not 100 percent sure. I could look back, I'm not sure.
Q Did you find anything offensive or inappropriate about Tadd's text messages to you about returning to work?
A No.
Q So Tadd Stone text messaged you and you had four email communications, five email communications with either Chuck or Tammy after January 30th?
A Yes.
Q And you quit?
A I resigned, yes.
Q Is there a difference between quitting and resigning?
A I don't know.
Q Okay. And after you resigned, you filed another charge of discrimination, correct?
A Yes.
(Deposition Exhibit Number 16 marked for identification.)
Q (MR. YOUNGER) I just handed you what's

marked as Exhibit 16. Do you recognize this document?
A Yes.
Q Okay. Is this a copy of your amended charge of discrimination?
A Yes.
Q And on the second page there's a separate paragraph that starts with February 29th, 2024 amendment.
Do you see that?
A Yes.
Q Is that paragraph your amendment to the charge?
A Yes.
Q Okay. I want to take a look at that real quick. You say I was constructively discharged this week from my job because I could not return to the hostile work environment created by my employer that has not been addressed since I filed my charge on February 3, 2024.
Did I read that correctly?
A Yes.
Q Do you have an understanding on what constructive discharge means?
A Do I know the definition for it? No.

Q Do you have an understanding of what it means?
A I guess, I don't know, I don't know.
Q You don't know if you have an understanding?
A I guess not.
Q Okay.
A But you could tell me.
Q You indicate that I could not return to the hostile work environment created by my employer that has not been addressed since I filed my charge on February 3rd?
A Correct.
Q Now, you made a complaint on January 30th, correct?
A Yes.
Q And at that time your complaint was addressed by eliminating the interaction between yourself and David Knoll, correct?
A No.
Q It wasn't?
A No.
Q Now, you have an email indicating that's what's going to happen, right?
A Yeah.

Q You were told that is going to happen, right?
A Yeah.
Q That was all to address your complaint, correct? I'm sorry, let me back up. Eliminating interaction between yourself and David Knoll was a response to your complaint, correct?
A My complaint never got put in specific.
Q Would you answer my question?
A Yes.
Q Eliminating the interaction between yourself and David Knoll was a response to your complaint?
A Yes.
Q I think you already told me, after that meeting on January 30th, you didn't have any further interaction with David Knoll, correct?
A No.
Q And David Knoll did not engage in any conduct or comments that were offensive, inappropriate that you deemed sexual harassment after that meeting on January 30th, correct?
A Correct.
Q Okay. What else did you want them to do to stop the harassing conduct other than to separate

two of you and not have interactions between you and David?
A I am sure you have heard about the meeting.
I asked for them to, well, they actually told me they were going to submit the complaint with the bigger HR department and that I would get a copy of it. That is what I was told. I was told by Tammy that they would do that, both her and Dave. They both mentioned it, G&A Partners. In my meeting with Chuck it is mentioned again. They will submit it with the HR department. You can hear Chuck say, well, I don't know, I don't know. That was that. I never got it. They never did it.
Q Okay.
A They never did what they were supposed to do. They didn't file anything.
Q How did that affect you?
A That makes me feel unsafe in my work environment and also they did not take me seriously. It is in their book that you have, or we have. They didn't do what they were supposed to do. That is our big HR company apparently. That's what they told me they would do and I never received it.
Q I want to make sure I understand. You

wanted the harassment to stop, right?
A 100 percent, but I also wanted it filed and noted that it happened not just in Chuck's emails because that means nothing to me. I want to see it with the HR department.
Q And you wanted the harassment to stop?
A Yes.
Q You never harassed again by David Knoll after you made the complaint, correct?
A I was not.
Q The action that they took, would you agree with me was effective in that it stopped the harassment?
A No, I would not agree with you.
Q No.
A I'm sorry.
Q Were you harassed between January 30th and February 26th?
A By David?
Q Yes.
A I didn't see David.
Q So the answer is no, you were not harassed between January 30th and February 26th; is that correct?
A That is correct.

Q So you got what you wanted?
A No.
Q The harassment to stop?
A No, I did not.
Q Well --
A I asked for a copy of the complaint to be filed with the HR department. If you listen to what was said, they said they would do it. It is in their book here they were supposed to do that. That's all I wanted for that to be in G&A Partners' system with their HR department that none of us employees even know was a thing until that moment.
Q First of all, you have no idea what other employees know, do you?
A I'm sorry?
Q You like to relate things that everybody thinks the same thing I do. None of the employees knew that. You don't know that, do you?
A The people that I spoke with at work, yes. No, not all of them though.
Q And how do you know that this was not reported to G & A?
A Because I asked for it and I got an email back saying, I am not sure what you're asking for was a copy of the harassment complaint.

Q Does it have to be in writing if they called G&A and talked to them?
A I was told by them that I would get a copy of it from G&A.
Q How did not getting a copy from G&A in any manner make your work environment intolerable?
A They didn't submit it. If I were to go back to work and nothing was noted and it kept happening.
Q But it didn't keep happening, did it?
A Because they never submitted the complaint.
Q The harassment did not keep happening?
A That was to protect myself, just like Tammy said. And she said they would do it and Chuck said they would do it, and Dave said they would do it and they never did it. By law --
Q What was to protect yourself?
A Putting my complaint in with G&A Partners HR department.
Q And I cut you off, I'm sorry. You were going to tell me a little bit about the law?
A I'm sorry.
Q You were going to tell me something about the law?

A I don't know.
Q You don't know what you were going to say when you said by law?
A I don't know. I don't remember, but in their handbook it talks about all of those. I just wanted to know where did the complaint go. There was none. Chuck is the HR department. There was never a complaint put in with the HR department.
Q You made a complaint with the HR Department, didn't you?
A With our actual work HR department. There was never anything put in. Like I was told, you can hear in it on the recording. They said there would be, there wasn't. That does not protect me in the workplace at all.
Q Does keeping David Knoll away from you protect you in the workplace?
A Yes, but that would not have happened because they never would have removed me from his department.
Q That is complete speculation on your part because you didn't work, correct?
A The day that I went to work after the meeting, I thought maybe I would be moved out of his office and his desk. As an employer that's the

first thing I would have done.
Q Is that something they told you they were going to do?
A Well, they said they were going to remove, I wouldn't be around him at all.
If he came in that day, he would have been in the same room as me.
Q What they said was they were going to eliminate the interactions between the two of you, correct?
A Yes.
Q They didn't say they were going to move you, or move him, or change desks, or put you in different offices, or anything else, did they?
A That would be eliminating interactions, correct?
Q That's your interpretation, but not what they said to you, correct? Is that correct?
A Yes.
Q Yes, that's not what they said to you. They didn't say to you we are going to separate you, put you in different offices, change desks or anything else. They said we are going to eliminate the interactions between the two of you, correct?
A That is what they said, but that would --

Q They also said they were going to put Tammy in place of David, correct?
A As much as they could.
Q They said as much as we can we are going to do this?
A If you listen to the recording, yes.
Q So what happened at work between January 30th and February 26th that made your working conditions so intolerable that you had to quit? You can answer the question.
MR. GHIO: I'm going to object to the form of the question to the extent that you are asking her to repeat what she's already testified to. Subject to that, you can answer it.
Q (MR. YOUNGER) Let me back up. When you quit, did you feel that your workplace environment was so intolerable that you couldn't go?
A Yes.
Q Okay. What occurred in the workplace environment after January 30th that made your workplace environment so intolerable that you felt you had to quit?
A Well, I was retaliated against after our meeting. And I was given a copy, I was not taken seriously by Chuck, by Tammy, by anyone. That's

what happened. That's all I can say. That's what happened.

Q When you say you were retaliated against, is that the keeping the log?

A I'm sorry?

Q Is that keeping the log, being told to keep a log of what you did?

A Yes, because I know how they are. They made people so uncomfortable they quit their jobs.

Q Any other retaliation?

A Not that I can think of right now.

Q And I think you already told me, you never kept a log, right?

A No.

Q You only worked one more day?

A Yes.

Q Because you never did it, is it fair to say that keeping a log didn't interfere in any manner with you ability to do your job?

A One more time, I'm sorry.

Q Because you never kept the log, is it fair to say that keeping the log did not in any manner impede your ability to do your job?

A No, it did not. With that being said, that log was for no reason other than to make me

uncomfortable and to single me out and it came after the meeting.
Q Would you agree with me that not turning in your harassment complaint to G&A in no manner impacted your ability to do your job between January 30th and February 26th?
A It definitely impacted my ability to do my job.
Q So the only day that you worked, February 1st, what impact did that have on you being able to do your job?
A What, I'm sorry, I'm confused here. What did them not putting the complaint in to the HR department?
Q Correct.
A How did that affect me?
Q No.
A Is that the question?
Q No. When I asked you what retaliation occurred, you told me about the log, okay. And you told me that they did not submit your complaint of harassment to G&A Partner. They did not give you a copy. That's what you told me the retaliation was; is that correct?
A I told you the retaliation was them giving

me a notebook and me writing down what I was going to do every hour on the hour every day that I was there. They did not do that for every employee.

Q Is that different than keeping a log?

A That is --

Q Of what you did?

A I don't --

Q Bear with me and try to answer my question. If you don't understand them, please tell me you don't understand them, okay?

I just want to make sure it is clear. I asked you what the retaliation was that you are claiming, and you said they told you you had to keep a log of everything you did every day and they didn't submit your harassment complaint to G&A Partners HR and they didn't give you a copy of the complaint to G&A Partners HR; is that correct?

A I don't want to say yes because it is not.

Q Because you think it sounds bad for your case?

A No, not at all. I think you're not understanding what I'm saying.

Q Okay. Let me try it this way.

A You are confusing me.

Q Let me try it this way. You claim you

were retaliated against for making a complaint on January 30th, correct?

A Yes.

Q Tell me every single one, one at a time, how you were retaliated against?

MR. GHIO: I'm going to object to this question because it has been asked and answered multiple times what she believes her retaliation was. Subject to that, you can answer it.

A I was given a book to log what I did every hour on the hour every day, not just on the weekends. If I were working on the weekends. That just came out of nowhere. That was not, that didn't come until after our meeting. If they wanted me to do that, why didn't we do that the day before the meeting. Why we didn't do it before the meeting if it was that big of a deal. We didn't.

These people push people out and make people uncomfortable so they can't file unemployment. That's how I feel. That's how I feel. I've seen it before my eyes. If they gave every single person there a notebook that day, everyone would have been doing it, but you can't just single one person out to make them so uncomfortable. It was unnecessary is what it was

and they knew what they were doing. I was way too busy at work to keep a log, too busy.

Q Are you finished?

A Yes.

Q Can I just refer to that as keeping a log of your daily activity?

A The notebook?

Q Yes.

A Sure.

Q I just want to make sure we are talking about the same thing when I'm asking you questions, okay.

So they retaliated against you by making you keep a log?

A Yes, because they knew it would make me uncomfortable.

Q This will be over a lot quicker if you just stop talking after you answer the question.

A Okay.

Q Okay?

A Yeah.

Q Was there any other retaliation against you for making your complaint other than making you keep that log?

A Not that I can think of right now.

Q Do you have anything that you can review or refer to that would refresh your recollection as to what your allegations of retaliation are in this lawsuit?
A No.
Q Who is Coren Feritz at G&A Partners?
A I have no idea. We never knew anyone or had meetings with G&A Partners. I was under the impression that was just for our time clocking in and our PTO.
Q Why didn't you just contact G&A Partners and make your complaint yourself?
A I did contact them to ask if the complaint was put through.
Q Did they tell you?
A Yes.
Q What did they tell you?
A They said they have nothing from Chuck.
Q Why didn't you just then register your own complaint with them?
A Because Chuck said he was going to do it and Tammy said they were going to do it. I don't know.
Q You don't know why you didn't do it?
A I wasn't even aware of G&A partners HR

department, but Chuck and Tammy said they were going to do it and I took their word for it.
Q And even after they told you no, they didn't file anything, you didn't file your own complaint?
A No, I did not because I was still waiting.
Q Now, do you know when you contacted G&A?
A I don't know the exact date. It might show in their system possibly, but I can't get into their system any more.
Q Who is their?
A G&A Partners.
Q Do you know if it was before or after you resigned?
A Oh, it was before because I called to see the complaint.
Q So sometime between January 30th and February 26th?
A Yes, I believe so, yes.
Q Now, would you take a look at Exhibit 3.
A Is it 407, I don't know if that's a three or an eight.
Q No.
A Why am I not seeing it unless I have it in my hand. Yes.

Q You have it there?
A Uh-huh.
Q This was provided to you on November 22nd, right?
A This physical copy, no.
Q The policy itself was provided to you on November 22nd of 2022 and you signed off on it on the last page, correct?
A Yes, on the computer. We didn't get physical copies.
Q Once you were on the computer and you signed off saying you read this and you understood it and you agree, it was available to you for you to look at on the computer after that, correct?
A I suppose I could get into it on my timecard clock.
Q And on the second page, about the middle of the page the paragraph starts with, in addition. Do you see where I'm at?
A Yes.
Q Would you agree with me talking about reports of harassment and discrimination?
A Yes.
Q The last sentence of this paragraph says, if the company does not completely and timely

address your report or complaint, you should contact G&A Partners and it gives you the phone number, correct?

A Yes.

Q It actually says it again in the next paragraph, correct?

A Yes.

Q Okay. And you had this from the very first day of your employment, correct?

A This physical copy?

Q You keep saying it has to be a physical paper copy. You had the policy, correct?

A Yes.

Q Why didn't you call G&A and report your claims of harassment and report that they weren't being addressed by the company?

A Because I was told that my boss would report it and I would get a copy of it. He said he was going to report it and Tammy said they were going to report it. That is my answer that is why I didn't because I was waiting for them to do it.

Q That makes sense all the way up until the time you called G&A and find out it wasn't reported. Why didn't you report it at that point in time?

A I have no idea. I don't know. I guess I

was still waiting for them to get a copy of it possibly, I don't know. They said they were going to do it and they didn't.

Q I think you have already said, your goal was to get the harassment to stop, right?

A Yes.

Q In what manner or how I should say, would making this report to G&A Partners have made it stop?

MR. GHIO: Are you asking her to speculate on what G&A might do?

MR. YOUNGER: She's been speculating all day. She might as well go ahead and keep doing it.

MR. GHIO: So the question you have been asking, subject to my objection, allows you to speculate.

A I already forgot what the question was.

Q (MR. YOUNGER) Sure. You wanted them to file a report of your harassment complaint with G&A and give you a copy, correct?

A Yes.

Q Would it have in any manner ended the harassment by David Knoll?

A Because it would have been noted in their system, not just in Chuck's. If an owner is head of

HR, they're not going to do things they say they're going to do. I'm proof. If that would have been in there, if I would have gotten that complaint it would have changed things. I would have felt more comfortable, but nothing was put in. That's not protecting me.

All what Chuck and Tammy said is hearsay. They can put a complaint in his computer notes like he did or in his email all they want, but that's not a complaint to HR like he should have done. He should have done that. I was told they were going to do that to protect me from further things happening. That's what I was told.

Q They actually said that was going to protect you?

A I believe Tammy did, yes, I believe.

Q Is that on the recording?

A Excuse me?

Q Is that on the recording?

A I don't know. I think it might be something along those lines.

Q Would it have been said during one of those two meetings that you recorded?

A I believe so, yes.

Q Okay. We can listen to the recording and

see if she actually said that, right?
A Yeah. She's a female. She knows.
Q If it is not in the recording would you agree with me that she didn't say it?
A No, I would not. That's the whole point of the complaint, sir.
Q I'm sorry, what's the whole point of the complaint?
A To protect me at work.
Q From the harassment of David Knoll?
A Yes. From anything further happening and him stopping, yes.
Q I just want to make sure I'm clear, or it's clear, or we're in agreement, it did stop. David Knoll never harassed you again after January 30th, did he?
A Yes, it stopped.
Q As a matter of fact, David Knoll never harassed you again after January 25th, did he?
A I would have to think about that. I don't know.
Q Please think about it because that's why we are here.
A Well.
MR. YOUNGER: Can you read it back?

(The requested portion of the record read by the reporter.)

A No, he did not. He was not given the chance to be around me. I wasn't even there. No.

Q You mentioned that you made many job applications after you quit at Walter Knoll. Can you tell me to where?

A Oh, my gosh. I literally got on Indeed and started submitting. I would have to pull them all up.

Q Do you have the ability to pull your Indeed account and all of your applications?

A I've never looked at applications, but I can try.

Q Did you make any applications through anywhere other than Indeed?

A I do not believe so.

Q You had one job for a day, right?

A Uh-huh. That was just recently. Like this year.

Q You had one job for a day, correct?

A Yes.

Q Were you offered any other jobs as a result of your application through Indeed?

A Can I look at my applications? You are

asking me a bunch of different questions.
Q If you like.
A I thought you wanted me to pull them up.
Q If you don't know the answer, that's perfectly fine.
A I had a job.
Q If you don't know the answer to my questions, that's perfectly fine.
A I don't know.
Q Okay. I'm not sure which question you are answering. Were you offered any jobs through Indeed that we haven't already talked about, which would have been your flower installing in Columbia, Illinois?
A I don't know. I honestly don't know. That was two years ago, sir.
Q Did you have any interviews?
A I think I might have had one phone interview.
Q Do you recall who with?
A Maybe possibly with the special school district. I think I did like some phone questionnaire, but no in person. I would have to look back at all of this. I don't remember.
Q Do you recall what your pay rate was when

you quit at Walter Knoll?
A I do not. Maybe 18, 17.
Q It was less than 20 bucks an hour, right?
A Yes.
Q After you quit, were you able to make up the hours by working for Culinary Canvas?
A To bring me to 40 hours a week?
Q Yes. To make up the hours you missed?
A No.
Q Now you are working 40 hours a week now, right?
A Yeah, events are busy season right now. It is weddings. Winter is not.
Q When you quit in February there wasn't a lot of work available?
A True.
Q How long did it take before you could pick up enough work at Culinary Canvas to get up to 40 hours a week?
A I mean, really honestly, sir, it just depends on the week. Spring and summer is busy with weddings and events.
Q So would it have been spring time, March or April?
A I'd say more summer.

Q So no spring?
A It starts picking up in spring. I can go back and look at my hours.
Q I'm just trying to get an idea. April, May, June, any idea?
A May, we will say May for wedding season.
Q Were you able to increase the hours at all between the time that you quit and the time that the season picked up?
A No.
Q Nothing at all?
A To 40 hours a week, no.
Q At all. Ten hours a week, 20 hours, I don't care what it was. Were you able to increase the hours?
A It just depends on the week. We don't have a set schedule is what I'm saying. We go in and pick up events. If it was busy one week, I could have had 40 hours. I don't remember what I was working back then as far as hours go.
Q You made a comment a little bit ago something to the effect of that they push people out, get them to quit so they don't to have pay unemployment.
Did I restate that accurately?

A Uh-huh, yes.
Q Who did they push out, make them quit so they didn't have to pay unemployment?
A Katy Danielle, April wasn't allowed to get unemployment.
Q Do you know April's last name?
A Becker.
Q Thank you.
A That's the only people's first and last names I know.
Q Do you know anybody with a first name that they did that to?
A Not off the top of my head, no.
Q Do you have any documents or records that would help you refresh your recollection as to who that happened to?
A No.
Q Do you suffer from anxiety?
A Still to this day or back then.
Q Let's start with to this day?
A No.
Q Did you suffer from anxiety at some point in time while you worked at Walter Knoll?
A Yes.
Q Was it ever diagnosed?

A After, when I went to the doctor it was after the meetings and after all of that madness, yes.
Q So this one trip to the doctor on February 7th, you got a diagnosis of anxiety?
A Yeah, she gave me some medication to calm my nerves.
Q What medication?
A I would have to go back and look. I'm not exactly sure what it was, but I can get a copy from her.
Q Being prescribed medication is a little different than being diagnosed with anxiety. Were you diagnosed with anxiety?
A I would have to look at her papers.
Q You don't know?
A She gave me medication she told me I was having anxiety. So, yes, she told me that I had anxiety, yes.
Q You claim to have a loss of enjoyment of life. Can you explain to me what that means?
A Excuse me?
Q You claim to have loss of enjoyment of life?
A I claim now?

Q Can you explain that to me?
A Right now in this moment?
Q Since you were employed by Walter Knoll up to now?
A Yes, because it has put me through hell. This has put me through hell.
Q Can you explain what you mean by put you through hell as a loss of enjoyment of life?
A Yes, it gave me anxiety after all of that I lost a job that I loved, loved. And thereafter I struggled with depression after that which I got prescribed depression medicine and that's what it did to me.
Q Gave you anxiety and depression?
A Yes, it destroyed me. That happening destroyed me for a while.
Q How long?
A I don't know, I mean, until this whole thing is over with.
Q So you're still suffering?
A I try not to. I exercise, I go to women's groups and talk, but I have my days.
Q What are your bad days like now?
A I don't feel like doing anything.
Q When is the last time you had a bad day?

A When is the last time I had a bad day?
Q Yes, ma'am.
A I'm human, today.
Q You didn't feel like doing anything today?
A No.
Q Was that because of this deposition?
A Yes.
Q If you know, when is the last time you had a bad day because of what happened at Walter Knoll?
A Like I said, this affected me big time. And until this is over and the anxiety of all of this is gone, I guess that's when it will stop. I don't know how else to answer your question.
Q My question about last time you had a bad day because of what happened at Walter Knoll?
A Um, I guess when I have to look over everything last week again. It makes me bring it all back last week and today.
Q What did you look over last week?
A Like 400 pages of papers that you submitted and same thing you have, emails.
Q Anything else you can tell me you reviewed?
A No, that's it.
Q Because 400 pages, that's not nearly 400

pages in front of you. Do you remember anything else that you might have reviewed?

MR. GHIO: She just said reviewed the stuff you submitted.

MR. YOUNGER: The question was, I want to know if she remembers what any of it was? It is a fair question. If she doesn't, she can say no.

Q (MR. YOUNGER) Do you remember any other documents that you reviewed that are not sitting on the table in front of you?

A Yes, all of the 400 pages.

Q Do you remember what any of them were?

A I mean there's 400 pages, sir. I don't know how to answer that, sorry.

Q You don't know how to answer the question. Do you remember any other documents that you reviewed last week that are not sitting on the table in front of you?

A No.

Q Other than reviewing those documents, did you do anything else to prepare for your deposition today?

A Um, yes. I looked over things that I had emails with Chuck and Tammy. Went over some stuff that's actually in front of me right now, the

charges. Just went over everything that I could that I had.
Q We have been through your documents with you. You told me you looked at everything that's on the table, plus some other documents you don't remember what they are, fair?
A I mean they are what you submitted. I remember what I read. There was 400 pages.
Q My question is, did you do anything else, other than review the 400 pages of documents, to prepare for your deposition?
A Yes. I just told you I met with my lawyer.
Q Okay. I don't want to talk about anything you talked to your lawyer about?
A You just did, sir.
Q I get it. I'm going to exclude the conversation with your lawyer. You looked at documents. Did you do anything else to prepare for your deposition?
A Yes. At home I went over what I had. I looked back at emails. I tried to look at Tadd's text messages, but they're gone and I don't know how to get them back. I tried to look at Tammy's messages. I don't know how to get those back. I

just read what I have. That's what I did.
Q Do you have emails that you haven't been shown today?
A From Chuck and Tammy?
Q That you reviewed?
A I don't believe so.
Q Okay.
A I think we have everything in there from Chuck and Tammy. I think Tadd's were text messages.
Q Do you have emails from anybody else that you reviewed that you haven't been shown today?
A No, I don't believe.
Q You said you looked at what you had?
A Uh-huh.
Q Is that something different than the emails and the 400 pages of documents?
A I mean of course I have a notebook of things that happened.
Q You have a notebook of things that happened?
A Yeah.
Q When did you create that notebook?
A Uh, I have no idea. When I started taking notes so I could refresh my memory.
Q Were you still employed at Walter Knoll?

A No.
Q Why did you write in a notebook?
A Last week to refresh my memory.
Q Did you say last week?
A I'm sorry.
Q Did you say last week?
A Yeah, after our meeting and whatnot, I took some notes from stuff that I had.
Q Where are those notes?
A At home.
Q Has anyone seen the notes other than you?
A No. I'm pretty sure they're in the trash. They were just like an outline what I wanted to read as far as emails and whatnot.
Q You took the notes on your own, you weren't instructed to do so?
A No.
Q If you have them, please do not throw them away.
A Okay. Yeah, I don't have that notebook with me that I would have written them in, but yeah.
Q What does the notebook look like?
A What does it look like?
Q Yes.
A A green notebook I believe.

Q Is it spiral bound with like the wire binding on it?
A Yes.
Q Eight and a half by 11?
A Sure.
Q Do you turn the pages left to right?
A Yes.
Q Not up and down?
A Yes.
Q When you wrote your notes in this notebook, did you write them all at one time?
A The past week or two I was taking notes for today refreshing my memory.
Q I understand what you're doing. Other than that notebook, did you keep any other notes regarding this situation?
A No.
Q Do you know what medication you were given on February the 7th?
A I don't remember exactly what it was called.
Q When is the last time you took it?
A I think 30 days or so, and then I started exercising. I don't like taking medication. It is not something that you would take every day though.

Q How often were you taking it?
A If I had anxiety and tried to pull myself out of it. I tried to exercise beforehand so I wouldn't have to take it. Some days I would have to. I can get the name of it from her if you would like.
MR. YOUNGER: That's all the questions I have, thank you.
MR. GHIO: Let's take a 5-minute break.
(Recess)
EXAMINATION
BY MR. GHIO:
Q Angela, Mr. Young was asking you some questions about the policies and handbooks from Walter Knoll. I want to go back over those again with you just briefly. We looked at Exhibit 5, which is the employee handbook. And you signed that when you first went to work at the company, correct?
A Yes.
Q Okay. And after you had a chance to look at it, was it a computer monitor screen you were looking at?
A Yes.
Q And where was that computer that you were working on to sign the policies and look at the

documents, where is that located?
A It was in a separate room. Chuck's office is right here and then it was the next room over or next room or two rooms over in their computer room. I don't know if it is still a computer room now.
Q So the entire time that you worked there, was that room set up that same way with that computer and the monitor?
A Yeah, I believe so, yes.
Q Okay. Was that just for employees that were looking at documents that the company had available for employees?
A I believe so. I think they could go and use them.
Q For example in Exhibit 5, did you sign an acknowledgment for that?
A Yes.
Q Well, Exhibit 5 doesn't show your signature, but you remember signing it when you saw it?
A Yeah, I thought I signed everything, each one.
Q And I think in the disclosures we got there were two copies of it and the second copy may have been the one with your signature. But we did

look at it, I believe it was Exhibit 3. This one has your electronic signature, correct?
A Yes.
Q Now, we talked a little bit about this G&A Partners, the HR entity that worked with the company. Had you ever met anyone from G&A Partners in St. Louis?
A No.
Q Okay. And the sexual harassment policy, or the policy against unlawful harassment and retaliation we saw in Exhibit 3. Did Walter Knoll ever provide any training to you as an employee on that policy?
A No.
Q Did you ever have any kind of human resources training as an employee when you worked at Walter Knoll?
A No.
Q Now, I know we talked about longer meeting, which I believe was on January 30th when Dave was in there with you and Tammy.
In that meeting David Knoll actually acknowledged the incident with the rose, correct?
MR. YOUNGER: I object to the leading form of the question. Subject to that, go ahead.

Q (MR. GHIO) Did he acknowledge what happened at 1 Met Square?
A He did not remember, no.
Q And Mr. Younger ask you about if you contacted G&A Partners to see if your complaint about David Knoll had been received. Was that a phone call that you made to G&A Partners?
A Yes.
Q And I think you said this, let me be clear about this. You believe you made that phone call prior to you telling Walter Knoll that you weren't going to come back to work?
A Yes.
Q Do you remember the name of the person you spoke to?
A I don't. I don't even think I got a name. I just asked them if a complaint had been put in. They asked me for my name and social. I gave it to them and they said I have nothing and that was it.
Q Okay.
A Maybe they would have a log.
Q When you were speaking to them about whether or not they had received your complaint of sexual harassment about David Knoll, did they tell you, you could make a complaint right now about

David Knoll with them?
A No.
Q Let me ask you one last question, Angela. During the time period when you were off after February 1st of 2024, when did you make the decision that you couldn't go back to work for the company?
A Um, after I realized that they didn't put a complaint in and not protected by anyone there. And I thought about everything and it was in that moment I decided I can't, I can't.
Q After you had the meeting with Tammy and Chuck and Dave, were you back in the workplace and had seen that your desk was still in the same place that Dave's desk was?
A Well, our desk was the same desk, yeah.
Q And had you been told that Dave was no longer going to be able to use that desk?
A No.
MR. GHIO: I don't have any further questions.
MR. YOUNGER: Signature?
MR. GHIO: We'll read. I will take a PDF.
(End of deposition.)

State of Missouri

SS.

County of St. Louis

I, Randy R. Dunn, a Licensed Certified Court Reporter by the Supreme Court in and for the State of Missouri, duly commissioned, qualified and authorized to administer oaths and to certify to depositions, do hereby certify that pursuant to Notice in the civil cause now pending and undetermined in the Federal District Court, State of Missouri, to be used in the trial of said cause in said court, I was attended at the offices of McMahon Berger, 2730 North Ballas Road, Suite 200, in the City of St. Louis, State of Missouri, by the aforesaid attorneys; on the 21st day of August, 2026.

The said witness, being of sound mind and being by me first carefully examined and duly cautioned and sworn to testify the truth, the whole truth, and nothing but the truth in the case aforesaid, thereupon testified as is shown in the foregoing transcript, said testimony being by me reported in shorthand and caused to be transcribed into typewriting, and that the foregoing page correctly

set forth the testimony of the aforementioned witness, together with the questions propounded by counsel and remarks and objections of counsel thereto, and is in all respects a full, true, correct and complete transcript of the questions propounded to and the answers given by said witness; that signature of the deponent was not waived by agreement of counsel.

I further certify that I am not of counsel or attorney for either of the parties to said suit, not related to nor interested in any of the parties or their attorneys.

--------------------------------------

Randy R. Dunn RPR, CRR, CCR No. 193

CERTIFICATE OF OFFICER AND
STATEMENT OF DEPOSITION CHARGES
(Rule 57.03(g)(2)(a) & Sec. 492-5990 RSMo 1990)

Deposition of Angela Sanatino, August 21, 2026, 181 pages

Custody of the original transcript: Mr. Robert Younger

TAXED IN FAVOR OF PLAINTIFF: $

TAXED IN FAVOR OF DEFENDANT: $

The above charges have not yet been paid. It is anticipated all charges will be paid in the normal course of business to: 360 Litigation Services Production Department, 1332 Strassner Drive, St. Louis, MO 63144.

IN WITNESS WHEREOF, I have hereunto set my hand and seal on this 3rd day of September, 2026.

__________________________

Randy D. Dunn
RPR, CRR, CCR No. 193

SIGNATURE PAGE

Comes now the witness, Angela Sabatino, and having read the foregoing transcript of the deposition taken on August 21, 2026, acknowledges by signature hereto that it is a true and accurate transcript of the testimony given on the date hereinabove mentioned.

_______________________________________

Subscribed and sworn to me before this

________________ day of _______________.

My commission expires

_____________________________________

Notary Public

# CORRECTION PAGE

Page ___ Line____ Reason ______________________________

________________________________________________________________

Page ___ Line____ Reason ______________________________

________________________________________________________________

Page ___ Line ____ Reason ______________________________

________________________________________________________________

Page ___ Line ____ Reason ______________________________

________________________________________________________________

Page ___ Line____ Reason _______________________________

________________________________________________________________

Page ___ Line____ Reason ________________________________

________________________________________________________________

Page ___ Line____ Reason _________________________________

________________________________________________________________

Page ___ Line____ Reason _________________________________

________________________________________________________________

Page ___ Line____ Reason _________________________________

________________________________________________________________

Page ___ Line ____ Reason ________________________________

________________________________________________________________

### $

**$25** 10:25

**$30** 16:2

**$30s** 11:2,25

### 1

**1** 16:11,14 18:23 176:2

**10** 125:3,6

**100** 12:17,18 59:1 93:14 96:7 122:21 137:4 142:2

**100%** 86:3

**11** 126:14,17 129:16 172:4

**12** 130:11,14 132:17

**12th** 133:11,17 134:5

**13** 131:24

**14** 133:2,5

**15** 20:24 29:3 123:23 135:21,24

**16** 137:23 138:1

**16th** 73:25

**17** 162:2

**18** 162:2

**19.42** 133:19

**19th** 16:18 131:19 132:25

**1:00** 80:23

**1:15** 42:13

**1st** 63:18 116:12,16 124:6 129:20,22 130:5, 8 149:10 177:5

### 2

**2** 21:11,14 22:11

**20** 11:7,24 16:2 162:3 163:13

**2019** 9:21

**2021** 19:5

**2022** 16:18 17:1 22:4 23:12 24:8,22 155:7

**2023** 29:21 30:9 32:23 73:17,25 91:21 109:12

**2024** 14:14 29:17 36:17 38:22 40:8 41:15 42:12 43:7 46:3 63:12 65:4 124:25 125:10 130:20 133:11 136:4,10,15 138:8,20 177:5

**20th** 132:22

**22nd** 17:1 22:3 23:12, 16 24:8,21 27:19 33:9 36:17 155:3,7

**23** 12:18 14:18 29:20 30:4,12 37:3 90:21 92:18

**24** 14:19 16:8 29:17,18, 19 37:2

**24th** 41:2

**25** 11:7 14:12 65:4

**25th** 64:2,5 69:1,11 83:7,9 112:4 159:19

**26th** 112:7 136:4,10,15 142:18,23 147:8 149:6 154:18

**28th** 36:17,21 37:7 38:6,12 42:12 48:25 53:9,16,23 54:2 55:17, 20 56:9 59:9,21 60:2 62:20 70:3,18 71:5,17, 21,25 86:7,10 112:9

**29** 41:15

**29th** 38:21 40:8 41:2,17 42:23 46:3,21 53:16 55:20 63:12 70:2,17 71:4,13,16,20,24 112:11 138:8

**2:00** 82:13

**2nd** 125:10,13 126:4,7, 10,21 129:17

### 3

**3** 23:2,5 124:25 138:20 154:20 175:1,11

**30** 40:1 43:7 74:2 172:23

**30-foot** 121:19

**30th** 47:9 49:9,13 50:2, 3,24 51:18 53:22 55:9, 20,24 56:3 69:22 70:21 72:11 73:2 83:2 86:24 112:14,18 113:11 114:4 115:3 129:12 130:2 136:12 137:13 139:14 140:16,22 142:17,23 147:8,20 149:6 151:2 154:17 159:16 175:20

**31st** 51:12,15,21 55:21 56:9,17,24 57:2 62:25 115:8,18,21 116:8 129:13,20,22 130:4,8

**3rd** 139:12

### 4

**4** 23:22,25 63:12

**40** 162:7,10,18 163:12, 19

**400** 167:20,25 168:11, 13 169:8,10 170:16

**407** 154:21

**4620** 9:11

**4:00** 34:4

### 5

**5** 24:18 28:22 173:16 174:15,18

**5-minute** 173:9

### 6

**6** 36:7,10 42:12

**63128** 9:15

**6th** 73:17

### 7

**7** 39:4,7 41:11 42:1 64:9 67:25

**7:47** 136:10

**7th** 130:20 132:9 165:5 172:19

### 8

**8** 63:5,8 124:2

**8:00** 34:4

**8:10** 42:13

**8th** 132:12,14

### 9

**9** 124:13,16

### A

**a.m.** 42:13 80:23 82:13 136:10

**ability** 118:15 121:1 123:7 148:19,23 149:5, 7 160:11

**absent** 86:9

**abundantly** 116:14

**access** 24:15

**accident** 6:16

**accomplished** 128:14

**account** 160:12

**accountable** 54:10

57:24 58:3,6,23

**accurate** 127:3,5

**accurately** 7:19 63:14 163:25

**acknowledge** 123:14 176:1

**acknowledged** 175:23

**acknowledgment** 22:11 24:4 174:16

**act** 11:15 64:15,21 65:3

**action** 88:9 109:14 142:11

**actions** 32:19 73:9 109:17 120:17

**activity** 11:25 152:6

**actual** 24:12,15 59:19 89:4 122:8 145:11

**added** 31:1,3,13,25

**addition** 155:18

**address** 9:10 140:4 156:1

**addressed** 83:6 138:19 139:11,18 156:16

**admitted** 120:13

**advance** 81:6

**advances** 81:2

**advertisement** 17:18

**affect** 120:23 121:1,14, 16 122:17,18,21,22 141:18 149:16

**affected** 119:1,2 123:1, 8 167:10

**affects** 121:17 123:7

**aforesaid** 6:4

**age** 6:2

**agree** 35:19 95:25 96:5 127:5 128:16 129:19 142:11,14 149:3 155:13,21 159:4

**agreement** 159:14

**ahead** 41:7 77:25 98:15,16 115:25 117:4, 6 157:13 175:25

**allegations** 32:6,12 153:3

**alleged** 120:7,13,14,17

**allowed** 15:3 49:2 164:4

**amended** 138:4

**amendment** 138:9,12

**amount** 21:6 67:17

**Angel** 127:10

**Angela** 6:1,13 68:1 134:1 173:13 177:3

**answering** 7:12 128:25 161:11

**answers** 98:8

**anxiety** 164:18,22 165:5,13,14,18,19 166:9,14 167:11 173:2

**app** 14:23

**apparently** 20:3 141:23

**appears** 16:15 21:21 95:25 132:3

**application** 160:24

**applications** 13:11 160:6,12,13,15,25

**applied** 17:20 19:10

**appointment** 41:20 43:23 126:8 130:18,22

**appointments** 43:19

**approval** 56:4 57:14

**approve** 77:2

**approved** 133:1

**approximately** 13:4 15:15

**April** 92:10,14,16 93:25 96:19 97:11,18 98:12 99:10,24 162:24 163:4 164:4

**April's** 98:20 99:14 164:6

**area** 100:19 101:14

**arms** 65:24

**ASAP** 134:1

**aspect** 118:20

**ass** 95:4 102:22

**assistant** 20:15 131:5

**assume** 8:4 18:14 68:9 95:16 135:16

**assumes** 60:13,16

**assuming** 68:20

**assumption** 68:11

**attended** 124:10

**attention** 38:10,14,17 127:7

**audibly** 7:13

**authorization** 56:5 60:4,6 72:4

**availability** 18:17

**average** 14:19

**avoid** 7:11

**aware** 153:25

## B

**back** 13:10 14:1 15:10 16:7 19:4 25:8 39:1,3 40:1,25 43:6,11,12 48:18 54:15 63:24 74:11 81:23 83:21 85:7 86:6 89:13 100:5 101:15 126:13 132:21 136:23 137:5 140:5 143:24 144:8 147:15 159:25 161:24 163:3, 20 164:19 165:9 167:18 169:22,24,25 173:15 176:12 177:6, 12

**bad** 32:19 117:5,6 150:19 166:23,25 167:1,9,14

**badgering** 123:10,18

**barbecue** 12:25

**bartend** 10:11,13

**bartending** 10:25 11:11

**basically** 54:16 115:20 125:12 129:7,10

**bathroom** 65:21 66:20, 21 67:8,12

**Bear** 150:8

**Becker** 92:15 97:11,18 164:7

**Becker's** 96:19

**bed** 82:13

**beds** 13:17,23

**begin** 113:7,12

**believes** 151:8

**bent** 74:7,14,16

**big** 61:22 87:10,16 89:19,21 141:23 151:17 167:10

**bigger** 141:7

**binding** 172:2

**bit** 29:1 80:12 88:22 119:22 124:8 127:17, 22 132:2 144:22 163:21 175:4

**blackout** 18:18 134:25

**blow** 108:18

**book** 52:23 58:9 141:21 143:9 151:10

**booklet** 7:6

**bordering** 123:10

**boss** 14:9 61:3 156:17

**bosses** 58:1,6

**bothered** 105:23
**bothering** 121:13,19
**bottom** 124:22 127:8
**bound** 172:1
**Bowl** 134:24
**box** 39:18
**boxed** 54:19
**boxes** 54:24
**brain** 121:13
**break** 8:21,24 9:3,6 28:22 62:16 123:21,25 173:9
**briefly** 173:16
**bring** 162:7 167:17
**brother** 91:12
**brothers** 83:17,20 84:17,25
**brought** 38:10,13,16 53:21 69:13 87:1,3 102:24
**brush** 75:8 76:3,16 79:8
**brushed** 77:19 78:6 79:25
**brushing** 79:19
**bucks** 162:3
**building** 25:14 26:16 30:12 74:4 82:22 90:20 118:9
**bunch** 14:5 161:1
**busier** 21:3
**business** 128:1
**busy** 15:1,4,19 22:21 152:2 162:12,21 163:18
**butt** 75:9 76:4 77:1,2 78:13,15,22 79:2,4,9, 19 80:1,7,8,13,25 81:11 82:23 83:4 86:21 95:3,7,9,14,17,24,25 96:2,16,17 102:14,17 103:10 110:4
**butts** 96:13,14

**C**

**call** 14:20 19:20 68:2,4 117:15 156:14 176:7, 10
**called** 12:20,22,23 13:14,15 40:2 62:22 67:25 68:12,15,19,20 144:2 154:15 156:23 172:21
**calls** 98:14
**calm** 165:6
**cameras** 54:8 94:18
**Canvas** 10:6,7 12:14, 20,21 13:8 14:15,20 15:16,22 162:6,18
**car** 6:16 46:1
**care** 8:23 35:16,23 37:18 77:8,16,17 86:9 98:6 163:14
**case** 6:4 150:20
**categories** 105:17 109:23
**cetera** 17:14
**chain** 12:25 136:14
**chance** 124:3 126:23 160:4 173:20
**change** 15:5,8 16:6 20:24 21:4,5 29:5 30:9 31:11 34:4,7 146:13,22
**changed** 16:5 21:6 29:3 158:4
**charge** 31:16 32:3 35:17 39:11,12 75:20 113:17 120:20 124:19 137:21 138:5,13,19 139:11
**charges** 169:1
**check** 135:8
**Christmas** 30:16,20,25 31:6,7 37:12 74:3 106:8 107:2 109:5,10
**Chuck** 16:20 17:21 18:4,5,13 19:21 20:16 27:8,9,10 30:1 36:2,4 50:14,21 52:16 53:20 61:1,8 69:23 71:15 81:24 92:3,24 93:2,9 100:18,22 104:14 112:18,21 113:1 126:21 127:6 133:9,16, 18 134:8 135:10 136:3, 13,24 137:12 141:11, 13 144:15 145:7 147:25 153:18,21 154:1 158:7 168:24 170:4,9 177:12
**Chuck's** 99:7 101:6 134:20 142:3 157:25 174:2
**cigarette** 8:22
**claim** 102:25 103:2 150:25 165:20,23,25
**claiming** 120:11 150:13
**claims** 156:15
**clean** 31:20,21
**cleaned** 30:15,24
**cleaning** 135:15
**clear** 18:4,9 110:3 116:14 123:19 150:11 159:13,14 176:9
**cleared** 48:8,11 49:3,12
**client** 11:22
**clients** 30:19,20 31:1
**Clinic** 130:23
**clock** 90:19 134:9,14 155:16
**clocked** 63:15
**clocking** 153:9
**close** 134:23
**closed** 20:21
**closely** 39:24 42:16 61:3
**co-worker** 79:13
**code** 9:14
**collect** 100:8
**Columbia** 13:13 14:16 161:13
**combination** 67:15,19
**comfortable** 158:5
**command** 136:15
**comment** 22:23 88:9 89:17,22 90:5 91:4 103:11 109:14 163:21
**comments** 86:22,23 87:10,23 88:18,19 89:10,15,16 95:5 102:18 103:10,11,15, 21 104:7 109:17 110:6, 12 111:4,18 114:5 117:22,25 118:4,22 119:6,13,22 121:6,24 122:3 128:3 140:20
**committed** 32:19
**communicate** 49:4
**communicating** 55:12
**communication** 49:6 55:8 57:4,11 58:13 116:15
**communications** 114:17 136:16,25 137:11,12
**company** 10:8 13:13 119:3 141:23 155:25 156:16 173:18 174:11 175:6 177:6
**complain** 96:24 97:13
**complained** 58:18
**complaining** 58:21 73:10

**complaint** 73:20,22 92:10 96:19,23 97:1,2, 3,11,12,15,19,23 98:2, 11,20,24 99:2,9,15,24 100:2,9,10,14,22 127:15,24 128:12 129:5 133:24 135:12 139:14,17 140:4,7,8,13 141:7 142:9 143:6,25 144:12,19 145:6,8,9 149:4,13,21 150:15,17 151:1 152:23 153:12, 13,20 154:5,16 156:1 157:19 158:3,8,10 159:6,8 176:5,17,23,25 177:8

**complaints** 73:6 92:3, 12,17 97:4 98:19 112:25

**complete** 28:10 117:10 145:21

**completely** 155:25

**complimented** 59:7

**compound** 46:5 57:16

**computer** 25:4 155:9, 11,14 158:8 173:21,24 174:4,5,8

**concentrate** 70:11 121:18 123:8

**concerned** 50:19

**conclusion** 98:14

**Concord** 9:17

**conditions** 147:9

**conduct** 71:12 86:23 87:21 103:15 104:7 111:18 112:25 114:6 117:13,15 118:22 119:6,13,22 121:23 122:2 123:1 128:2,10, 15 140:20,25

**confirmation** 59:19

**confirmed** 129:15

**confused** 149:12

**confusing** 150:24

**considered** 80:1

**constant** 89:11 90:4 103:20 104:2 105:7,9

**constantly** 67:19

**constructive** 138:24

**constructively** 138:16

**contact** 78:12,13 114:8, 11 115:1 116:15 153:11,13 156:1

**contacted** 154:7 176:5

**contacting** 115:1

**contend** 80:25 88:10,15 89:7,23 103:16 104:8 112:5

**continue** 112:24

**continues** 123:16

**control** 89:14

**conversation** 17:21 65:9,17,20 66:24 69:3 81:21 85:12,20,23,25 86:1 104:25 121:3 169:18

**conversational** 12:10

**conversations** 70:2 71:16,20,24 114:2

**copies** 155:10 174:24

**copy** 24:10,13,14 124:19 132:17 133:23, 25 135:11 138:4 141:8 143:6,25 144:3,5 147:24 149:23 150:16 155:5 156:10,12,18 157:1,20 165:10 174:24

**Coren** 153:6

**corporate** 10:12

**correct** 16:16 17:1,5 25:9,11,14,17 29:12,24 32:4,7,10 36:3,18 37:2 38:22 39:13 42:14,20 49:9 50:25 51:15,18,21 55:5,24 56:5,11,17,21, 25 59:10,13,16,17,21 63:2 71:9,10 72:17 73:3,7,11,14,17 78:7 96:17 98:12,22,23,25 99:7,11 100:16 102:25 103:7,13 109:15 110:4, 7,10,13 117:22 118:7, 10 124:23,25 125:14 128:3,6,10 129:2,3,21 130:20 131:19 132:7 133:21 134:8,17,21 135:3,12 136:10 137:21 139:13,15,19 140:5,7,17,22,23 142:9,24,25 145:22 146:10,16,18,24 147:2 149:15,24 150:17 151:2 155:8,14 156:3, 6,9,12 157:20 160:21 173:18 175:2,23

**correctly** 42:9,17 43:8 65:5 127:12 134:2 138:21

**County** 9:9,19

**couple** 6:16,22 13:2 33:7,10 92:8 129:16

**cover** 36:16

**cracked** 100:15

**crash** 45:25

**create** 170:22

**created** 138:18 139:10

**cry** 67:14 82:25

**crying** 66:20 67:7,10 69:10,18 82:15,16,21, 24

**Culinary** 10:6,7 12:14, 20,21 14:20 15:16,21 162:6,18

**curious** 19:4

**cut** 88:25 144:21

**D**

**dad** 74:21 80:21

**daily** 105:5 152:6

**damn** 48:22

**Danielle** 94:6,8 164:4

**Danielle's** 100:2

**date** 90:2,11,13 91:5 109:8 130:19 154:8

**dated** 16:18

**dates** 89:25 102:20 103:12 110:13

**daughter** 74:9,12,21 79:16 80:20

**Dave** 21:4,9 29:9,15 30:4,9,17,22 31:14 32:1 38:18 52:3 53:24 54:1 68:1 72:12 74:8, 11,22 75:15 79:23 81:24 83:11,13,14 92:23 93:1,9 95:3,5,6, 9,13 107:8 141:10 144:16 175:21 177:12, 16

**Dave's** 30:22 74:9 177:14

**David** 32:13,15,19,21, 23 33:3,12,13 34:1 40:1 44:17 47:16,21,24 48:2,25 50:10,13,21,22 53:20 56:6 64:3 65:25 66:1,7,8 67:4,9,10,13, 20,21 69:11,15,23,24 71:12,23 73:2,6,9 80:18 81:1,11 83:2 84:4,6,12 86:21,23 87:15,23 88:10,14 89:4,17,23 95:23 96:1 101:17 102:8 103:2,6, 18 104:8 106:21 108:24 109:14,15,18 110:4,6,9,12,21 111:18 112:5,14,17,21,25 113:8,13,16,23 114:2,

5,11,17 116:16 117:13, 21,24 118:8,12 119:7, 22 127:9,16,25 128:13 129:1,6,21 130:8 136:14 139:19 140:6, 12,17,19 141:2 142:8, 19,21 145:16 147:2 157:23 159:10,15,18 175:22 176:6,24 177:1

**David's** 80:20 118:22 121:23 122:2

**day** 13:25 14:9,10 18:3 21:17 22:6 23:8 25:6 27:19,25 28:8,16 33:1, 4,6,11 34:6 36:23 39:2 41:18 42:25 43:2,3,4,5, 13,17 44:24 45:10,12, 19 46:10,13,14,18 49:21,25 50:4,7,8 51:3 52:9 54:6,20 56:9,10 57:8 59:8 61:9,17 62:13 63:2 67:21,22 69:6,8,9,11,19 70:19, 20 71:1 73:21 85:9,19 86:17,19 94:16,17 96:9 104:1,10 112:13 114:15 115:2,8,21 116:1,4,18,20 117:5, 21,24 118:25 121:7 122:11 124:8,9 126:2, 11,12 129:24 130:5 132:18 135:1,2,16 145:23 146:6 148:15 149:9 150:2,14 151:11, 15,22 156:9 157:13 160:18,21 164:19,20 166:25 167:1,9,15 172:25

**days** 18:18 63:15 129:16 166:22,23 172:23 173:4

**deadline** 34:23 37:8 45:7 48:12,16 54:4 55:15 60:24,25 61:5, 20,21,23 62:5 86:8

**deal** 61:22 151:17

**decided** 30:17 177:10

**decision** 34:24 72:2,4, 17,20 177:5

**deemed** 140:21

**Defendant's** 126:17

**definition** 138:25

**delve** 119:21

**demand** 21:1

**department** 20:22 30:18 82:8 113:17 133:24 141:7,12 142:5 143:7,11 144:20 145:7, 8,10,11,20 149:14 154:1

**depend** 34:13

**depending** 11:7,22,25 16:3 34:5

**depends** 10:24 15:1,17 162:21 163:16

**depict** 63:14

**deposes** 6:5

**deposition** 6:15,17 16:11 21:11 23:2,22 24:18 36:7 39:4 63:5 123:17 124:13 125:3 126:14 130:11 131:21 133:2 135:21 137:23 167:6 168:21 169:11, 20 177:23

**depression** 166:11,12, 14

**describing** 109:24

**design** 20:14

**desk** 52:3 54:8 115:10 145:25 177:13,14,15, 17

**desks** 146:13,22

**destroyed** 166:15,16

**detail** 66:14

**details** 76:24 77:8,9,17 78:10 103:24 104:13

**diagnosed** 164:25 165:13,14

**diagnosis** 165:5

**died** 100:3 101:3

**difference** 76:15 95:19 137:17

**differently** 96:6,8

**difficult** 103:22 104:2 105:8

**difficulty** 121:23 122:2

**digitally** 124:23

**direct** 17:7 30:5 127:7

**discharge** 138:24

**discharged** 138:16

**disclosures** 174:23

**discrimination** 23:15 32:3 39:11,12 124:20 137:21 138:5 155:22

**discussed** 18:12 109:20 111:19 117:14

**discussion** 18:13 55:7 71:7

**discussions** 70:16 71:3,11 85:3

**display** 20:14 73:14 83:10

**displays** 20:19

**district** 161:22

**doctor** 43:19 44:19 45:9 86:17 131:1,7,12 165:1,4

**doctor's** 41:20 43:22 133:20

**document** 21:15 23:5,7 24:1 36:11 39:8 44:14 63:9 124:17 125:7 126:18 130:15 131:25 133:6 135:25 138:2

**documents** 28:18 111:16 164:14 168:9, 16,20 169:3,5,10,19 170:16 174:1,11

**door** 27:3,5 88:2 100:15,20

**doors** 26:24

**double** 61:7

**draw** 85:17

**drill** 74:11,13 75:3,10, 11,18 78:23 80:10,11

**dude** 7:2

**due** 45:7

**duly** 6:2

**duties** 20:13,14 29:3,4 30:9 31:1,4,13,25

E

**earlier** 29:1 86:14 126:2 130:25

**early** 86:19

**eat** 90:13 91:5 102:20 103:12 110:13

**eating** 90:1

**effect** 163:22

**effective** 142:12

**effectively** 118:6,11,13, 21 119:12

**efficiently** 118:21

**elderly** 35:16

**electrical** 119:17

**electronic** 175:2

**eliminate** 146:9,23

**eliminating** 139:18 140:5,11 146:15

**email** 16:15,20 18:23, 24 19:4 113:15 125:9, 18 126:20 129:16 132:4,6 133:16,21,25 134:4,6,7,16,20 136:2, 4 137:4,11 139:23

143:23 158:9

**emails** 133:8 136:18 142:4 167:21 168:24 169:22 170:2,10,16 171:14

**Emotionally** 122:20

**employed** 166:3 170:25

**employee** 22:11 24:10 59:8 61:6 93:5,6,8,19 100:4 118:6 150:3 173:17 175:12,16

**employees** 17:25 22:22 36:6 61:2 66:16,18 74:2 93:11,14 94:14 143:12,14,17 174:10, 12

**employer** 138:18 139:10 145:25

**employment** 19:7 22:6 23:8 28:1 33:2,5 156:9

**end** 14:9 123:17 128:5 135:3 177:23

**ended** 30:15 100:8 128:14 157:22

**engage** 114:5 140:19

**engaged** 119:7

**enjoyment** 165:20,23 166:8

**entire** 37:20 174:6

**entity** 175:5

**entrance** 74:3

**entrances** 74:5

**entryways** 74:3

**environment** 96:20 138:18 139:10 141:20 144:6 147:16,20,21

**essentially** 14:5,7 17:22 19:13 20:16 30:24 31:16 113:15 116:2

**events** 10:8,10,11,12, 17 11:22 12:23,24 14:23 15:10,11 58:20 72:18 109:24 162:12, 22 163:18

**Events/culinary** 13:8

**Eventually** 89:16

**evidence** 60:14

**exact** 51:13 112:16 154:8

**EXAMINATION** 6:7 173:11

**examples** 104:3 105:8, 11,12 106:6,17 111:3 122:8

**exchange** 26:18

**excited** 20:7

**exclude** 169:17

**Excuse** 84:5 158:18 165:22

**exercise** 166:21 173:3

**exercising** 172:24

**exhibit** 16:11,14 18:23 21:11,14 22:11 23:2,5, 22,25 24:18 36:7,10 39:4,7 41:11 42:1,12 63:5,8 64:9 67:25 70:8 124:2,13,16 125:3,6 126:14,17 129:16 130:11,14 131:21,24 132:17 133:2,5 135:21, 24 137:23 138:1 154:20 173:16 174:15, 18 175:1,11

**experience** 18:16

**experienced** 105:6

**explain** 104:13 107:15, 20 165:21 166:1,7

**explained** 115:10

**explaining** 123:1

**explanations** 103:23

**extent** 98:14 147:12

**eyes** 75:7 151:21

**F**

**F-ER** 66:4

**fact** 95:23 99:10 159:18

**facts** 8:16 60:13,16 89:4 99:14

**failed** 118:21

**fair** 7:9,21 8:5 29:5 53:25 63:24 70:14,15 78:5 99:17 114:17,18 131:15 148:17,21 168:7 169:6

**fairly** 15:9

**fall** 34:17 109:11

**familiar** 6:18 92:17

**Family** 130:23

**fashion** 83:13

**faster** 97:9

**favor** 70:7

**February** 14:13,18 16:8 29:19 63:12,18 116:12, 16 124:5,25 125:10,13 126:4,7,10,21 129:17, 20 130:5,8,20 131:19 132:9,12,14,22 133:11, 17 134:5 136:4,10,15 138:8,20 139:12 142:18,23 147:8 149:6, 10 154:18 162:14 165:5 172:19 177:5

**feel** 72:22,24 89:24 120:18 141:19 147:16 151:20,21 166:24 167:4

**feeling** 132:15

**felt** 74:17 75:8,10,12 76:3,11,13,14 78:14,19 79:7,8 132:23 147:21 158:4

**female** 65:22,23 120:19 159:2

**females** 92:8 96:8

**Feritz** 153:6

**figure** 54:16 55:4

**file** 141:17 151:19 154:4 157:19

**filed** 32:3 137:20 138:19 139:11 142:2 143:7

**fill** 28:19

**filled** 13:10 21:18

**filling** 24:17

**film** 54:15

**find** 20:4,9 25:19 62:10 92:19,21 93:8 104:21 106:23 137:6 156:23

**fine** 19:19 127:4 161:5, 8

**finish** 12:8,10,11 13:20, 21 35:2 77:12,14 103:24 123:12

**finished** 7:5 41:11 77:24 83:10 123:22 152:3

**Fire** 12:23,24,25 13:8

**Fire/culinary** 14:15

**fired** 127:25

**floor** 66:15,17

**floral** 20:22 135:1

**Florist** 32:4,16 33:16 136:18

**flower** 13:12,16,23 14:3,15 17:14 20:22 83:24 84:17 112:3 161:13

**flowers** 17:14 28:11,17

**fluff** 74:6

**fluffing** 74:7,15

**forceful** 76:20

**forgot** 157:17

**form** 7:6 46:4 49:20,24 50:3 54:21 56:4 57:10, 15 60:12 72:6 109:22 136:25 147:11 175:24

**forms** 25:16

**found** 19:21 20:6 28:12, 20 33:15 89:6 101:18 109:18 110:22 114:6

**fourth** 132:3

**Fox** 89:25 90:19,22 102:20

**Friday** 26:13 27:13,22 34:4 37:22 43:20 45:5 61:4 62:1 71:8 86:11, 15 112:7 125:16 129:17

**friend** 111:21,22

**front** 52:4 79:13 82:25 83:22 124:3 168:1,10, 18,25

**fronts** 20:17

**full** 15:20 115:2

**full-time** 100:4

**funny** 84:25

**future** 119:2

G

**G&a** 141:10 143:10 144:2,4,5,19 149:4,22 150:15,17 153:6,8,11, 25 154:7,12 156:2,14, 23 157:8,11,19 175:4,6 176:5,7

**G&h's** 133:24

**g13** 131:21

**gap** 19:9

**garden** 13:17

**gardening** 17:13

**garland** 74:5,6,15

**gave** 16:2 53:4 54:4 105:12 122:11 151:21 165:6,17 166:9,14 176:18

**gay** 96:7

**general** 91:23 96:10 104:19,21 105:22 120:19 121:16 134:24

**gentleman** 15:24

**get all** 34:14

**get along** 66:1

**GHIO** 28:24 46:4 55:25 57:15 60:12 72:6 77:10,14 78:2 98:13 103:25 105:17 109:21 122:4 123:6,12 147:11 151:6 157:10,14 168:3 173:9,12 176:1 177:19, 22

**girl** 101:23

**girls** 101:25

**give** 16:23 21:24 24:14 51:23 70:24 80:4 91:15,20 92:3 100:6 104:13 105:11 106:6 115:16 119:10 121:21 134:6 149:22 150:16 157:20

**giving** 39:16 58:9 108:18 123:14 149:25

**glass** 8:22

**global** 99:20

**goal** 128:14 157:4

**good** 6:9,10 48:22 59:8 61:6,19 62:13 83:12 117:3,7 118:6 123:20, 24,25

**gosh** 160:8

**grabbed** 83:13

**great** 98:5

**green** 171:25

**greenhouse** 31:15,17, 19

**Greffet** 131:4

**ground** 6:23 80:10

**groups** 166:22

**guess** 19:14 45:18 58:9 66:2 84:24 139:3,6 156:25 167:12,16

**guessing** 21:22

**gun** 75:18,20,21 78:24 79:5,8,19,25 81:1,12 83:4 86:21 95:10,17 102:17 103:10

**guy** 101:23

**guy's** 8:12

**guys** 14:5 30:15 101:24

H

**half** 15:14 35:16 49:7 55:18 59:5 62:6 172:4

**halfway** 86:16 136:5

**hallway** 47:15

**hand** 23:24 67:9 75:11 78:23 83:22 124:15 126:16 154:25

**handbook** 24:4,11,15, 20 25:2 27:20 28:18 145:5 173:17

**handbooks** 173:14

**handed** 16:13 21:13 36:9 63:7 130:13 131:23 133:4 135:23 137:25

**handing** 23:4 39:6 125:5

**hands** 75:1,5,6

**happen** 45:19,21 46:1, 24 58:24 66:25 85:18 89:3 92:13 99:21 106:12 122:8 139:24 140:1

**happened** 8:9,17 35:18 56:24 68:18 73:16,24 83:9 85:4,14,15 87:11, 18 89:12 90:17 91:21 98:3 104:1 106:18 109:25 110:15,18 112:7,9,11 120:9,12 122:8 142:3 145:18 147:7 148:1,2 164:16 167:9,15 170:18,20 176:2

**happening** 144:9,10,13 158:13 159:11 166:15

**harass** 32:16 128:18 129:2

**harassed** 32:7,13 103:3 112:5 142:8,17,22 159:15,19

**harasses** 121:5

**harassing** 73:6 103:6, 16 109:19 110:23 114:7 119:24 128:9,15 140:25

**harassment** 23:15 32:10,18 58:18,21 65:3 88:10,15 89:7,8,18,23 96:10 101:18 102:12, 25 104:6,9,22 105:5 120:8,11 128:5 133:23 135:12 140:21 142:1,6, 13 143:3,25 144:13 149:4,22 150:15 155:22 156:15 157:5, 19,23 159:10 175:9,10 176:24

**harassments** 120:17

**hard** 76:20 77:1,19

**head** 7:12,20 75:8 94:11 108:17 119:18 121:7 157:25 164:13

**hear** 7:18,24 17:10 68:2,3 99:3,4,5 141:12 145:13

**heard** 8:5 10:13 95:2 100:22 102:7 141:3

**hearsay** 98:11 158:8

**heavy** 31:21
**hell** 166:5,6,8
**helping** 45:7 61:24
**hey** 116:4
**Higgins** 111:23,24
**high** 17:24
**hired** 19:10 20:2 31:21
**hold** 54:10 57:24 58:2,5
**holidays** 20:21 31:9 135:1
**home** 13:18 82:13 111:12 169:21 171:10
**homes** 13:23
**honestly** 38:7 39:3 80:22 86:3 90:7 116:17 118:18 161:15 162:20
**hostile** 138:18 139:10
**hostility** 96:21
**hour** 10:25 11:2,25 16:2 41:19 52:8,24 58:12 123:23 150:2 151:11 162:3
**hourly** 10:21
**hours** 14:19 15:15 36:14,20 39:24 40:3 42:8 47:18 48:1,6 52:23,24 53:16 62:4 100:7 101:4,5,8,9 133:19 134:24 162:6,7,8,10,19 163:3,7,12,13,15,19,20
**HR** 82:7 91:12,17,19 133:24 141:7,12,23 142:5 143:7,11 144:20 145:7,8,9,11 149:13 150:16,17 153:25 158:1,10 175:5
**huge** 30:12,13 118:18
**human** 90:10 105:22 118:1 120:19 167:3 175:15

**I**

**idea** 26:6 54:1 78:19 123:24 143:13 153:7 156:25 163:4,5 170:23
**identification** 16:12 21:12 23:3,23 24:19 36:8 39:5 63:6 124:14 125:4 126:15 130:12 131:22 133:3 135:22 137:24
**identified** 103:5
**Illinois** 13:13 14:16 161:14
**immediately** 65:10,12 95:16 119:1
**impact** 118:15,18 122:22 149:10
**impacted** 119:11 120:16 123:4 149:5,7
**impede** 148:23
**important** 72:25
**impossible** 113:16 128:19
**impression** 153:9
**in-person** 18:1 20:1
**inappropriate** 19:22 20:5,10 28:13,20 32:24 33:15,17,19 80:9 101:19 104:9,14,18,22 109:19 110:22 114:6 119:23 121:9 137:7 140:21
**inappropriately** 94:25
**incident** 59:24 60:1 64:3 65:8,9,16,17 83:7 87:7 112:3,4 175:23
**incidents** 86:20 89:6 103:5,9 106:7 109:23
**includes** 11:19
**increase** 163:7,14
**increased** 29:5
**indicating** 83:14,18 139:23
**information** 27:25 111:16 123:15
**inside** 27:1,4
**installer** 13:12,16 14:3,15
**installing** 13:17 161:13
**instance** 8:9 118:25
**instances** 27:4 35:6 69:18
**instruct** 123:16
**instructed** 49:20 171:16
**instructions** 51:23,25 115:14
**intense** 89:11
**interaction** 128:8 139:18 140:6,11,17
**interactions** 127:10 128:13,17,20,22,24 129:1,5,21 130:7 141:1 146:9,15,24
**interchangeably** 76:1
**interest** 17:13
**interesting** 97:6
**interfere** 148:18
**interpret** 79:18 107:4,5,6,9
**interpretation** 146:17
**interrogatories** 6:6
**interrupt** 121:8,11
**interrupted** 122:10
**interview** 18:1,13,15,24 19:20,23 20:1 161:19
**interviewed** 17:20
**interviews** 17:23 161:17
**intolerable** 144:6 147:9,17,21
**inventory** 20:18 31:22 37:13 54:6,19 88:1
**investigate** 54:16 55:2
**investigation** 54:22
**involved** 35:24 50:10
**involving** 64:3 86:20
**issue** 55:11 61:14,17

**J**

**jam** 30:14
**January** 36:17,21 37:7 38:6,12,21 40:1,8 41:3,15,17 42:12,23 43:7 46:3,21 47:9 48:25 49:9,13 50:2,3,24 51:12,15,18,21 55:9,17,20 56:9,17 59:9,21 60:2 62:20,25 63:12 64:2,5 65:4 69:1,22 70:2,3,21 71:4,13,16,17,20,21,24,25 72:11 73:2 83:2,7,9 86:24 112:4,14,18 114:4 116:8 129:12,13,20,22 130:2,4,8 136:12 137:13 139:14 140:16,22 142:17,23 147:8,20 149:6 151:2 154:17 159:16,19 175:20
**job** 10:24 13:11,12 17:10 20:13,14,16 29:3 30:9 31:1,3,13,25 48:12,14,22,23 55:3 61:6,11,19 62:12,13 81:15 101:9 108:18 117:3,7,16 118:6,11,13,15,20 119:12,18 120:5 121:1 122:24 138:17 148:19,23 149:5,8,11 160:5,18,21 161:6 166:10
**jobs** 17:12 148:9 160:23 161:11

**joined** 50:21

**joke** 74:20

**joking** 90:6

**journal** 111:8,10

**June** 163:5

K

**Katie** 94:6,8 100:2

**Katy** 164:4

**Katy's** 100:22

**keeping** 145:16 148:4, 6,18,22 150:4 152:5

**kind** 6:18,22 7:17 12:10 20:7 79:23 107:8 175:15

**knees** 107:2,12,23 110:10

**knew** 25:19 36:5 54:5 59:7,13 73:21 83:19 88:22 143:18 152:1,15 153:7

**knocked** 27:3

**Knoll** 12:15 13:4,9,11 14:13 15:2,6,14 16:21, 22 17:11,18 18:5 20:13,16 23:9 27:10 29:4,10,15 30:2,5,13 31:17 32:4,13,15,16, 19,21,23 33:3,12,13,16 34:2 36:3,4 38:14 39:13 40:1 47:16,21,24 48:25 52:3 53:19,20 59:19 60:25 61:1 64:3 65:9,17 71:8,15,23 73:9 79:24 85:21 86:1, 21,23 88:10,14 101:17 102:9 103:2,6,17 104:8 107:8 110:4,6,9,12,21 111:9,18 112:1,5,18,21 113:11,22 114:2,5,11 116:16 117:21,24 118:9,12 124:10 125:9 126:21 127:6,9,16,25 128:13 132:4 133:9,16 136:17 139:19 140:6, 12,17,19 142:8 145:16 157:23 159:10,15,18 160:6 162:1 164:23 166:3 167:9,15 170:25 173:15 175:11,17,22 176:6,11,24 177:1

**Knoll's** 30:23 31:23 52:3 71:12 100:18 112:25 117:13

**Knolls** 18:7 34:19 47:7, 9 48:18 49:6 52:6 58:1 61:8 82:25 93:20 94:15,23

**knowing** 109:18

**knowledge** 33:14

L

**ladder** 88:21 121:19 122:7

**lasted** 69:19

**laughed** 74:19

**law** 144:17,22,25 145:3

**lawful** 6:2

**lawsuit** 32:4 153:4

**lawyer** 169:13,15,18

**leading** 175:24

**leaking** 119:15

**Leann** 111:23,24

**leave** 41:9 44:6 112:22

**leaves** 86:16

**led** 119:7

**left** 14:13 41:9,19,22 42:13 44:10,20 50:13, 22 69:24 86:19 100:7 115:24 116:9 172:6

**legal** 60:19 98:14

**legs** 8:21

**letter** 136:7

**level** 49:12

**lie** 60:17

**life** 82:22 165:21,24 166:8

**lift** 31:21

**lights** 106:9 107:3

**lines** 66:2,3 158:21

**listed** 105:17

**listen** 65:13 143:7 147:6 158:25

**listening** 100:18

**literally** 119:17 160:8

**live** 9:22

**lived** 9:20 10:1

**located** 174:1

**locked** 26:24

**log** 49:20,24 50:4 51:3 52:1,23 53:2,14 56:10 57:3,10,23 58:17,22 59:24 60:5 63:1 72:21 115:11 116:7,19 117:2 148:4,6,7,13,18,21,22, 25 149:20 150:4,14 151:10 152:2,5,14,24 176:21

**logged** 54:7

**logging** 52:7

**long** 9:20 14:8 18:24 19:9 27:17 59:4 77:20 78:12,13 162:17 166:17

**longer** 113:14,24 175:19 177:17

**looked** 83:15,16,21 84:2 90:2 136:19 160:13 168:23 169:4, 18,22 170:13 173:16

**loss** 165:20,23 166:8

**lost** 166:10

**lot** 15:18 17:24 18:7 21:2 31:24 35:16 36:6 37:23 55:7 86:19 100:17,21 101:13 103:23 152:17 162:15

**Louis** 9:9,19 10:12 13:1 175:7

**love** 41:8 93:8

**loved** 62:13 166:10

**lunch** 85:7 90:1 103:12 123:21,25 124:1

**Lydia** 131:4

M

**made** 34:24 67:14 72:5, 17,21 73:5,22 89:17,23 92:17 96:22,25 97:4, 11,18,23 98:2,19 100:10,13 103:10 105:24 106:4 107:16 110:6 116:6 117:22,25 120:18,19 127:24 139:14 142:9 145:9 147:8,20 148:9 157:8 160:5 163:21 176:7,10

**madness** 165:2

**main** 87:6

**major** 89:9

**make** 6:21 8:1,15 10:25 11:2,6 12:5 18:4,9 39:23 40:3 41:23 42:8 47:3,17,25 48:6,12,16, 20 53:2 60:18 62:4 77:14 82:5 83:12 95:5 97:2,3 106:16 114:5 116:14 117:11,15,22, 24 118:1 123:19 133:13,15 141:25 144:6 148:25 150:11 151:18,24 152:10,15 153:12 159:13 160:15 162:5,8 164:2 176:25 177:5

**makes** 26:10 46:23

61:7 72:13 88:8 121:6 141:19 156:22 167:17

**making** 11:24 73:20 81:1 102:17,18 106:14 120:21 125:23 151:1 152:14,23 157:8

**male** 102:14 107:1

**males** 96:8

**man** 95:20 96:7 104:25 107:22

**man's** 96:16

**manage** 10:10,17

**managed** 118:5

**management** 38:10,14 49:12,13 56:4 58:14 97:1,12,14,19,23 100:10

**manager** 17:4 34:17

**managers** 26:22

**managing** 11:1,10

**manner** 12:24 79:18 108:14 119:11 122:9 129:11 133:14 136:17, 21 144:6 148:19,22 149:4 157:7,22

**March** 162:23

**mark** 19:3

**marked** 16:12,14 21:12, 14 23:3,4,23,25 24:19 36:8,10 39:5,7 54:24 63:6,8 124:14,16 125:4,6 126:15,16 130:12,14 131:22,24 133:3,5 135:22,24 137:24 138:1

**married** 90:3,12 91:6

**massive** 74:2

**matter** 89:14 96:9 105:23 106:3 159:18

**means** 7:25 42:7,11,24 138:24 139:2 142:4 165:21

**medication** 165:6,8,12, 17 172:18,24

**medicine** 130:23 166:12

**meet** 33:6,7 34:23 45:7 61:21 62:5 112:14 126:6

**meeting** 33:13 34:1 38:19 44:16 45:25 47:7,9,11,12,20,23 48:2 49:10 50:1,7,9,13 51:2,9,17,20 53:19,24 55:9,23 56:2,7,19,23, 24 57:2 68:18 69:23 70:19,21 72:10,11,22, 23 73:1,5,10 83:1 86:24 112:17,19 113:6, 11,22 114:1,4,9,10,16, 23,24 115:15,17 119:1, 4,8 127:18,23 129:11, 12,14,24,25 130:1,2,4 140:16,22 141:4,11 145:24 147:24 149:2 151:14,16 171:7 175:20,22 177:11

**meetings** 153:8 158:23 165:2

**memory** 39:15 170:24 171:3 172:13

**men** 96:1 102:11

**men's** 96:13,15

**mentally** 122:20

**mentioned** 141:10,11 160:5

**Mercer** 94:4,23 95:6,14, 20,24 102:21

**merchandise** 20:18 37:13 87:9 100:19 101:14

**Mercy** 125:23 126:2,8,9 130:18,22

**merged** 12:20 15:23,25

**message** 86:12 134:9

**messaged** 137:10

**messages** 111:20 137:7 169:23,25 170:9

**met** 15:25 33:10,12 48:16,17 74:4 82:22 90:20 126:9 169:12 175:6 176:2

**metal** 87:8

**Metropolitan** 73:11,25

**Michael** 94:2,3,23 95:6, 14,20,23 96:15 102:21

**middle** 39:19 42:2 64:14,20 133:18 155:17

**mind** 116:5 121:14 128:25

**minute** 16:24 28:22 41:6

**minutes** 45:15 123:23

**mischaracterizing** 110:1

**missed** 35:15 162:8

**missing** 100:5

**Missouri** 9:17

**mistype** 135:17

**moldy** 119:15

**mom** 35:16 37:19 41:19 43:19 45:8 86:17 100:3 101:3 111:15

**moment** 29:16 143:12 166:2 177:10

**Monday** 26:13 27:13,22 34:3 36:16 38:21,25 39:1,25 40:8,13,20 41:2,15 42:19,23 43:10,13,17,22 44:15, 22,23,25 45:8,11,20 46:3,9,20,25 47:1,19 48:18,21 61:10,21 62:20 70:1,3,4,17 71:4, 12 112:11

**monitor** 173:21 174:8

**month** 14:25 15:25

**months** 20:25 29:3 33:7,10 73:19

**morning** 6:9,10 29:2 40:2,21,22 41:10 46:25 51:9,10 52:2 53:12 56:16

**mother** 43:22 44:18 45:4 66:4 86:10

**Mother's** 135:2

**mouth** 87:19 108:22 120:21

**move** 78:15 114:15 146:12,13

**moved** 145:24

**movement** 88:1

**multiple** 77:21 95:24 109:24 110:16 151:8

**municipality** 9:16

**N**

**named** 15:24

**names** 18:8 92:4 94:9, 10 164:10

**native** 13:17

**nature** 79:20 80:2 81:5 135:18

**necessarily** 92:11 95:21

**needed** 34:15,19 35:13 38:4 120:5

**negative** 119:11 120:23

**negatively** 120:16 121:1

**nerves** 165:7

**nice** 87:10,11,12,15 89:19,20 90:3 108:18 110:16

**night** 75:17 81:13,14, 17,22

**nights** 15:2

**nodding** 7:12

**nods** 7:20

**noon** 112:16 123:21

**note** 54:8 133:20

**notebook** 52:4,7 53:13 115:10,13,16 150:1 151:22 152:7 170:17, 19,22 171:2,20,22,25 172:11,15

**noted** 142:3 144:8 157:24

**notes** 158:9 170:24 171:8,9,11,15 172:10, 12,15

**November** 16:18 17:1 19:5 22:3 23:12,16 24:8,21 27:19 33:9 73:17,25 155:3,7

**number** 16:11 21:11,14 23:2,22 24:18 36:7 37:24 39:4 62:8 63:5 124:13 125:3 126:14 127:8 130:11 131:21 133:2 134:19 135:10, 14,21 137:23 156:2

**nurse** 126:9 131:1,4,11

**O**

**object** 46:4 55:25 57:15 60:12 72:6 77:10,11 78:1 98:13 109:21 123:6 147:11 151:6 175:24

**objection** 60:18 77:15 78:3 109:25 157:15

**objectionable** 78:3,4

**obligation** 60:19

**occurred** 65:3 73:11 147:19 149:20

**October** 90:20,21 91:21 92:18

**offend** 90:9 91:2,4

**offended** 90:12 91:3,8, 9

**offensive** 19:21 20:4,10 28:13,20 32:24 33:15 90:10 101:18 104:8,22 106:23 109:18 110:22 114:6 119:23 137:6 140:20

**offer** 102:19 105:4

**offered** 103:12 110:13 160:23 161:11

**offering** 90:12

**office** 26:15,23 30:21, 22,23 52:4 85:7,10 97:20 98:9 99:7 100:18 101:14 109:5 114:14, 25 145:25 174:2

**offices** 146:14,22

**online** 17:16,17 21:18, 22 24:13,16,21

**open** 20:19 27:5 100:16,20

**opinion** 99:20

**opportunity** 8:14,16 17:10

**oral** 6:5

**order** 48:5 54:11 72:18 116:5 123:18

**ordered** 83:17

**orientation** 22:8,9

**outline** 171:13

**overtime** 18:18 48:7

**owner** 82:8 157:25

**owns** 128:1

**P**

**p.m.** 42:13

**pack** 30:14

**pages** 167:20,25 168:1, 11,13 169:8,10 170:16 172:6

**paid** 10:21

**paper** 156:12

**papers** 165:15 167:20

**paperwork** 54:15

**paragraph** 127:8 138:8, 12 155:18,24 156:6

**part** 21:17 22:8 31:17 40:12 41:18 42:25 43:2,4,5,13,16 44:24 45:9,11 46:10,13,14, 18,20 86:18 134:12 145:21

**particulars** 39:18 64:12,18

**Partner** 149:22

**partners** 141:10 144:19 150:16,17 153:6,8,11, 25 154:12 156:2 157:8 175:5,6 176:5,7

**Partners'** 143:10

**passed** 66:21 100:3

**passing** 69:2 114:12, 13,22 130:9

**past** 15:14 64:13 114:24 172:12

**pay** 10:23 11:23 14:11 16:1,6 161:25 163:23 164:3

**payroll** 100:7 134:23

**PDF** 177:22

**peak** 134:25

**pen** 52:5

**pending** 123:24

**people** 25:13 27:1 57:4 61:15 74:10 75:15 88:23 91:13 92:2,22,23 93:13 94:16,17 96:11 97:5 105:1 110:25 120:21 143:19 148:9 151:18,19 163:22

**people's** 13:23 14:6 96:13 164:9

**percent** 12:17,18 59:1 96:7 122:21 137:4 142:2

**perfectly** 161:5,8

**perform** 118:21 119:12, 18 122:21,23

**performance** 120:15

**period** 36:16 56:9 62:11 117:20 118:2 119:19 120:24 121:14 177:4

**permission** 61:12 62:3 80:5

**person** 17:23 27:11 47:24 79:23 107:8 120:20 151:22,24 161:23 176:14

**phone** 17:21 18:2,13, 15,24 19:20,23 37:24 51:14 156:2 161:18,22 176:7,10

**phrase** 89:2

**phrased** 91:6 116:5

**physical** 24:13 86:18 155:5,10 156:10,11

**physician** 131:5

**pick** 14:23 15:10 162:17 163:18

**picked** 84:18,19 163:9

**picking** 15:11 163:2

**pictures** 54:9

**place** 18:25 21:2 25:10 58:14 72:19 91:11 129:7 147:2 177:13

**plain** 46:10 54:18 60:7 62:5,12

**plants** 13:17 31:22

**plugging** 106:8 107:2

**point** 8:7,20 25:6 38:9, 12 48:24 50:2 56:8 58:8,10 112:19 113:5, 10 132:20 156:24 159:5,7 164:22

**policies** 27:20 28:9,18 173:14,25

**policy** 23:14 135:6,7 155:6 156:12 175:9,10, 13

**portion** 33:24 121:22 160:1

**position** 16:3

**possibly** 69:12 88:6 154:9 157:2 161:21

**potential** 19:7

**practitioner** 126:9 131:1,5,12

**prepare** 168:21 169:11, 19

**prescribed** 165:12 166:12

**presence** 102:9

**present** 8:9 38:24 41:14,17 42:22 44:4,5 45:20 50:20 81:19 90:25 96:22,25 97:18, 22,25 98:1 100:13

**pretty** 85:13 171:12

**previous** 47:13,14

**primarily** 55:11

**printed** 133:14

**prior** 29:23 32:21 33:13 34:1 38:20 53:8,11,12, 20 59:9 73:19 91:21 92:18 126:3 176:11

**problem** 21:25

**process** 28:12,16,19 60:19

**promise** 97:9

**proof** 158:2

**propounded** 6:6

**protect** 144:14,18 145:14,17 158:12,15 159:9

**protected** 177:8

**protecting** 158:6

**protective** 123:18

**provide** 132:16 175:12

**provided** 23:7,16 24:7, 21 28:18 133:20 155:3, 6

**PT0** 133:19

**PTO** 135:9 153:10

**pull** 94:17 160:9,11 161:3 173:2

**punished** 81:9 100:6 116:3

**push** 151:18 163:22 164:2

**pushed** 28:6

**pushing** 87:8,12,25 88:1

**put** 54:8 65:23 70:8 74:13,15,23,24 87:9 88:20 129:6 140:8 145:8,12 146:13,22 147:1 153:14 158:5,8 166:5,6,7 176:17 177:7

**putting** 144:19 149:13

**Q**

**question** 7:24 8:5,8 9:1, 5 12:8,11,12 20:8 25:20 26:12 33:21 45:24 46:5,7,19 52:14 55:25 57:9,16 59:20 60:9,13,15 62:22 63:17 65:13 70:12 72:7 78:2, 3 88:7 92:1 94:20 97:7 102:1 103:25 109:22 110:1 113:19 117:23 118:18 123:7,9,13,24 128:25 140:9 147:10, 12 149:18 150:9 151:7 152:18 157:14,17 161:10 167:13,14 168:5,7,15 169:9 175:25 177:3

**question/answer** 7:7

**questioned** 53:15

**questionnaire** 161:23

**questions** 7:1 22:19,24 23:20 25:1,4,5,22,25 26:2,6,7,8,11,18 27:11, 13,18,24 28:3 60:15 61:10 65:13 98:8 102:4 152:11 161:1,8 173:7, 14 177:20

**quick** 63:17 77:21 138:16

**quicker** 152:17

**quickly** 22:15 23:17 24:25

**quiet** 7:17

**quit** 13:9 15:5,13 29:19 137:15 147:10,16,22 148:9 160:6 162:1,5,14 163:8,23 164:2

**quitting** 100:9 137:17

**quotes** 68:8

**R**

**rack** 87:1,7,9,10,11,12, 15,16,22,23 88:11 89:19,20,21 103:11 105:18 110:16

**racks** 87:14 102:19

**rambling** 113:3

**ran** 31:15

**rate** 10:23 14:11 16:1,7 17:24 161:25

**reach** 92:24

**read** 16:23 22:14 23:14, 17 28:10 33:23,25 40:12 41:6,8 42:6,9,17 43:8 65:2,5 126:23 127:2,9,12 133:17 134:2 138:21 155:12 159:25 160:2 169:8 170:1 171:13 177:22

**reading** 41:4,11 44:15

**reads** 7:7

**ready** 135:15

**real** 26:6 138:15

**realized** 177:7

**reason** 123:16 148:25

**recall** 14:11 18:12,20, 23 20:12 36:23 38:24 39:3 43:1 45:20 46:19, 23 65:19 67:3 84:23 85:11 87:3 90:17,18 114:21 161:20,25

**receive** 22:10 24:10 133:25

**received** 141:24 176:6, 23

**recently** 15:24 126:24 160:19

**recess** 28:25 62:18 124:1 173:10

**recognize** 21:14,19 23:5,25 36:10 37:5 39:7 63:8 124:16 125:6 126:17 130:14 131:24 133:5 135:25 138:1

**recollection** 40:7 41:14 153:2 164:15

**record** 6:12 7:9 18:9 33:25 63:11 160:2

**recorded** 51:17,20 158:23

**recording** 68:24 145:13 147:6 158:17,19,25 159:3

**records** 126:13 164:14

**red** 63:19

**refer** 39:17 70:9 152:5 153:2

**reference** 75:20 110:7

**referencing** 24:11

**referring** 108:1,2,3,6,8, 10 134:12

**refresh** 40:7 41:13 153:2 164:15 170:24 171:3

**refreshing** 172:13

**register** 153:19

**regroup** 116:1

**regular** 21:23 105:5

**rejoin** 135:16,17,18

**relate** 143:16

**related** 12:25

**relation** 18:22

**relationship** 113:8,14

**relayed** 129:10

**remarks** 33:3

**remember** 8:10,11 13:14 22:25 24:12 26:8 33:12 41:1 46:2 47:3 52:20 66:14 67:6,7 69:5,8,9 82:20 90:18 105:24 106:2 110:24 111:2,17 116:17,18 145:4 161:24 163:19 168:1,8,12,16 169:6,8 172:20 174:19 176:3, 14

**remembers** 168:6

**remove** 127:9 146:4

**removed** 136:14 145:19

**repeat** 147:13

**repeated** 134:7,13,16

**reply** 6:5

**report** 15:21 86:22 90:23 91:10,12,13 156:1,14,15,18,19,20, 24 157:8,19

**reported** 20:15 91:16, 21 143:22 156:23

**reporter** 33:25 160:2

**reporting** 32:10 35:17, 20 113:8,14

**reports** 155:22

**represent** 16:14

**request** 115:14

**requested** 33:24 160:1

**reside** 9:8

**resignation** 136:7

**resigned** 136:16 137:16,20 154:14

**resigning** 137:18

**resources** 175:16

**respect** 94:22 105:4

**respectful** 107:1

**respond** 38:2

**responded** 132:14,16

**response** 66:1 101:6 102:19 127:15 134:20 140:7,12

**rest** 116:1,4

**restate** 163:25

**restroom** 8:22 28:23 66:23,25 67:1,2

**result** 59:23 120:16 129:4 160:24

**retaliated** 32:9 147:23 148:3 151:1,5 152:13

**retaliation** 23:15 148:10 149:19,23,25 150:12 151:8 152:22 153:3 175:11

**return** 138:17 139:9

**returning** 137:8

**review** 24:24 111:17 153:1 169:10

**reviewed** 167:23 168:2, 3,9,17 170:5,11

**reviewing** 25:16 168:20

**ridiculous** 61:18

**Robin** 47:14 65:9,17 66:24 67:25 68:22 69:1,4 71:7 85:21 86:1 88:19

**room** 22:20 25:4 30:13, 24 99:1 109:9 146:7 174:2,3,4,5,7

**rooms** 174:4

**rose** 83:13,21 84:25 86:22 122:11,13 175:23

**roses** 102:18 103:11 110:7

**roughly** 15:14 19:1

**rubbing** 83:23

**rug** 91:18,22 92:18 97:16 99:13,15,19,25

**rules** 6:23

## S

**Sabatino** 6:1,13,14 134:1

**Sabatino0082@gmail. com.** 133:22

**sat** 52:2,4

**Saturday** 48:6,15

**scanned** 54:19

**scarry** 61:1

**schedule** 14:23 34:2,7 101:7 163:17

**school** 161:21

**scream** 61:2 67:21,24 75:16 94:16 120:1,3

**screamed** 61:1 69:20 119:19 120:5

**screaming** 67:19 96:11 119:14,16 120:2

**screen** 173:21

**screw** 75:18,20,21 78:24 79:5,8,19,25 81:1,12 83:4 86:21 95:10,17 102:17 103:10

**screws** 74:14

**searching** 19:14

**season** 15:19 162:12 163:6,9

**seconds** 77:21 78:17 79:11

**send** 133:16,23

**Senior** 30:13

**sense** 8:1 156:22

**sentence** 155:24

**separate** 138:7 140:25 146:21 174:2

**server** 11:15

**set** 10:11,15 11:3,8,10, 19 14:22 16:6 30:20,25 44:16 109:10 163:17 174:7

**setting** 11:5 20:16 30:16 73:13

**sex** 101:19,20,22

**sexual** 32:10,18 58:18, 21 65:3 79:19 80:2 81:1,5 88:10,15,19 89:7,18,23 95:12,13, 16,22 101:18 102:12, 25 104:6,9,21,24 105:5 107:8,10,13,15,16,17, 18,21,23 108:4,12,23 111:1,4 120:8,11,17 121:6 140:21 175:9 176:24

**sexually** 32:7,13,15 73:6 103:3,6,16 109:19 110:23 112:5 114:7 119:24 121:5

**shared** 52:3

**sheets** 54:6

**shelves** 61:10

**shoe** 80:11

**shops** 17:14

**shoulders** 7:13

**show** 77:22 83:17 154:9 174:18

**showed** 84:17,24

**showing** 30:19

**shown** 170:3,11

**showroom** 30:16,19,25 109:6

**shrugging** 7:12

**Shutting** 20:20

**sick** 37:19 43:20 45:4,8 65:25 66:7 67:13 89:16

**side** 22:23 37:13 74:14 82:1 83:11

**sign** 14:2 21:25 28:10 173:25 174:15

**signature** 21:23 24:5 174:19,25 175:2 177:21

**signed** 13:25 14:7 21:22 22:12 23:12 24:14 124:23 155:7,12 173:17 174:21

**significant** 64:15,21 65:3

**signing** 174:19

**simple** 46:11 60:8 62:5, 12

**simply** 54:18 55:1

**single** 93:6 94:17 96:9 117:21,24 149:1 151:4, 22,24

**sir** 7:16 8:3,6,13 12:1 14:17 16:4,24 17:3,6, 19 18:6 22:2 23:6,10, 13 24:6,9,23 25:3 28:21 29:11,13,22 32:5,11,20 34:10 36:4, 15,19,22 38:23 39:14, 22 40:5,9 51:19,22 56:15,18 63:20 106:18 112:2 124:7 159:6 161:16 162:20 168:13 169:16

**sit** 106:15

**sitting** 80:10 168:9,17

**situation** 101:11 172:16

**Sixteen** 9:25

**skip** 136:2

**skipping** 132:2

**slower** 15:10

**smack** 76:6,16,18 95:3, 14

**smacked** 95:6,23 102:21

**smacking** 102:14

**small** 133:17 134:12

**Smith** 15:24

**smoke** 8:22

**soccer** 15:4

**social** 176:18

**soft** 77:19

**son** 9:23,24

**soul** 122:12,14

**sound** 17:1

**sounds** 90:3 150:19

**speak** 53:4 92:12 97:3 98:17 125:24 128:19

**speaking** 50:9 82:18 176:22

**speaks** 104:19,21 121:5

**special** 161:21

**specific** 95:1 111:2 125:25 126:1 140:8

**specifically** 46:19 78:21 123:4

**specifics** 66:16 67:7 99:22 104:3,4,5,17,20 105:2,3 110:24

**speculate** 157:10,16

**speculating** 26:5 157:12

**speculation** 145:21

**spell** 9:12

**spells** 69:19

**spend** 100:17,21 101:13

**spiral** 172:1

**spoke** 47:6 66:5 91:3 104:10,11 105:22 106:5 110:25 126:1 130:25 136:13 143:19 176:15

**spot** 83:25 84:8 122:15, 16

**spring** 12:17 14:18 15:10 30:11 162:21,23 163:1,2

**Square** 73:11,25 176:2

**St** 9:9,19 10:12 12:25 175:7

**stamps** 62:7

**stand** 77:22

**standing** 106:10

**staring** 84:1,10 122:12, 14

**start** 12:12,14 29:14 30:8 52:7 81:14 164:20

**started** 12:16 15:11 16:25 17:8 18:22 20:12,20 21:4,8 25:9 28:11,16 29:9 31:14 33:1,4,9 73:2 118:4,18 160:9 170:23 172:23

**starting** 16:21

**starts** 39:20 42:2 44:1 64:14,21 136:4 138:8 155:18 163:2

**state** 6:11 67:25

**stated** 78:4

**statement** 29:6 106:4

**stick** 97:7

**stone** 16:16 17:5,7 20:15,17 27:13 29:24 31:14 38:24 40:8 41:14 46:2 71:19 113:12,23 137:10

**Stone's** 30:6 32:22

**stop** 123:12 128:3 129:5 140:25 142:1,6 143:3 152:18 157:5,9 159:14 167:12

**stopped** 142:12 159:17

**stopping** 81:11 159:12

**store** 37:13 66:23 83:11,23

**stores** 20:19,20

**strange** 19:25 20:6,9 59:8 62:11

**street** 9:12

**stretch** 8:21

**struggle** 62:1

**struggled** 166:11

**stuff** 21:18 22:17 30:14 31:20 34:15 61:2,9 85:17 113:4 115:4 168:4,24 171:8

**stylus** 21:24

**subject** 98:14 110:2 128:9 147:14 151:9

157:15 175:25

**submit** 141:6,12 144:7 149:21 150:15

**submitted** 133:24 136:9 144:11 167:21 168:4 169:7

**submitting** 160:9

**suffer** 164:18,22

**suffered** 92:23 93:1,19

**suffering** 94:14 166:20

**Sugar** 12:23,24,25 13:8 14:15

**summer** 29:17,18,21 30:4,8,11,12 32:23 109:9,11 162:21,25

**Sunday** 36:17,21 37:6, 22 38:6,10,13,17 39:20,23 40:3 42:8,11 47:25 48:4,16,24 53:9, 16,23 54:2,12,23 59:20 60:4 61:11,17 62:2,4, 20 70:3,6,18 71:4 86:7 112:9

**Sundays** 47:17 48:6

**super** 17:24 134:24

**supervised** 29:15,23 30:1

**supervising** 31:14 113:7,12,23,24

**supervisor** 17:7 30:5,6, 7,10 32:1,22 48:13,14 73:23 113:13

**supervisors** 57:11

**support** 99:14,16

**suppose** 21:16 102:15 155:15

**supposed** 13:24 31:18 34:3,20 50:15 141:16, 22 143:9

**surprise** 127:19

**swept** 91:18,22 92:18

97:16 99:13,15,18,25

**sworn** 6:2

**system** 54:20 143:11 154:9,10 157:25

### T

**T-A-D-D** 17:5

**T-H-E-I-S-S** 9:13

**table** 83:13 168:10,17 169:5

**Tadd** 16:15 17:5,7 20:15 26:1,3,6 27:12, 14,18 29:24 30:6 31:14,23 32:21 34:16, 25 35:1,9,10,11,15,19 37:16,18,20,24 38:1,3, 24 39:25 40:7,13,19 41:2,8,14 42:16,19 43:6 44:2,4,6,7,15,17 45:20,25 46:2 47:2,5 48:8,12 50:15 51:6,23 52:5 53:13 54:10 56:13,24 58:1 71:19 73:21 74:4,8,22 75:14 79:14 80:17,20 81:18, 20,22,23 83:15,16 84:2 85:1,3,12,23,25 86:9 88:4,6,7 89:13 93:16, 23 113:7,12,23 115:10, 14,18 127:10 135:15 136:20 137:1,10

**Tadd's** 30:7,10,23 32:1 137:7 169:22 170:9

**taking** 32:21 37:18 44:18 170:23 172:12, 24 173:1

**talk** 8:14 12:4 52:16 65:7 66:4 68:25 71:1 85:16 96:12 98:5,20 99:21 102:24 127:22 166:22 169:14

**talked** 14:9 18:1 68:22 81:16,17 83:20 86:5 88:16 89:5 90:8 124:8 127:17 131:1 144:2

161:12 169:15 175:4, 19

**talking** 18:10 25:8 35:25 55:20 74:13 83:1 96:9,10 99:5 102:6,7, 16 112:24 119:6 152:10,18 155:21

**talks** 145:5

**Tammy** 36:2,3,4 38:18 44:17 48:2,25 50:11,21 52:16 53:19,24,25 54:7 56:6,20,24 58:4 61:8 69:23 72:12 73:3 83:2 104:15 112:14,18 113:2,6,11,22 115:15, 17 125:9 129:6 132:4, 7,11 133:20 135:8 136:13,24 137:12 141:9 144:15 147:2,25 153:22 154:1 156:19 158:7,16 168:24 170:4, 9 175:21 177:11

**Tammy's** 169:24

**tap** 122:16

**tapping** 83:24 122:12

**tasks** 117:10

**tear** 11:17,19

**tears** 69:14

**Technically** 76:10

**telling** 61:8 125:12 132:20 176:11

**tells** 123:13

**ten** 14:25 15:18 112:15 163:13

**terms** 76:1

**testified** 122:5,6 147:13

**testify** 6:3

**testimony** 110:1

**tests** 39:15

**testy** 12:7

**text** 38:3 86:12 111:20

137:7,10 169:23 170:9

**texts** 38:7,8 137:2

**Thanksgiving** 73:13 135:2

**Theiss** 9:11

**therapist** 125:19,22,25 126:1,3,6

**therapy** 86:18

**thing** 11:3 12:2 40:2 74:24 75:22 83:3,6 98:4 110:15 115:21 121:9 143:12,17 146:1 152:11 166:19 167:21

**things** 7:13 28:10 31:21 48:15 57:13 67:15,18, 20 83:17 90:4 91:13 101:17,24 102:11,16 110:21 119:17 120:8, 10 143:16 158:1,4,13 168:23 170:18,19

**thinking** 13:10 27:16 45:2 108:11,15,16,17, 19,20

**thinks** 143:17

**thought** 32:24 37:2 66:20 83:21 145:24 161:3 174:21 177:9

**throw** 171:18

**Thursday** 37:21 43:20 45:5 61:4,25 63:18 64:2,4 65:4 69:1 71:8 83:7,9 86:15 112:3

**time** 8:7,20 13:5 14:21, 24 15:20 16:5 18:22 19:9,10 20:24 22:21 25:6 27:17 35:17 38:9, 12 40:25 47:1 48:24 49:15,17,19,23 50:2 51:13 53:1,8,11,20,21 56:8 58:25 59:18 60:3 62:7,21 63:1,11,14 69:13 70:23 72:14 75:4 82:14 84:7 85:1 88:17 89:12,15 90:8 91:3

95:4,5 98:3,4 100:17, 20,21 101:13 103:21 104:12,24 105:25 106:5,18 109:2,3 110:4,7,10,13,25 111:8,14 112:13,16 113:5 117:9 118:10 123:20,25 127:14 128:11 131:15 132:20 134:8,9,14 139:17 148:20 151:4 153:9 156:23,24 162:23 163:8 164:23 166:25 167:1,8,10,14 172:11, 22 174:6 177:4

**timecard** 155:16

**timely** 155:25

**times** 27:6 38:1 62:7 87:12,20 95:8,24 105:18 109:25 110:16, 18 135:7 151:8

**timesheet** 36:13 63:11

**tiny** 134:11

**title** 131:13

**to-wit** 6:6

**today** 6:19 8:7,11 125:19 167:3,4,18 168:22 170:3,11 172:13

**told** 17:22 35:12,13 37:14 47:16,21,24 48:2,5,21,25 49:7,8,11, 15,17,22,23 50:3 51:3 52:5 55:14,17,23 56:3, 6,10,13,16 57:3,9,22 58:2 59:23 60:1 61:13, 20,23 63:1 65:25 67:4, 8,9 68:3,5,21 72:15,17, 23 74:4,23 75:14 77:13 80:15 81:23 82:5,12 83:3 84:4,6 85:15,16 86:14,25 91:18 97:11, 15 98:11 99:10 100:25 113:6,11,15,21 115:9, 25 127:14 129:4,7 135:8 136:13 140:1,15 141:6,8,9,24 144:3 145:12 146:2 148:6,12 149:20,21,23,25 150:13 154:3 156:17 158:11,13 165:17,18 169:4,12 177:16

**tool** 57:4

**top** 83:24 94:11 122:12 136:3 164:13

**touch** 74:25 75:4,6 76:8,17,20,21,25 77:1, 3,4,5,8,17 78:6,8,9,10, 14 79:12

**touched** 77:20 78:22 79:2,4 80:11 82:22 95:9,17,24 96:13,14,16 103:9 110:4 127:22

**touches** 77:2 80:4

**touching** 80:25 81:11 83:3 86:21 96:2,12 102:17

**training** 175:12,16

**transcribe** 7:6

**trash** 171:12

**treated** 94:25 96:6,8

**treating** 96:1

**tree** 74:3 106:9 109:5

**trees** 109:10

**trick** 39:16

**trip** 165:4

**True** 162:16

**truth** 6:3,4

**truthfully** 60:15

**Tuesday** 40:1 43:7,11, 12 44:16,18,21 47:9,19 49:8 50:25 62:20 69:22 70:22 73:1 115:2

**turn** 172:6

**turned** 54:7 74:17 75:13 78:19 92:3,10,11 113:3

**turning** 149:3

**turnover** 17:24

**turns** 104:23

**type** 7:6 133:18

**types** 120:11

## U

**Uh-huh** 10:14,16,18 34:10 41:25 46:12 54:13 55:22 67:23 78:16 82:3 98:18 100:23 119:9 120:25 155:2 160:19 164:1 170:14

**unaware** 48:3

**unclear** 11:10

**uncomfortable** 68:1 102:15 105:25 106:5 117:19,22,25 118:1 120:18,19,22 148:9 149:1 151:19,25 152:16

**understand** 7:23 18:8 22:16,18 23:18 25:5, 12,13 32:12 33:18,20 41:23 44:13 45:23 46:6,17 55:16 60:11,19 61:22 65:8 72:16 76:12,15,17 77:5,7 78:9 81:6 99:20 116:24 133:14,15 135:5 141:25 150:9,10 172:14

**understanding** 14:20 46:9 75:24 95:13 138:23 139:1,5 150:22

**understood** 8:5 135:19 155:12

**unemployment** 100:8 151:20 163:24 164:3,5

**unexpectedly** 100:4

**unlawful** 23:14 175:10

**unnecessary** 151:25

**unsafe** 141:19

**ups** 10:11

**upset** 65:21,23 67:5 88:8

## V

**vacation** 134:24

**vagina** 83:21 84:9,12, 22,25 110:7 122:13

**vague** 56:1

**Valentine's** 33:11 61:9 83:10 135:1,16

**Valentines** 31:7

**verbal** 92:11

**verbally** 51:24

**video** 54:15

**videos** 55:1

**visit** 130:19

**visited** 126:3

**voice** 7:18

**voluntarily** 117:10

## W

**wait** 77:11,24

**waiting** 154:6 156:21 157:1

**walk** 26:22 84:3 85:15 114:24

**walked** 83:19

**Walter** 12:15 13:4,9,11 14:13 15:1,5,13 16:21 17:11,18 20:12 23:8 29:4 30:13 31:17 32:4, 16 33:16 34:2 38:14 39:13 59:19 60:25 102:9 103:17 111:9 112:1 124:10 136:17 160:6 162:1 164:23

166:3 167:9,15 170:25 173:15 175:11,17 176:11

**wanted** 14:6 30:17,18 57:22 58:11 68:17 81:24 82:13 83:12 90:1 113:2 120:7 128:5 142:1,2,6 143:1,10 145:6 151:14 157:18 161:3 171:13

**warehouse** 31:22,23,24 46:1 54:25 109:9 119:15

**watched** 62:1

**watching** 54:9

**water** 8:22

**wedding** 15:19 163:6

**weddings** 10:12 162:13,22

**Wednesday** 51:10 53:12 62:21 115:8

**week** 14:19 15:15 19:2 34:14,16 37:1,5,20 47:13,14 63:12,25 64:2 71:8 86:10 117:6 135:2 138:17 162:7,10,19,21 163:12,13,16,18 167:17,18,19 168:17 171:3,4,6 172:12

**weekend** 26:13 34:12, 18,19,21 35:2,7 55:13 57:5,7,13 61:16 62:8, 23

**weekends** 15:3 27:23 34:9 49:1,2,11 56:3 59:10 72:3 117:11 151:12

**weeks** 135:1

**wet** 119:18

**whatnot** 171:7,14

**whatsoever** 136:17

**window** 20:18

**Winter** 162:13

**wintertime** 15:9

**wire** 172:1

**witnesses** 87:21,24 88:3

**woman** 95:19 107:2

**woman's** 96:17

**women** 96:1 102:11

**women's** 96:14 166:21

**word** 7:24 33:18 40:19 44:1,7 65:12 68:8 84:12 108:22 154:2

**words** 87:19

**work** 10:6,10 13:7,15, 25 14:6,8,19 15:15,18, 19 18:3,17,19 21:1,2,3, 5,6 25:9,10 29:5 31:22 33:6,8 34:5,9,11,12,16, 17,21,22 35:5,15,16,21 37:2,23 38:6,25 39:24 40:1,8 41:15 42:16 43:1,6,12 44:20 45:5,6 46:2 48:3,18 49:2,11 51:8 52:2,9 53:1,10 54:3,5,6,9,10 55:12,15 57:12 58:13 59:7 60:3, 7,25 61:4,5,7,11 62:4, 19 67:17 72:3 85:19 86:6,12 96:8,20 97:5, 20 100:5,6 111:12,24 115:22 116:9,12 118:5, 9 120:9,15 121:8,11, 18,22 122:1,9,21,23,24 123:2,5,9 124:10 125:13 131:18 132:24 136:23 137:8 138:18 139:10 141:19 143:19 144:6,8 145:11,22,23 147:7 152:2 159:9 162:15,18 173:18 176:12 177:6

**workday** 119:2

**worked** 14:14 20:15,25 29:3 31:24 33:16 36:14,20 38:17 57:8 59:4 61:15 63:15 88:17 93:16 103:17,21 115:2 124:5 130:5 148:15 149:9 164:23 174:6 175:5,16

**working** 10:3 12:15 13:3,9 15:18 16:21 21:4,9 26:13 27:13,23 28:11,17 29:9,14 35:11 37:6,9,11,12 38:9,13 53:17 54:2,17 57:5 59:20 61:17 62:22 70:3,6,17 71:17,21,25 82:24 93:9 102:9 111:9 119:16 147:9 151:12 162:6,10 163:20 173:25

**workplace** 67:18 69:21 91:23 145:15,17 147:16,19,21 177:12

**works** 43:18 60:20 61:3

**workshop** 30:14

**Worksite** 22:11

**worried** 61:24

**wrath** 48:17 92:23 93:1, 19 94:14,23

**write** 171:2 172:11

**writing** 51:24 144:1 150:1

**written** 171:21

**wrong** 47:15 65:22,24 67:9 102:22

**wrote** 172:10

Y

**yard** 14:6

**yards** 14:7

**year** 13:4 15:14 31:11 49:7 55:18 59:5 62:6 135:3 160:20

**years** 6:16 59:5 94:12 161:16

**Young** 173:13

**Younger** 6:8 16:13 21:13 23:4,24 24:20 28:22 29:1 33:23 36:9 39:6 46:6 56:2 57:17 60:18,23 62:17,19 63:7 72:9 77:11,16 78:5 98:16 104:1 105:19 106:1 110:3 122:6,19 124:2,15 125:5 126:16 130:13 131:23 133:4 135:23 137:25 147:15 157:12,18 159:25 168:5,8 173:7 175:24 176:4 177:21

Z

**zip** 9:14